# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORIS ANDERSON, et al., | Case No. 1:21-cv-01134-ADA-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING COUNTY DEFENDANTS' MOTION TO STRIKE, GRANTING IN PART AND DENYING IN PART THE OFFICER DEFENDANTS' MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART THE CFMG DEFENDANTS' MOTION TO DISMISS, GRANTING DEFENDANT HIG'S MOTION TO DISMISS, DENYING HIG'S MOTION TO STRIKE, AND GRANTING LEAVE TO FILE A SECOND AMENDED COMPLAINT |
| v. | |
| COUNTY OF FRESNO, et al., | |
| Defendants. | |
| | (ECF Nos. 25, 48, 49, 56) |
| | **OBJECTIONS DUE WITHIN TWENTY-ONE DAYS** |

## I.

## INTRODUCTION

Currently before the Court are Defendants' various motions to strike and dismiss that were referred to the assigned Magistrate Judge for the preparation of findings and recommendations.  In consideration of the moving, opposition, and reply briefs, the declarations and exhibits attached thereto, as well as the arguments presented at oral argument, the Court issues the following findings and recommendations recommending denying the County

Defendants' motion to strike, granting in part and denying in part the Officer Defendants' motion to dismiss, granting in part and denying in part the CFMG Defendants' motion to dismiss, granting Defendant HIG's motion to dismiss, denying HIG's motion to strike, and granting Plaintiffs leave to file a second amended complaint.

## II.

## BACKGROUND

### A.    Procedural Background

On July 23, 2021, Plaintiffs Doris Anderson, individually and as the successor in interest for the decedent Jah-Quavious Anderson, and James Jenkins, initiated this action.  (ECF No. 1.)  The action was filed against the County of Fresno ("County"), California Forensic Medical Group, ("CFMG"), HIG Capital LLC ("HIG"), Fresno County Sheriff-Coroner Margaret Mims ("Mims"), and Fresno Director of Public Health David Pomaville ("Pomaville").  (Id.)  On October 4, 2021, pursuant to the stipulation of the parties, the Court extended the time for all Defendants to file a responsive pleading; tolled the statute of limitations with respect to claims against Defendant Pomaville until the close of fact discovery in exchange for dismissal of Defendant Pomaville without prejudice; and continued the scheduling conference.  (ECF No. 13.)  On October 12, 2021, the Court dismissed Defendant Pomaville pursuant to a notice of dismissal.  (ECF No. 15.)

On November 2, 2021, the Court again continued the deadline to file responsive pleadings pursuant to the parties' stipulation.  (ECF No. 19.)  On December 1, 2021, Plaintiff filed a first amended complaint (the "FAC"), the operative complaint in this action.  (ECF No. 20.)  The FAC added Defendants Jami Carter ("Carter"), Chris Garcia ("C. Garcia"), Frank Ponce ("Ponce"), Moises Franco ("Franco"), Meng Cha ("Cha"), Linda Thao ("Thao"), Ka Her ("Her"), Anthony Sanchez ("A. Sanchez"), Rachel LeBoeuf ("LeBoeuf"), David Ventura ("Ventura"), Dillon Owens ("Owens"), Jose Alanis ("Alanis"), Jonathan Sanchez ("J. Sanchez"), Genevieve Garcia ("G. Garcia"), and Maria Guerrero ("Guerrero").  Summons were issued on December 6, 2021.  (ECF No. 22.)  On December 22, 2021, the Court granted a stipulated request extending the time for Defendants CFMG and HIG to respond to the first amended

complaint.  (ECF No. 24.)

On December 22, 2021, Defendants County and Mims (collectively the "County Defendants") filed a motion to strike portions of Plaintiffs' FAC.  (County Defs.' Mot. Strike ("Mot. Strike"), ECF No. 25.)[1]  Additionally on this same date, the County Defendants filed an answer.  (ECF No. 26.)  On January 18, 2022, Plaintiffs filed an opposition to the motion to strike.  (Pls.' Opp'n Mot. Strike ("Opp'n Strike"), ECF No. 30.)  On January 19, 2022, the Court granted a stipulated request to extend the time for CFMG and HIG to respond to the first amended complaint.  (ECF No. 31.)  On January 19, 2022, waivers of service were returned executed for G. Garcia, Guerrero, A. Sanchez, C. Garcia, Ventura, Owens, Ponce, Carter, J. Sanchez, Alanis, Her, Thao, Cha, Franco, and LeBoeuf.  (ECF Nos. 32-46.)  On January 25, 2022, the County Defendants filed a reply to the opposition to the motion to strike.  (County Defs.' Reply Opp'n Strike ("Reply Strike"), ECF No. 47.)

On February 14, 2022, HIG filed a motion to dismiss and motion to strike.  (Def. HIG's Mot. Dismiss ("HIG Mot."), ECF No. 48.)  On the same date, Defendants CFMG, G. Garcia, and Guerrero ("CFMG Defendants"), filed a motion to dismiss.  (Defs. G. Garcia, Guerrero, & CFMG's Mot. Dismiss ("CFMG Mot."), ECF No. 49.)  While the motions were initially set for hearing for March 15, 2022, then assigned District Judge Dale A. Drozd advised the parties that all civil motions set for hearing would be decided on the papers without a hearing.  (ECF No. 50.)  On March 1, 2022, Plaintiffs filed oppositions to both motions to dismiss.  (Pls.' Opp'n CFMG Mot. ("Opp'n CFMG"), ECF No. 51; Pls.' Opp'n HIG Mot. ("Opp'n HIG"), ECF No. 52.)  On March 7, 2022, the Court granted a stipulated request to extend the time for Plaintiffs to file reply briefs.  (ECF No. 54.)

On March 14, 2022, Defendants Carter, C. Garcia, Ponce, Franco, Cha, Thao, Her, Sanchez, LeBoeuf, Ventura, Owens, Alanis, and J. Sanchez (collectively the "Officer Defendants"), filed a motion to dismiss, setting the motion for hearing on April 19, 2022.

---

[1]  For ease of reference throughout this order, the Court will refer to the page number that is entered by the CM/ECF system into the parties' principal brief, not the parties' pagination, and use the generic abbreviations "Mot." "Opp'n" or "Reply" rather than "Mem." in referring to the principal briefing material, even if a separate memorandum of points and authorities.

1   (Officer Defs.' Mot. Dismiss ("Officer Mot."), ECF No. 56.)  Judge Drozd again informed the

2   parties that the motion would be decided on the papers.  (ECF No. 57.)

3       On March 21, 2022, replies were filed to the oppositions to both the HIG and CFMG

4   motions to dismiss.  (CFMG's Reply Opp'n CFMG ("CFMG Reply"), ECF No. 58; HIG's Reply

5   Opp'n HIG ("HIG Reply"), ECF No. 59.)  On March 28, 2022, Plaintiffs filed an opposition to

6   the Officer Defendants' motion to dismiss.  (Pls.' Opp'n Officer Mot. ("Opp'n Officer"), ECF

7   No. 60.)  On April 7, 2022, the Officer Defendants filed a reply brief.  (County Officer Defs.'

8   Reply Opp'n Officer ("Officer Reply"), ECF No. 61.)

9       On August 31, 2022, this action was reassigned to District Judge Ana de Alba.  (ECF No.

10  65.)  On September 12, 2022, the District Judge referred the County Defendants' motion to strike

11  (ECF No. 25), Defendant HIG's motion to dismiss & strike (ECF No. 48), Defendants CFMG,

12  G. Garcia, and Guerrero's motion to dismiss (ECF No. 49), and the County Officer Defendants'

13  motion to dismiss (ECF No. 56), to the assigned Magistrate Judge for the preparation of findings

14  and recommendations and/or other appropriate action.  (ECF No. 67.)  On September 14, 2022,

15  the Court set the motions for hearing for October 5, 2022.  (ECF No. 69.)  On September 20,

16  2022, pursuant to the parties' stipulation, the Court continued the hearing until November 2,

17  2022.  (ECF No. 71.)

18      On November 2, 2022, the Court held the initial hearing on the motions.  (ECF No. 72.)

19  John Burton appeared on behalf of Plaintiffs.  Brande Gustafson, Jemma Saunders, Evelina

20  Gentry, and Ellen Robbins appeared on behalf of the Defendants.  Pursuant to the matters

21  discussed at the initial hearing, the parties agreed to file a stipulation regarding the particular

22  claims against specific Defendants by November 9, 2022, and the Court continued the hearing on

23  the motions until November 16, 2022.  (ECF No. 72.)

24      On November 9, 2022, Plaintiffs and Defendant CFMG filed a stipulated agreement to

25  "jointly request to dismiss Plaintiffs' sixth claim for relief, brought under Title II of the

26  Americans with Disabilities Act, against CFMG with leave to amend their Complaint to allege a

27  claim for relief under Title III of the Americans with Disabilities Act instead," and proffering

28  that Plaintiffs will amend the complaint after the Court has ruled on the pending motions to

1   dismiss.  (ECF No. 74.)  HIG did not join in the stipulation, and proffered at the hearing that it

2   declined to join in the stipulation pending the Court's rulings on the pending motions.

3       On November 16, 2022, a second hearing on the pending motions was held.  (ECF No.

4   75.)  John Burton appeared on behalf of Plaintiffs.  Brande Gustafson, Peter Bertling, Evelina

5   Gentry, and Ellen Robbins appeared on behalf of the Defendants.

6       **B.      Complaint Allegations and Stipulation Clarifying Claims against Defendants**

7       The operative complaint is the first amended complaint filed on December 1, 2021.  (ECF

8   No. 20.)  Twenty-nine-year-old Jah-Quavious ("Quabo") Anderson (hereinafter, "Mr. Anderson"

9   or "Decedent"), suffered from a chronic seizure disorder that he successfully controlled with

10  medication and by avoiding seizure triggers, including undue heat.  (FAC ¶¶ 1, 26-27.)  On June

11  22, 2020, Mr. Anderson arrived at Fresno County Jail.  (Id. at ¶¶ 28-29.)  At the time, CFMG

12  contracted with the County of Fresno to provide healthcare services to inmates.  (Id. at ¶ 13.)

13  During his intake, Mr. Anderson informed the medical staff about his history of epilepsy.  (Id. at

14  ¶ 29.)  Because this was not Mr. Anderson's first incarceration, CFMG employees had access to

15  Mr. Anderson's prior medical history, including documentation that reflected his condition and

16  needs for medication and housing in a well-ventilated, air-conditioned physical environment.

17  (Id. at ¶¶ 27, 29.)

18      It reached 103°F in Fresno on the day Mr. Anderson arrived at the Jail.  (Id. at ¶ 30.)  The

19  temperature the day before reached 104°F.  (Id.)  Despite Mr. Anderson's medical history and

20  need for a well-ventilated, air-conditioned physical environment, CFMG employees and jail staff

21  housed him in general population in a cell that faced the sun, instead of in a medical ward with

22  the ventilation and air conditioning necessary for someone with his condition.  (Id. at ¶¶ 2, 29,

23  30.)

24      Mr. Anderson complained to at least five officers that his cell was intolerably hot, putting

25  him at an increased risk for seizures and asked to be moved to a cooler cell.  (Id. ¶¶ 2, 31, 33-34.)

26  Mr. Anderson filled out an Inmate Request form, in which he stated, "I have a seizure disorder

27  (epilepsy) and heat triggers my seizures.  I was placed in a cell that is extremely hot and would

28  like to be swapped or moved cells.  I'm getting hot flashes 'symptoms of on coming seizure.' "

1   (Id. ¶ 31.)

2       During the early hours of June 24, 2020, Mr. Anderson's cellmates woke up to Mr.

3 Anderson having a severe seizure.  (Id. ¶ 36.)  They used the emergency intercom to request

4 help.  (Id.)  Jail officers arrived at Mr. Anderson's cell and asked CFMG medical staff to

5 respond.  (Id. ¶ 38.)  G. Garcia and Guerrero, registered nurses employed by CFMG, arrived in

6 response to that call.  (Id. ¶¶ 15, 38.)  The custody staff and nurses dismissed the seizure

7 diagnoses and incorrectly attributed the symptoms to drugs or excited delirium.  (Id. ¶¶ 2, 38.)

8       For approximately 25 minutes after officers were first notified of the seizure, custodial

9 staff, and nurses Guerrero, and G. Garcia, aggravated Mr. Anderson's condition by continuously

10 moving and trying to restrain him, first in a device that is used to evacuate people with physical

11 disabilities and then in a disciplinary restraint chair, rather than a medical gurney.  (Id. ¶¶ 2, 38-

12 40.)  Mr. Anderson stopped breathing.  (Id. ¶ 41.)  At that point, paramedics were called—25

13 minutes after Mr. Anderson began continuously seizing.  (Id. ¶¶ 39, 40-41.)  Mr. Anderson was

14 pronounced dead shortly upon arriving at the hospital.  (Id. ¶ 41.)

15       The FAC alleges twelve causes of action against nineteen defendants for the death of Mr.

16 Anderson: (1) Fourteenth Amendment claim for deliberate indifference to serious medical needs

17 pursuant to 42 U.S.C. §1983[2]; (2) Fourth Amendment excessive force claim pursuant to 42

18 U.S.C. §1983; (3) Fourteenth Amendment claim for failure to protect from harm pursuant to 42

19 U.S.C. §1983; (4) Fourteenth Amendment substantive due process claim for deprivation of the

20 right to familial relationship pursuant to 42 U.S.C. §1983; (5) Monell liability claim pursuant to

21 42 U.S.C. §1983; (6) a claim under Title II of the Americans with Disabilities Act, 42 U.S.C.

22 §12131, et seq. (the "ADA"); (7) a claim pursuant to the Rehabilitation Act; (8) failure to

23 furnish/summon medical care; (9) wrongful death; (10) negligence; (11) Bane Act claim,

24 California Civil Code §52.1; and (12) battery.

25       As agreed to by stipulation following the initial hearing, the parties have clarified which

26

27

28 [2]  As relevant to the motion to dismiss by County Officer Defendants, while in the caption page the claim only references the Fourteenth Amendment, the body of the complaint brings the first cause of action for deliberate indifference to serious medical need in violation of both the Eighth and Fourteenth Amendments.  (FAC at p. 14.)

Defendants each of the causes of action apply to.  (ECF No. 73.)  This is relevant to the Defendants' arguments below that Plaintiffs have engaged in "shotgun" pleading, and their motions to dismiss arguing Plaintiffs have insufficiently identified which Defendants each claim apply to.

The Court shall now summarize the applicability of the claims to each of the Defendants, as based on the parties' filed stipulation.  (ECF No. 73.)  Further as noted above, Plaintiffs and Defendant CFMG filed a stipulated agreement to dismiss Plaintiffs' sixth claim for relief, brought under Title II of the Americans with Disabilities Act, against CFMG with leave to amend their Complaint to allege a claim for relief under Title III of the Americans with Disabilities Act instead.  (ECF No. 74.)  HIG did not join in the stipulation, and proffered at the hearing that it declined to join in the stipulation pending the Court's rulings on the pending motions.

The following causes of action are brought against Defendant County of Fresno: (5) Monell; (6) ADA; (7) Rehabilitation Act; (8) failure to furnish medical care; (9) wrongful death; (10) negligence; (11) Bane Act; and (12) battery.

The only cause of action against Sheriff Mims is the fifth cause of action for Monell liability.

The following causes of action are brought against Defendants Carter and Franco: (1) Fourteenth Amendment deliberate indifference to serious medical need; (3) Fourteenth Amendment failure to protect from harm; (4) Fourteenth Amendment substantive due process and deprivation of right to familial relationship; (8) failure to furnish medical care; (9) wrongful death; (10) negligence; and (11) Bane Act.

The following causes of action are brought against Defendants C. Garcia, Ponce, Cha, Thao, Her, A. Sanchez, LeBoeuf, and Alanis: (1) Fourteenth Amendment deliberate indifference to serious medical need; (2) Fourteenth Amendment excessive force; (3) Fourteenth Amendment failure to protect from harm; (4) Fourteenth Amendment substantive due process and deprivation of right to familial relationship; (8) failure to furnish medical care; (9) wrongful death; (10) negligence; (11) Bane Act; and (12) battery.

1   The following causes of action are brought against Defendants Ventura, Owens, and J.
2   Sanchez: (1) Fourteenth Amendment deliberate indifference to serious medical need; (3)
3   Fourteenth Amendment failure to protect from harm; (4) Fourteenth Amendment substantive due
4   process and deprivation of right to familial relationship; (9) wrongful death; (10) negligence; and
5   (11) Bane Act.

6   The following causes of action are brought against Defendants CFMG and HIG: (5)
7   Monell liability; (6) ADA, though stipulated to dismiss with leave to amend; (7) Rehabilitation
8   Act; (9) wrongful death; and (10) negligence.

9   The following causes of action are brought against the Defendants G. Garcia and
10  Guerrero (the "Nurse Defendants"): (1) Fourteenth Amendment deliberate indifference to serious
11  medical need; (2) Fourteenth Amendment excessive force; (3) Fourteenth Amendment failure to
12  protect from harm; (4) Fourteenth Amendment substantive due process and deprivation of right
13  to familial relationship; (9) wrongful death; and (10) negligence.

## III.

## LEGAL STANDARD

### A.     Motion to Strike

17  "The court may strike from a pleading an insufficient defense or any redundant,
18  immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).   A motion to strike may
19  be granted where "it is clear that the matter to be stricken could have no possible bearing on the
20  subject matter of the litigation." Wilkerson v. Butler, 229 F.R.D. 166, 170 (E.D. Cal. 2005)
21  (quoting LeDuc v. Kentucky Central Life Ins. Co., 814 F.Supp. 820, 830 (N.D.Cal.1992)).   The
22  function of a "motion to strike is to avoid the expenditure of time and money that must arise
23  from litigating spurious issues by dispensing with those issues prior to trial." Wilkerson, 229
24  F.R.D. at 170 (quoting Sidney–Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir.1983)).

25  "Granting a motion to strike may be proper if it will make the trial less complicated, or if
26  the challenged allegations are so unrelated to plaintiff's claims as to be unworthy of any
27  consideration as a defense and whose presence in the pleading will be prejudicial to the moving
28  party." Garcia ex rel. Marin v. Clovis Unified Sch. Dist., No. 1:08-CV-1924 AWI SMS, 2009

1  WL 2982900, at *23 (E.D. Cal. Sept. 14, 2009).  However, motions to strike "should not be
2  granted unless it is clear that the matter to be stricken could have no possible bearing on the
3  subject matter of the litigation."  Neveau v. City of Fresno, No. 104CV06490OWWJLD, 2005
4  WL 8176468, at *7 (E.D. Cal. Oct. 17, 2005) (quoting Colaprico v. Sun Microsystems, Inc., 758
5  F. Supp. 1335, 1339 (N.D. Cal. 1991)).

6      "Motions to strike are disfavored and infrequently granted."  Nat. Res. Def. Council v.
7  Kempthorne, 539 F. Supp. 2d 1155, 1162 (E.D. Cal. 2008); see also Neilson v. Union Bank of
8  California, N.A., 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003) ("Motions to strike are generally
9  regarded with disfavor because of the limited importance of pleading in federal practice, and
10  because they are often used as a delaying tactic.").  "Where allegations, when read with the
11  complaint as a whole, give a full understanding thereof, they need not be stricken."  LeDuc v.
12  Kentucky Cent. Life Ins. Co., 814 F. Supp. 820, 830 (N.D. Cal. 1992) (citing Bloombury
13  Woolen Co. v. Moosehead Woolen Mills, 109 F. Supp. 804, 806 (D. Me. 1953)).  "Under the
14  liberal federal pleading rules notice and clarity of claims is all that is required."  LeDuc, 814 F.
15  Supp. at 830 (citing Colaprico, 758 F. Supp. at 1337).

16      **B.     Motion to Dismiss**

17      Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on
18  the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A
19  motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro
20  v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations
21  of material fact are taken as true and construed in the light most favorable to the nonmoving
22  party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading
23  standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual
24  allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me
25  accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.
26  Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-
27  pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However,
28  "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." <u>Id.</u> at 678.  To avoid a dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570.

In deciding whether a complaint states a claim, the Ninth Circuit has found that two principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief. <u>Starr</u>, 652 F.3d at 1216.  "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." <u>Navarro</u>, 250 F.3d at 732 (citing <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir.1988)).

Courts freely grant leave to amend a complaint which has been dismissed.  <u>See</u> Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."); <u>Lopez v. Smith</u>, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

## IV.

## DISCUSSION

The following motions are before the Court: (A) the County Defendants' motion to strike references to the 2015 Consent Decree issued in <u>Hall v. County of Fresno</u>, case no. 1:11-cv-02047-LJO-BAM ("<u>Hall</u>"); (B) the Officer Defendants' motion to dismiss various causes of action; (C) CFMG and the Nurse Defendants' motion to dismiss various causes of action; and (D) HIG's motion to dismiss causes of action five, six, seven, nine, and ten, and motion to strike the request for punitive damages.  The Court proceeds to discuss each of the respective motions

1  in turn.

2  **A.  The County Defendants' Motion to Strike References to Consent Decree**

3  The factual allegations in Plaintiffs' complaint begin with a section entitled: "Fresno

4  County Jail's History of Inadequate Correctional and Medical Care."  (FAC at p. 7.)   In this

5  section, Plaintiffs cite to and mention a 2015 consent decree that was reached in <u>Hall v. County</u>

6  <u>of Fresno</u>, case no. 1:11-cv-02047-LJO-BAM (the "Consent Decree").  Plaintiffs also cite to and

7  mention a remedial plan, which was created pursuant to the Consent Decree (the "Remedial

8  Plan").  (FAC ¶¶ 23-25.)  The County Defendants argue this is improper as the Consent Decree

9  contains a provision restricting the "use" of the Consent Decree.  County Defendants further

10  argue reference to the material is immaterial, impertinent, and unduly prejudicial, thus subject to

11  the motion to strike.

12  1.  <u>The Hall Action and Consent Decree Terms</u>

13  On December 13, 2011, a class-action and request for injunctive and declaratory relief

14  was filed against Sheriff Margaret Mims, among other defendants, and the County of Fresno was

15  eventually substituted in Mim's place.  (<u>Hall</u>, ECF Nos. 1, 56.)  In <u>Hall</u>, the class was approved

16  as: "all prisoners who are now, or will in the future be, confined in the Fresno County Jail."  (<u>See</u>

17  <u>Hall</u>, ECF Nos. 175 at 12; 179.)

18  County Defendants proffer the first amended complaint in <u>Hall</u> alleged that the conditions

19  in the Fresno County Jail violated the constitutional and statutory rights of all prisoners who

20  were or will be housed in the jail; that the parties agreed to a process whereby experts would

21  inspect the jail and issue reports and recommendations; that based on those recommendations,

22  the parties engaged in extensive settlement negotiations and executed the Consent Decree in May

23  of 2015; that as part of the Consent Decree, the parties agreed to a detailed Remedial Plan that

24  the County of Fresno was responsible for implementing; and the Remedial Plan covered all the

25  substantive areas in dispute such as health care, personal safety, and disability discrimination.

26  (Mot. Strike 3.)

27  Paragraph 22 of the Consent Decree states: "Neither the fact of this Consent Decree nor

28  any statements of claims contained herein shall be used in any other case, claim, or

11

administrative proceedings, except that Defendant and its employees and agents may use this Consent Decree and any statement contained herein to assert issue preclusion or *res judicata*." (See ECF No. 30-1 at 55.)[3]

County Defendants contend paragraphs 23, 24, 25, and 85(a)-(b) of the FAC contain statements that are immaterial, unduly prejudicial, and not relevant or germane to the underlying factual issues in the complaint. County Defendants argue such information adds nothing to the case; does not change or enhance any cause of action; provides no redeeming benefit to the complaint or Plaintiffs' allegations; and the mentioning of the Consent Decree or Remedial Plan in these paragraphs violates a court order. (Mot. Strike 4-5.)

Plaintiffs respond County Defendants essentially focus solely on paragraph 22 of the Consent Decree, but fail to show that Plaintiffs have "used" the decree in a prohibited manner, equating "mentioning" the Consent Decree and Remedial Plan to a prohibited "use." (Opp'n Strike 5.) Plaintiffs suggest the most relevant definitions of the word "use" in the *Merriam-Webster Dictionary* are "to put into action or service" or "to carry out a purpose or action by means of," and that *Black's Law Dictionary* provides a similar definition: "[t]o employ for the accomplishment of a purpose; to avail oneself of." (Decl. Hanna Chandoo Supp. Opp'n Strike ("Chandoo Decl."), Ex. 7, ECF No. 30-1 at 133; *Use*, Black's Law Dictionary (10th ed. 2014).) Plaintiffs argue the express references in the Consent Decree to collateral estoppel and *res*

---

[3] Defendant makes a request for judicial notice of the (A) the Consent Decree, docket entry 112-1 in the Hall action; (B) the findings and recommendations recommending granting final approval of the class action settlement in Hall, docket entry 175 in Hall; (C) the order adopting the findings and recommendations granting approval of the class action settlement, docket entry 179 in Hall; and (D) the entry of judgment, docket entry 180 in Hall. (See ECF No. 25-2 at 2.) However, the County Defendants failed to attach the Consent Decree to their request for judicial notice, and instead appear to have mistakenly attached the motion for preliminary approval of the class action settlement, docket entry 112 in Hall, but did not attach the Consent Decree that was attached as docket entry 112-1. (See ECF No. 25-2 at 2.) Nonetheless, the Plaintiffs attached the correct document to their opposition (ECF No. 30-1 at 45), did not object to the request for judicial notice, and presented substantive defenses to the County Defendants' arguments despite the document not being attached. The Court has additionally accessed the referenced documents through the Court's electronic record system. Accordingly, the Court shall take judicial notice of docket entries 112-1, 175, 179, and 180, entered in the Hall action, case number 1:11-cv-02047-LJO-BAM. Under the Federal Rules of Evidence, a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken "of court filings and other matters of public record." Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); Lee, 250 F.3d at 689; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Bennett v. Medtronic, Inc., 285 F.3d 801, 802 n.2 (9th Cir. 2002).

*judicata* make clear that the purpose of any prohibited "use" would involve the re-litigation of claims and issues that arose in <u>Hall</u> and that Plaintiffs have not "used" the decree in this prohibited manner.  (Opp'n Strike 11.)  Instead, Plaintiffs proffer they include references to the Consent Decree and Remedial Plan to show that those Defendants with exposure to <u>Monell</u> liability had actual notice of the precise deficiencies in the Jail's system that caused Mr. Anderson's death.  Plaintiffs contend Defendants had actual notice that their policies and procedures were deficient; allege Defendants were deliberately indifferent by failing to remediate those deficient policies and procedures that led to Mr. Anderson's death; and by underscoring Defendants' actual notice, argue the Consent Decree enhances the plausibility of Plaintiffs' pleading and, therefore, should not be stricken.

In that regard, Plaintiffs also argue the Consent Decree highlights Fresno County Jail's long history of providing inadequate care to its residents and provides critical background information regarding jail policies that relate to Mr. Anderson's death.  Plaintiffs emphasize they have not asked the Court or a jury to draw any conclusions regarding whether the practices and procedures in the decree were followed with respect to Mr. Anderson, nor could Plaintiffs ask the Court to make any such determination at this stage.  Given the "limited importance of pleading in federal practice," <u>Neilson</u>, 290 F. Supp. 2d at 1152, and the liberal allowance for background information in pleadings in order to "give a full understanding" of the complaint, <u>LeDuc</u>, 814 F. Supp. at 830, Plaintiffs argue Defendants' motion should be denied.  (Opp'n Strike 11.)  Plaintiffs submit County Defendants were on notice their policies and procedures were deficient; the existence of the Consent Decree and Remedial Plan establish exactly that; and unfortunately, Mr. Anderson's death means remediation has fallen short.

County Defendants reply that not only have Plaintiffs violated a court order by citing to the Consent Decree itself, but they *are* trying to relitigate claims contained therein, in violation of paragraph 22.  Specifically, they suggest Plaintiffs' arguments that the Consent Decree highlights the County Jail's history of providing inadequate care, and that the Consent Decree supports demonstrating notice of deficiencies in the policies and procedures to show deliberate indifference, are actually claims that are part of the Remedial Plan and have thus already been

litigated.  Further, County Defendants argue that while Plaintiffs claim they are not asking the Court or a jury to draw conclusions regarding whether the practices and procedures in the decree were followed with respect to Mr. Anderson, to prove their allegations that County Defendants are not complying with the Consent Decree and/or Remedial Plan, Plaintiffs will likely seek discovery into the Consent Decree which is strictly forbidden since the decree is still in effect. See Herrera v. Cnty. of Fresno, No. 118CV01297AWIEPG, 2019 WL 1284489, at *2 (E.D. Cal. Mar. 20, 2019) ("[T]he Court finds that ¶ 22 of the consent decree precludes the Court from compelling Defendants to respond.").[4]

Based on a plain reading of the provision, the Court is somewhat hesitant to ascribe Plaintiffs' restrictive meaning to the term "use" as it appears the exclusion for the defendants there to cite *as needed* for estoppel or *res judicata*, appears to have been the *only intended* permitted "use" of the Consent Decree, and does not necessarily mean "use" only pertains to re-litigation of the same issues and claims that arose in the Hall action.  On the other hand, a restrictive meaning narrowly applied to litigation-type restrictions is reasonable and practical, as it does not make sense to the Court to ascribe a broad meaning to the term "use" on a public court document.  The document is not sealed, and thus without a more precise definition of the word use, it *is* reasonable to ascribe a more narrow meaning to the use of such public court document, and that purports to cover such a large class of jail inmates, including future inmates, who would not be aware or provided notice of such inclusion,

While the word "use" is not separately defined within the Consent Decree, the duration is

---

[4]  The discovery requests at issue in Herrera were as follows:

Plaintiffs move to compel Defendants to respond to Plaintiffs' discovery requests related to a consent decree entered in the case of *Hall v. County of Fresno*, Case No. 1:11-cv-02047-LJO-BAM (E.D. Cal.). Those discovery requests are the following:

• RFP 12: "All DOCUMENTS that discuss or refer to compliance OR non-compliance with THE consent decree...."
• Interrog. 9: "Describe YOUR efforts to comply with the terms of the consent decree ...."
• RFA 1: "Admit that YOU are currently in violation of the terms of the consent decree.... "
• RFA 2: "Admit that YOU have not hired 127 correctional officers since the execution of the Consent Decree, as required by § IV.A.1 of the remedial plan attached as Appendix A to the Consent Decree (the "Remedial Plan").

Herrera, 2019 WL 1284489, at *1.

1    of the Consent Decree is defined.  Plaintiffs argue the Consent Decree has expired under its

2    durational provision, which provides: "The duration of this Consent Decree is four years from

3    the date this Consent Decree is entered by the Court, unless the court earlier determines that

4    Defendant is in substantial compliance with the Remedial Plan or, subject to the dispute

5    resolution process in Paragraph 18 that this time period shall be extended as to any provision of

6    this Consent Decree with which parties or the Court's expert(s) reasonably determine that

7    Defendant is not in substantial compliance for so long as substantial non-compliance persists."

8    (Consent Decree ¶ 20.)

9        The Consent Decree was entered on October 30, 2015.  (See ECF No. 25-2 at 32.)  Four

10   years from the date the Consent Decree was entered, was October 30, 2019, approximately eight

11   months before Mr. Anderson's death that occurred on June 24, 2020.  Plaintiffs emphasize

12   County Defendants attempt to bring this motion more than two years after that expiration date

13   without showing the Consent Decree is still operative or its term has been extended, noting the

14   docket in Hall shows that the durational term was never modified.  Plaintiffs argue no other court

15   has decided whether the Consent Decree remained operative after October 30, 2019, and the only

16   case that addresses the duration term the decision on a discovery motion in Herrera, which

17   Plaintiffs highlight relied on the duration term in denying the motion, and the decision issued

18   within the duration period described in the decree.  Thus, Plaintiffs submit that Herrera is

19   distinguishable.

20       Defendants reply that Paragraph 22 does not contain a limit as to time, and even if it did,

21   paragraph 22 would still be applicable in the instant matter because the Consent Decree is still in

22   effect.  (Reply Strike 2.)  In this regard Defendant presents the following argument in briefing,

23   which the Court excerpts in full to showcase the somewhat confusing editing of the language to

24   attempt to fit their interpretation:

25           Paragraph 20 of the Consent Decree does not restrict its duration to
             only four years.  Rather, paragraph 20 provides that "[t]he duration
26           of this Consent Decree is four years from the date this Consent
             Decree is entered by the Court…..**or the Court's expert(s)**
27           **reasonably determine that Defendant is not in substantial**
             **compliance for so long as substantial non- compliance exists**."
28           (emphasis added) The County of Fresno has yet to receive an

1
2
3

> opinion from the Court's experts designating all sections of the Remedial Plan as being in substantial compliance. Without receiving an order designating all provisions as being in substantial compliance, the Consent Decree is still in effect. *See Declaration of Daniel Cederborg, Esq.*, paras 3-5.

4 (Reply Strike 3 (emphasis added by Defendants).)  The Court finds the argument confusing as

5 the conclusory declaration appears to reinforce the Plaintiffs' and the Court's own interpretation

6 of the plain meaning of the durational provision:

7
8
9

> Paragraph 20 of the Consent Decree indicates that the duration of this Consent Decree is four years from the date this Consent Decree is entered by the Court, unless the Court's expert(s) reasonably determine that Defendant is not in substantial compliance for so long as substantial non-compliance persists.

10
11

> At present, the County of Fresno has yet to receive an opinion from the Court's experts designating all sections of the Remedial Plan as being in substantial compliance.

12

> Therefore, the Consent Decree is still in effect.

13 (Decl. Daniel Cederborg Supp. Reply Strike ("Cederborg Decl."), ¶¶ 4, 5, ECF No. 47-1 at 1.)

14     The Court is perplexed why counsel would present an argument based on an incomplete

15 recitation of the provision.  The Court finds it useful to take the clauses in turn.  First,"[t]he

16 duration of this Consent Decree is four years from the date this Consent Decree is entered by the

17 Court."  This is then qualified by: "unless the court earlier determines that Defendant is in

18 substantial compliance with the Remedial Plan," or alternatively, "subject to the dispute

19 resolution process in Paragraph 18 that this time period shall be extended as to any provision of

20 this Consent Decree with which parties or the Court's expert(s) reasonably determine that

21 Defendant is not in substantial compliance for so long as substantial non-compliance persists."

22     Thus, the baseline period is four years, unless the Court determines it should be shortened

23 due to substantial compliance, or should be extended due to not being in substantial compliance.

24 County Defendants concede Plaintiffs are correct the docket in <u>Hall</u> does not show that the

25 duration term was ever modified, but argue it is significant that it also does not show an order, or

26 opinion has been issued from the Court's experts designating all provisions of the Remedial Plan

27 as being in substantial compliance.  (Reply 3.)  This is not convincing, as to the Court, County

28 Defendants' proffer in this regard leads to a finding that the default four-year period has expired

1    under the plain reading of the provision.  The Court emphasizes the word "plain." If Defendants

2    meaning were intended then that could be "plainly" inserted.

3          Therefore, based on the plain language of the durational term provision, the record in

4    Hall, and the parties' arguments, the Court concludes the Consent Decree was no longer in effect

5    four years after it was entered, or October 30, 20219.

6          The Court also considers whether paragraph 22's "use" restriction is subject to the

7    durational provision.  First the Court finds language in the Consent Decree that weighs in favor

8    of finding the restriction in paragraph 22 to not be applicable to Mr. Anderson, at least as applied

9    to his time in Fresno County Jail in June of 2020.  The class as defined in the Consent Decree is

10   as follows: "The plaintiff class consists of all prisoners who are now, or at some time in the

11   future **during the terms of this Consent Decree** are, incarcerated in the Fresno County Jail."

12   (Consent Decree ¶ 6 (emphasis added).)

13         Second, there is language that weighs in favor of finding the Court no longer has

14   jurisdiction to enforce the terms of the Consent Decree, which lends to finding the use restriction

15   is no longer in effect.  Specifically, the lone provision pertaining to enforcement provides that:

16   "The Court shall **retain jurisdiction to enforce the terms** of this Consent Decree, and shall

17   have the power to enforce the agreement through specific performance and all other remedies

18   permitted by law **throughout the duration** of this Consent Decree."  (Consent Decree ¶ 19

19   (emphasis added).)

20         Thus, in consideration of the plain meaning of the relevant provisions, the absence of a

21   separate definition of "use" or a separate durational term as applied to paragraph 22, the Court

22   finds the use restriction provision no longer operative, and additionally that Mr. Anderson would

23   not have been a member of the class when he entered the Fresno County Jail in June of 2020.

24   Therefore, based only on the existence of and the terms of the Consent Decree, the fact it is not

25   sealed, and that Mr. Anderson does not appear to be a member of the class under the terms of the

26   Consent Decree, at least as to his last interaction with the jail, the Court recommends denying the

27   County Defendants' motion to strike.

28   / / /

2.     Whether the References are Immaterial, Impertinent, or Unduly Prejudicial

Defendant seeks to strike the following language from the complaint:

> **Paragraph 23, pg. 6:16-26:** "Also in 2011, the Prison Law Office filed a class action lawsuit against Defendant Mims and then-Public health Director Edward Moreno alleging a 'policy and practice of failing to prescribe medically necessary medications, including for…seizure disorders' at Fresno County Jail. The lawsuit further alleged 'a policy and practice of failing to adequately identify and treat the health care problems of newly arriving prisoners during the screening and intake process' and 'insufficient health care staffing to provide adequate health care to prisoners.' In 2015, a consent decree was reached in that case. The remedial plan created pursuant to the consent decree required that "[r]estraints shall not be used for medical purposes' and that '[t]he Sheriff's Office and medical staff shall communicate to determine appropriate housing for inmates with disabilities. Medical staff shall make available all information needed to make adequate housing decisions.' Defendants were aware of and disregarded these policies, resulting in Mr. Anderson's unnecessary suffering and death."

> **Paragraph 24, pg. 6:27-28:** "The remedial plan further required that the County increase its correctional staff by 127 employees. On information and belief, the County has failed to meet this requirement. "

> **Paragraph 25, pg. 7:1-6:** "The surge in inmate deaths at Fresno County Jail, and specifically the death of Mr. Anderson, are a direct result of constitutionally inadequate policies and practices implemented by Defendants County of Fresno, Sheriff-Coroner Mims, and CFMG/Wellpath that fail to comply with the remedial plan and limit information sharing between medical and custodial staff. State Audit Howle found that the Fresno County jail system lack sufficient sharing regarding inmates, which hinders their ability to make critical housing and care decisions to keep inmates safe."

> **Paragraph 85, pg. 18:3-9 (subsections a & b):** "These inadequate policies, procedures, and practices include, but are not limited to: a) Defendants failed to staff the Jail with sufficient numbers of qualified, competent, and appropriately-supervised medical staff to provide adequate medical care to inmates; b) Defendants failed to staff the Jail with sufficient numbers of qualified, competent, and appropriately-supervised custodial staff to provide adequate supervision and care to inmates."

(Mot. Strike 5-6.)

Defendants argue the above referenced paragraphs state various allegations that either cite, refer to, or allege that Defendants are not complying with the Consent Decree and/or Remedial Plan, again relying on the use restriction in paragraph 22 of the Consent Decree, and

language in these paragraphs are immaterial, impertinent, unduly prejudicial and not relevant to the underlying facts and allegations in this case.  County Defendants argue striking these materials is proper as it "will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues."  Sliger v. Prospect Mortg., LLC, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011).  Defendant submits the references are immaterial under Federal Rule of Civil Procedure 12(f), because the matter has no bearing on the controversy before the court.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993) ("Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.") (quotation marks and citations omitted).[5]

Plaintiffs respond the Consent Decree and Remedial Plan provide information regarding jail policies and procedures that are relevant to Mr. Anderson's death, including, for example, policies regarding the use of restraints and restraint chairs, and show Defendants had notice of the deficiencies in their procedures and standard of care.  Assuming the Court's findings above pertaining to the use restriction contained in paragraph 22 of the Consent Decree above are adopted, the legal standards underlying motions to strike accordingly support Plaintiffs' position, and weigh in favor of denying the motion to strike.  The Court agrees with Plaintiffs that County Defendants do not clearly demonstrate how they will be unduly prejudiced by the references to the Consent Decree and the Remedial Plan given both are publicly available documents that provide relevant background information and could show County Defendants were on notice of deficiencies that a jury could determine led to Mr. Anderson's death.  See In re Facebook PPC Advert. Litig., 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010) ("Plaintiffs allege that the statements relate to the complaints of 'absent Class members' and that Defendant is not prejudiced by allegations that are found on a public website . . . Defendant does not allege that it will suffer any specific undue prejudice, arguing only that the statements are hearsay and minimally probative [which] is insufficient to demonstrate undue prejudice."); Oracle Am., Inc. v. Micron Tech., Inc., 817 F. Supp. 2d 1128, 1132 (N.D. Cal. 2011) ("A court must deny the motion to strike if there is

---

[5]  County Defendants' briefing contains an incorrect citation to Fantasy v. Fogerty.  (See Mot. Strike 6.)

1    any doubt whether the allegations in the pleadings might be relevant in the action."); Sanchez v.

2    City of Fresno, 914 F. Supp. 2d 1079, 1122 (E.D. Cal. 2012) ("Immaterial matter is 'that which

3    has no essential or important relationship to the claim for relief or the defenses being pleaded.' "

4    (quoting Fantasy, 984 F.2d at 1527)); 914 F. Supp. 2d at 1122 ("Impertinent matter 'consists of

5    statements that do not pertain, and are not necessary, to the issues in question.' ").

6         Plaintiffs emphasize the Remedial Plan states: "Inmates shall not be placed in restraint

7    chairs unless there is sufficient justification for such placement that is documented in an incident

8    report," and "Restraints shall not be used for medical purposes."  (Consent Decree at 23, 38.)

9    Plaintiffs also emphasize it provides: "The Sheriff's Office and medical staff shall communicate

10   to determine appropriate housing for inmates with disabilities," and that "Medical staff shall

11   make available all information needed to make adequate housing decisions."  (Consent Decree at

12   15.)  The Court agrees that the Consent Decree and Remedial Plan, and these provisions, provide

13   background information that is relevant to Plaintiffs' claims and allegations.  In re Facebook, 709

14   F. Supp. 2d at 773 (N.D. Cal. 2010) (Allegations 'supplying background or historical material or

15   other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant.'

16   " (quoting LeDuc v. Kentucky Central Life Insurance Co., 814 F.Supp. 820 (N.D.Cal.1992))).

17        Defendants argue the Consent Decree does not provide any sort of notice whatsoever

18   with respect to Plaintiffs' claims because it involved a different healthcare provider, as the Hall

19   action was brought against Sheriff Mims and the Fresno County Department of Public Health,

20   whom the County contracted with at that time to provide all health care services in the jail, and

21   Wellpath, the jail's current medical care provider and the provider at the time of Mr. Anderson's

22   death, has never been a party to the Consent Decree.  Thus, County Defendants argue Plaintiffs'

23   claims that the Consent Decree demonstrates notice when the health care was provided by a

24   different medical provider are immaterial and impertinent to the instant matter.  The Court does

25   not find this a convincing.  The Court is skeptical of a proffer that County Defendants, and any

26   new medical provider, were not responsible for ensuring the new medical provider should be

27   aware of such significant Consent Decree class and deficiencies in previous medical care

28   provided to inmates, or that such information would somehow make it immaterial and

impertinent to the instant matter.

Finally, County Defendants contend the Hall Consent Decree amounts to a class action settlement, paragraph 22 was part of the settlement, and for the Court to not enforce such would provide a disincentive for future settlements.   (Reply 4-5.)   The Court does not find this argument availing as this should only provide an incentive to draft more clearly defined terms for settlement, and the Court finds no compelling reason to find jail inmates who were not yet part of the class at the time, nor even part of the class under the defined durational term, should be subject to such unclear use restriction provision that is no longer in effect.   The Court also doubts that but for that provision, in light of all the risk associated with a class action litigation, that no settlement would have occurred.

Accordingly, for the above reasons, the Court recommends the County Defendants' motion to strike be denied.   Oracle, 817 F. Supp. 2d at 1132 ("A court must deny the motion to strike if there is any doubt whether the allegations in the pleadings might be relevant in the action.").

**B.   The Officer Defendants' Motion to Dismiss[6]**

1.   The Court recommends Denying Defendants' Motion to Dismiss First, Second, Third, Fourth, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action for Shotgun Pleading

Officer Defendants argue every single one of Plaintiffs' claims fail to satisfy the pleading standards that require Plaintiffs to articulate the basis for their claims with sufficient particularity to inform the Officer Defendants as to the claims against each of them because Plaintiff generically reference "Defendants" in shotgun and conclusory fashion throughout the FAC.   Officer Defendants submit that there is no reasonable inference that any of the individually named Officer Defendants are liable for the misconduct alleged, because there is no specific misconduct alleged against any of them on an individual basis.

Plaintiffs respond that contrary to the Officer Defendants' assertions, the FAC discusses the actions of the individual defendants in particularized and individual detail.   Specifically,

---

[6] Again, the County Defendants, County of Fresno and Sheriff-Coroner Margaret Mims filed an answer on December 22, 2021, and are not parties to this motion to dismiss.  (ECF Nos. 26, 56 .)

while in the section of the FAC stating the legal theory for the first claim for relief does reference "Defendants" as indicated by the movants (FAC ¶¶ 54-63), Plaintiffs emphasize that section incorporates "by reference all previous paragraphs as though fully set forth herein." Plaintiffs note that in the preceding paragraphs, and in particular the "Factual Allegations" section (FAC ¶¶ 22-53) and the "Parties" section (FAC ¶¶ 8-19), the individual conduct each of the movants is alleged in detail. Accordingly, Plaintiffs argue the movants' representation that there is no specific misconduct alleged against any of them on an individual basis lacks merit, as there is specific conduct alleged as to each individual officer.

The Court declines to fully weigh into Defendants' wholesale motion to dismiss based on their argument the complaint is an example of shotgun pleading. The Court does not find it necessary at this juncture to compare the details of the complaint in this action to the complaints in the cases cited by the Officer Defendants, and that Plaintiffs contend are distinguishable. See Flores v. EMC Mortg. Co., 997 F. Supp. 2d 1088, 1103 (E.D. Cal. 2014) (complaint lacks "necessary cohesion and organization to decipher claims"); Sollberger v. Wachovia Sec., LLC, 2010 WL 2674456, at *1 (C.D. Cal. June 30, 2010) (impermissible "shotgun pleadings" in a case involving "an alleged Ponzi scheme"); Gauvin v. Trombatore, 682 F. Supp. 1067 (N.D. Cal. 1988) (plaintiff improperly "lumped together" as defendants, in one discrimination claim, "the California Department of Transportation, three Department employees, and nine private contractors and trucking subcontractors").

The Court finds it unnecessary for multiple reasons. First, at the Court's request at the initial hearing, the parties filed a stipulation clarifying which claims were alleged against which Defendants, which attempted to clear up some of the deficiencies that Plaintiffs acknowledged should be remedied. Further, the Court finds merit to Plaintiffs' arguments concerning the Defendants' bare motion directed at the nine causes of action. Specifically, Plaintiffs argue that while the Officer Defendants accuse Plaintiffs of "shotgun pleading," they are guilty of the same, as the movants lump together all of their contentions about nine causes of action into one argument that scarcely occupies more than one printed page. Plaintiffs emphasize that the Officer Defendants complain the FAC lacks the specificity required to give "fair notice," yet do

1  not address the elements of any of the claims they are challenging or analyze how the facts set

2  forth in the FAC are insufficiently pled to meet those elements, despite facts as to individual

3  Officer Defendants appearing in other portions of the complaint.

4      The Court agrees with Plaintiffs regarding the way Defendants move to dismiss in such

5  wholesale fashion, particularly because Plaintiffs are correct that there are individual factual

6  allegations pertaining to each Officer Defendant contained elsewhere in the complaint, and the

7  Officer Defendants do not address such factual allegations in relation to the elements of the

8  causes of action.[7]  Thus, the Court recommends Defendants' first motion to dismiss targeted at

9  the nine causes of action (Officer Mot. 4-5), be denied.  See Shay v. Apple Inc., 512 F. Supp. 3d

10  1066, 1071 (S.D. Cal. 2021) ("Defendants provide summary arguments and analyses seeking

11  dismissal of all causes of action without addressing how they apply to each cause of action [and

12  therefore] fail to meet Defendants' burden under Rule 12(b)(6) to prove that no claim has been

13  presented."); Corbett v. PharmaCare U.S., Inc., 567 F. Supp. 3d 1172, 1194 (S.D. Cal. 2021)

14  ("Because Defendant provides summary arguments and analyses seeking dismissal of all causes

15  of action without addressing how its argument apply to each cause of action, Defendant failed to

16  meet its burden under Rule 12(b)(6), and the Court DENIES the motion to dismiss."); Laborers'

17  Int'l Union of N. Am., Loc. 341 v. Main Bldg. Maint., Inc., 435 F. Supp. 3d 995, 1000 (D.

18  Alaska 2020) ("A dismissal for failure to state a claim is proper only if it appears beyond doubt

19  that the plaintiff can prove no set of facts in support of his claim which would entitle him to

20  relief." (quoting Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 923 (9th Cir.

21  2001))); Avalanche Funding, LLC v. Five Dot Cattle Co., No. 216CV02555TLNKJN, 2017 WL

22  6040293, at *3 (E.D. Cal. Dec. 6, 2017) ("In the context of a motion to dismiss, the burden is on

23  the defendant to prove that the plaintiff failed to state a claim."); Anderson v. Fishback, No.

24  CV050729ROSPC, 2009 WL 2423327, at *2 (E.D. Cal. Aug. 6, 2009) ("The defendant bears the

25  burden of proving plaintiff has failed to state a claim." (citing Hedges v. U.S., 404 F.3d 744, 750

26

27  _____

[7]  The Court additionally notes that the Officer Defendants' motion is also replete with formatting errors as
28  submitted, making it difficult, or in some instances, nearly impossible to see the case names, citations, and headings.
(See ECF No. 56-1 at 1-9.)

(3d Cir. 2005); <u>Bangura v. Hansen</u>, 434 F.3d 487, 498 (6th Cir. 2006); James Wm. Moore, *2 Moore's Federal Practice* § 12.34[1][a] at 12–73 (2008 ed.))); <u>Woulfe v. Universal City Studios LLC</u>, No. 222CV00459SVWAGR, 2022 WL 18216089, at *15 (C.D. Cal. Dec. 20, 2022) (same).

That is not to say the Officer Defendants' motion as applied to the entirety of the complaint does not have some merit; the Court does find multiple issues with the lumping together of Defendants as to the individual causes of action, and a lack of connection between facts and the causes of action, particularly before the parties stipulated as to which causes of action were alleged against which Defendants. Thus, while Defendants motion is insufficient to challenge the entirety of the nine causes of action as presented, the Court does not mean to hold any of these causes of action against these Officer Defendants would survive a properly presented motion to dismiss filed against a forthcoming amended complaint. Indeed Plaintiffs are not blameless in the manner that the Officer Defendants presented their initial motion, as shown by the necessity to stipulate to the causes of action. The Court's recommendation to deny this aspect of the motion to dismiss does not impact the Officer Defendants ability to renew their motion to dismiss as to these causes of action as to an amended complaint, except as where the Court's recommendations, if adopted, alter such ability as to certain claims or Officer Defendants.

In sum, while Plaintiffs' complaint *may* contain deficiencies as to specific causes of action as applied to specific Officer Defendants, Defendant' wholesale motion does not sufficiently demonstrate under the elements of such causes of action, why each cause of action is deficient as to a particular Officer Defendant under the facts that *are* alleged in the complaint. <u>Shay</u>, 512 F. Supp. 3d at 1071; <u>Corbett</u>, 567 F. Supp. 3d at 1194. As explained below, the Court does recommend granting other components of the Officer Defendants' motion, with leave to amend. The Court therefore recommends denying Defendants' motion to dismiss the first, second, third, fourth, eighth, ninth, tenth, eleventh, and twelfth causes of action for shotgun pleading, be denied without prejudice to renewal as to a forthcoming amended complaint.

*///*

1    2.    The Court Recommends Granting Officer Defendants' Motion to Dismiss
2          Plaintiffs' First and Third Causes of Action for Improperly Pleading Both Eighth
          and Fourteenth Amendment

3          Officer Defendants move to dismiss the first and third causes of actions arguing Plaintiffs

4    improperly plead both Eighth and Fourteenth Amendment violations when they may only bring

5    one such cause of action dependent on Mr. Anderson's custodial status at the time of the alleged

6    harm.  Plaintiffs respond they have pled the Eighth Amendment violation in the alternative, and

7    while they concede they cannot recover simultaneously on both theories, Plaintiffs contend

8    pleading the two theories in the alternative is expressly permitted by the Federal Rules.  See Fed.

9    R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense

10   alternatively."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses

11   as it has, regardless of consistency.").  Plaintiffs argue the fact that the two claims are pled in the

12   alternative is not an argument for dismissing either or both of them.

13         Plaintiffs' first cause of action is for deliberate indifference to medical need in violation

14   of the Eighth and Fourteenth Amendments.  (FAC ¶¶ 54-63.)  Plaintiffs third cause of action is

15   for failure to protect from harm in violation of the Eighth and Fourteenth Amendments.  While

16   Plaintiffs are correct that generally a plaintiff may plead alternative theories that may not

17   ultimately provide for simultaneous recovery, given Plaintiffs do not dispute the custodial status

18   of Mr. Anderson as a pretrial detainee, the Court finds the causes of action may be dismissed to

19   the extent they are brought under the Eighth Amendment.

20         A pretrial detainee's rights arise under the Fourteenth Amendment's Due Process Clause

21   whereas a convicted prisoner's rights arise under the Eighth Amendment's Cruel and Unusual

22   Punishments Clause.  See Bell v. Wolfish, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process

23   Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due

24   process of law."); Gordon v. Cnty. of Orange, 888 F.3d 1118, 1124 (9th Cir. 2018) ("[M]edical

25   care claims brought by pretrial detainees also 'arise under the Fourteenth Amendment's Due

26   Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment

27   Clause' " (quoting Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1069-70 (9th Cir. 2016))); see

28   also Castro, 833 F.3d at 1067-68 ("Inmates who sue prison officials for injuries suffered while in

1    custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if

2    not yet convicted, under the Fourteenth Amendment's Due Process Clause.").

3         Accordingly, the Court recommends Defendants' motion to dismiss the first and third

4    causes of action, only to the extent they are brought under the Eighth Amendment. Thus, the

5    claims may survive to the extent they are brought under the Fourteenth Amendment, and to the

6    extent they are not impacted by the Court's other recommendations. The Court recommends

7    denying leave to amend as to repleading any Eighth Amendment claim as futile based on

8    Plaintiffs' concession as to the custodial status of Mr. Anderson.

9         3.   The Court recommends Granting in Part and Denying in Part Officer Defendants'
              Motion to Dismiss Plaintiffs' Fourth Cause of Action
10

11        Officer Defendants move to dismiss Plaintiffs' fourth cause of action for deprivation of

12   substantive due process rights in violation of the Fourteenth Amendment. Defendants emphasize

13   that to prevail on a substantive due process claim, Plaintiffs must demonstrate the liberty

14   deprivation was caused by the government in such a way that shocks the conscience or interferes

15   with rights implicit in the concept of ordered liberty. Similar to their overriding motion to

16   dismiss all claims against the Officer Defendants, here, Officer Defendants argue that when

17   Plaintiffs generically reference "Defendants" in a shotgun and conclusory fashion, they fail to

18   articulate the basis for their claim with sufficient particularity to inform each of the thirteen

19   individually named defendants as to the claims against them. Defendants further argue Plaintiffs

20   fail to allege sufficient facts to set forth with sufficient particularity to inform each of the thirteen

21   individually named Officer Defendants of the alleged conduct that shocks the conscience.

22        Plaintiffs respond, similar as to the Officer Defendants' overriding motion to dismiss all

23   claims, that the FAC describes the circumstances leading up to the death of Mr. Anderson in

24   particularized detail and the Defendants' motion describes a different complaint than the one at

25   issue.

26        **a.   Legal Standards**

27        The parties do not dispute the "shocks the conscience" standard applies. "Parents and

28   children may assert Fourteenth Amendment substantive due process claims if they are deprived

1    of their liberty interest in the companionship and society of their child or parent through official

2    conduct." Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1075 (9th Cir. 2013)

3    (citations omitted).  However, "[o]nly official conduct that 'shocks the conscience' is cognizable

4    as a due process violation." Id. (quoting Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir.2008)).

5    "A prison official's deliberately indifferent conduct will generally 'shock the conscience' so as

6    long as the prison official had time to deliberate before acting or failing to act in a deliberately

7    indifferent manner." Lemire, 726 F.3d at 1075 (citations omitted); see also Est. of Prasad ex rel.

8    Prasad v. Cnty. of Sutter, 958 F. Supp. 2d 1101, 1126 (E.D. Cal. 2013) ("In a prison setting,

9    deliberate indifference to an inmate's basic human and medical needs constitutes

10   'constitutionally shocking' action." (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 851–

11   52, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998))).

12       In opposition, Plaintiff emphasizes that where "the circumstances are such that actual

13   deliberation by the official is practical," a showing of an officer's "deliberate indifference"

14   satisfies the "shocks the conscience" standard. Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir.

15   2010).  The Officer Defendants have essentially provided the Court with no substantive response

16   to this legal authority.  (See County Officer Reply at 2-5.)  The Court turns to clarify the legal

17   standards.

18       Here, the fourth cause of action is a claim for a Fourteenth Amendment substantive due

19   process deprivation of the right to familial relationship.  (FAC ¶¶ 79-82.)  While the Officer

20   Defendants' motion is only directed at the fourth cause of action, as relevant to the Plaintiffs'

21   reliance in Wilkinson, the Court notes the second cause of action is for excessive force in

22   violation of the Fourth Amendment.  (FAC ¶¶ 64-68.)  In Wilkinson, the Ninth Circuit explained

23   the framework applicable to the question of whether "excessive force shocks the conscience" as

24   to deprive a parent of their Fourteenth Amendment liberty interest:

25           This circuit has recognized that parents have a Fourteenth
             Amendment liberty interest in the companionship and society of
26           their children. Curnow ex rel. Curnow v. Ridgecrest Police, 952
             F.2d 321, 325 (9th Cir.1991). Official conduct that "shocks the
27           conscience" in depriving parents of that interest is cognizable as a
             violation of due process. Porter, 546 F.3d at 1137. In determining
28           whether excessive force shocks the conscience, the court must first

ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* at 1137(quoting *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 372 (9th Cir.1998) (internal quotation marks omitted)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id.* On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id.* at 1140. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even." *Id.*

In *Porter,* this court found that actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly and forced the officers to make "repeated split-second decisions." *Id.* at 1139. The court noted that "deliberation" should not be interpreted in the narrow, technical sense, reasoning that the Supreme Court had rejected the deliberate indifference standard even in cases where an officer giving chase could have deliberated while pursuing the suspect. *Id.* at 1139–40. Instead, the heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers to act quickly. *Id.* at 1140.

Here, application of the purpose-to-harm standard is clearly appropriate. Within a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot. Ultimately, Wilkinson's act of accelerating in reverse despite repeated warnings to stop forced Torres to make a split-second decision. As opposed to the five minutes which elapsed in *Porter,* the entire sequence of events here from the PIT maneuver to the final shot occurred in less than nine seconds.

Applying this standard, no evidence shows that Torres had a purpose to harm Wilkinson apart from legitimate law enforcement objectives.

Wilkinson, 610 F.3d at 554.

Similarly, Plaintiffs cite Ochoa, for its statement that the "deliberate-indifference test applies if the situation at issue 'evolve[d] in a time frame that permits the officer to deliberate before acting.' " Ochoa v. City of Mesa, 26 F.4th 1050, 1056 (9th Cir. 2022) (quoting Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008)).   The Court excerpts a greater portion than Plaintiffs as the Ochoa court provides a recent succinct summary of the differing applications of the standards:

On one hand, the deliberate-indifference test applies if the situation at issue "evolve[d] in a time frame that permits the officer to deliberate before acting." *Porter*, 546 F.3d at 1137. Deliberation is

not possible if the officers "encounter[ed] fast paced circumstances presenting competing public safety obligations." *Id.* at 1139. Deliberation in this context "should not be interpreted in the narrow, technical sense." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

On the other hand, the purpose-to-harm test applies if the situation at issue "escalate[d] so quickly that the officer [had to] make a snap judgment." *Porter*, 546 F.3d at 1137. This test requires "a more demanding showing that [the officers] acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* Legitimate objectives can include "arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Illegitimate objectives include "when the officer 'had any ulterior motives for using force against' the suspect, such as 'to bully a suspect or "get even," ' or when an officer uses force against a clearly harmless or subdued suspect." *Id.* (citations omitted) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014); *Wilkinson*, 610 F.3d at 554).

Ochoa, 26 F.4th at 1056; see also Porter, 546 F.3d at 1140 ("In sum, once Casey's evasive actions began the officers had to react quickly [and thus] whether Osborn's conduct shocks the conscience must be evaluated under the purpose to harm standard of culpability.")  Much of the differences in this line of cases pertain to excessive force during arrest, which can be impacted by the arrestee causing the circumstances, such as by evading the police, one distinguishable aspect from Mr. Anderson here, who was experiencing a medical emergency.  See Wilkinson, 610 F.3d at 554 (describing that in Porter, the Supreme Court held "the heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers to act quickly." (citing Porter, 546 F.3d at 1140)).  The amount of time for deliberation can vary depending on the circumstances and events.  See id. ("As opposed to the five minutes which elapsed in Porter, the entire sequence of events here from the PIT maneuver to the final shot occurred in less than nine seconds."); Porter, 546 F.3d at 1139 ("Placed along this spectrum, we are compelled to conclude that the purpose to harm standard must apply here [as] Osborn faced an evolving set of circumstances that took place over a short time period necessitating 'fast action' and presenting 'obligations that tend to tug against each other' [as] [t]he approximately five-minute altercation between Casey and Osborn that ended in Casey's shooting was obviously fast paced—and much shorter in duration than the typical car chase  . . . [and] was also quickly evolving and escalating,

1   prompting 'repeated split-second decisions.' ") (citations omitted).

2        The actual physical action in the above cases were by the officers, *i.e.* excessive force

3   claims involving shooting a fleeing suspect, not deliberate indifference to medical need.  See

4   Wilkinson, 610 F.3d at 554–55 ("No one could predict how quickly the minivan would gain

5   traction . . . because Torres was in a rapidly evolving situation requiring him to make 'split-

6   second judgments,' we need not scrutinize as closely as the district court did Torres' decision

7   about how best to minimize the risk to his own safety and the safety of others.").  It is somewhat

8   unclear based on the parties' lack of briefing, how the standards may be delineated as to the

9   differing claims for excessive force versus indifference to medical needs.  On one hand, it would

10  appear the standards can logically be extended.  See Lemire, 726 F.3d 1062, 1075 ("A prison

11  official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the

12  prison official had time to deliberate before acting or failing to act in a deliberately indifferent

13  manner."); Prasad, 958 F. Supp. 2d at 1126–27 ("In a prison setting, deliberate indifference to an

14  inmate's basic human and medical needs constitutes constitutionally shocking action . . . [as]

15  [p]rison incapacitates a prisoner to exercise ordinary responsibility for his own welfare, making

16  forethought about an inmate's welfare [ ] not only feasible but obligatory [and] [u]nder these

17  circumstances, extended opportunities to do better are teamed with protracted failure even to

18  care, and indifference is truly shocking.") (quotations and citations omitted).  In other words, in

19  the absence of time to deliberate during a time-intensive or urgent medical situation, a purpose to

20  harm in the failure to provide medical care would likely be required to "shock the conscience" in

21  the constitutional sense.

22        However, as stated in M.H. v. Cnty. of Alameda, differing standards do seem to generally

23  apply to the different types of claims, as brought (excessive force vs. deliberate indifference to

24  medical need):

25        The standard that applies to Plaintiffs' familial association claim
          against the Sheriff's Deputies for their use of force is different than
26        that which applies to Plaintiffs' claim against Hast and Nurse
          Sancho premised on their alleged deliberate indifference to
27        Harrison's serious medical needs. Unlike the "purpose to harm"
          standard that governs Fourteenth Amendment claims where an
28        official "makes a snap judgment because of an escalating

situation," *Wilkinson,* 610 F.3d at 554, where "actual deliberation is practical," deliberate indifference is sufficient to support a Fourteenth Amendment claim. *Id.* The Supreme Court has contrasted, for example, an officer's decision to give chase to a fleeing suspect with "the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 853, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding "purpose to harm" standard applied to high-speed police chase); *see also Porter,* 546 F.3d at 1139 (citing *Lee v. City of Los Angeles,* 250 F.3d 668, 684 (9th Cir.2001) (noting "where officers have ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail to do so, the suspect's family members need only plead deliberate indifference to state a claim under the due process right to familial association").

The Court concludes that the "deliberate indifference" standard applies to Plaintiffs' familial association claims against Defendants Hast and Sancho. Because the Court has already concluded that Plaintiffs have adduced sufficient evidence to deny summary judgment on their deliberate indifference claims, the Court will deny summary judgment as to their familial association claim as well.

M.H. v. Cnty. of Alameda, 62 F. Supp. 3d 1049, 1095–96 (N.D. Cal. 2014).  In the opinion, the court earlier noted that "the Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim," and that "the parties agree[d] the 'purpose to harm' standard applies with respect to the force used by the Sheriff's Deputies."  Id. at 1095.  On the deliberate indifference claim as to Hast, a social worker, and Sancho, a nurse, the court found they were aware of the plaintiff's risk of alcohol withdrawals, and deliberately indifferent.  Id. at 1077-80 ("[Hast] knew that Harrison was at risk for severe alcohol withdrawal, she knew that the condition requires immediate medical attention, and she knew that Harrison was displaying the symptoms of severe alcohol withdrawal[,] [y]et she did not notify a medical professional of Harrison's condition, or instruct a deputy to do so, or see him herself.").  They were not part of the excessive force claim.

Here, Plaintiffs argue that deliberation was practical under the facts alleged.  Specifically, Plaintiffs highlight allegations that: Mr. Anderson complained throughout the day that he needed to be moved to a cooler cell (FAC ¶ 31); that Mr. Anderson filled out an inmate request form, which was for all intents and purposes ignored, as the FAC alleges the request was still in the

1    guard station after Mr. Anderson died (FAC ¶ 31); and that there was plenty of time to move Mr.

2    Anderson to a different cell and for his medical condition to be evaluated, but instead, officers

3    callously treated Mr. Anderson as through he was intentionally misbehaving or suffering from a

4    self-induced, drug-related problem.  Plaintiffs further emphasize that they allege twenty-five

5    minutes elapsed from the time Mr. Anderson began seizing until the time of his death (FAC ¶¶

6    40-41); that some of that period was spent waiting for a restraint chair (designed for combative

7    inmates not medical emergencies) to arrive; and therefore submit that on the facts alleged in the

8    FAC, all the officers present, and those supervising them, exhibited deliberate indifference to the

9    risks posed by failing to address Mr. Anderson's medical condition, and, as a result, he died.

10          Neither the Plaintiffs nor County Officers Defendants proffer much analysis or

11   breakdown of the allegations as to each specific officer, aside from the general arguments

12   regarding shotgun pleading that were made before the parties' stipulated as to the claims

13   applicable to each individual defendant.  Given the parties have at least presented arguments

14   concerning the legal standards summarized above, the Court shall proceed to make findings to

15   the District Judge as to this substantive due process challenge, given the strict legal standards, as

16   the Court reasonably can do so.  This is in contrast to the Court declining above to partake in

17   such analysis as to the Officer Defendants' more generalized wholesale motion, which the Court

18   declined to conduct such exercise given no legal elements or specific arguments as to those

19   causes of action were provided in the motion to dismiss.[8]

20          **b.      Factual Allegations Pertaining to Officer Defendants**

21          Recognizing Plaintiffs may not be privy at this pre-discovery stage to all facts that would

22   delineate individual officer actions versus generalized references to officers at certain points in

23   the complaint, the Court now proceeds through the timeline as alleged and relevant to the Officer

24   Defendants, stopping to consider the allegations against specific named individuals at the point

25   where no further specific naming of them in the complaint occurs thereafter.

26   _____

27   [8]  Nonetheless, given the somewhat unclear standards presented and lack of arguments pertaining to specific facts as
     to the potential delineation as to certain Officer Defendants, the District Judge could simply deny the motion for
     reasons similar to the more generalized motion to dismiss the nine causes of action, and allow for more developed
28   briefing to be presented to any forthcoming motion to dismiss the forthcoming amended complaint.

1    Plaintiffs allege that:

2        Throughout June 23, Mr. Anderson complained to Officer Ventura
         and others that he needed to be moved to a cooler cell, and one in
3        the middle of the row would suffice. Officer Owen required Mr.
         Anderson to fill out an "inmate request form." He did so, stating:
4        "I have a seizure disorder (epilepsy) and heat triggers my seizures.
         I was placed in a cell that is extremely hot and would like to be
5        swapped or moved cells. I'm getting hot flashes "symptoms of on
         coming seizure." Mr. Anderson turned the slip in to Officer
6        Sanchez, who showed it to Officer Ventura, but did not forward it
         to classification. The request was still in the guard station after Mr.
7        Anderson died. Officer Owen claims to have never received the
         form, and therefore took no action to move Mr. Anderson to a safer
8        cell.

9    (FAC ¶ 31.) "Mr. Anderson called his mother on the telephone and complained that his cell was

10   too hot and he needed to be moved." (FAC ¶ 32.) "He said that he had turned in a request form

11   but the guards had told him that he would likely not be moved." (Id.) "Officer Ventura saw Mr.

12   Anderson's cell door open," "Mr. Anderson said that he had to keep the temperature down to

13   protect against seizures," but "Officer Ventura instructed Mr. Anderson to shut the cell door."

14   (FAC ¶ 33.) "According to jail interviews, in addition to Officers Owen, Sanchez and Ventura,

15   Mr. Anderson told Officer Ponce and Officer Thao that remaining in Cell 9 jeopardized his

16   health." (FAC ¶ 34.)

17       Thus, as to Owen, the only specific allegation is that Mr. Anderson told Owen remaining

18   in the cell jeopardized his health, at some point Owen required Mr. Anderson to fill out a request

19   form, and Owen claims to never have received the form which was still in the guard station at the

20   time of death. Ventura is alleged to have been notified by Mr. Anderson that he was keeping his

21   door open to prevent seizures, and that Ventura was shown the request slip. While slim, the

22   Court finds these allegations present enough information concerning Owen and Ventura to state

23   a claim for deliberate indifference at the pleading stage. Est. of Prasad, 958 F. Supp. 2d at 1126–

24   27 ("Prison incapacitates a prisoner to exercise ordinary responsibility for his own welfare,

25   making forethought about an inmate's welfare [ ] not only feasible but obligatory . . . [u]nder

26   these circumstances, extended opportunities to do better are teamed with protracted failure even

27   to care, and indifference is truly shocking.") (citations and quotation marks omitted).

28       The rest of the allegations pertain to occurrences after Mr. Anderson began seizing.  At

some point while Mr. Anderson was seizing in his cell, after "[t]here was no immediate response from custodial or medical staff," Mr. Anderson's cellmate "ran over to the control room and pounded on it to get the attention of custody staff." (FAC ¶ 36.) "Eventually MJ3 Security Officer Franco notified Officers Ponce and Cha by telephone that Mr. Anderson in Cell C-09 was 'having a possible seizure.' " (FAC ¶¶ 36-37.) This is the only mention of Defendant Franco's actions in the complaint.

"When Officers Ponce and Cha got to the cell, they saw inmates holding Mr. Anderson on the bottom bunk," and "Inmate Crocketts told the officers that Anderson was actively seizing. Both inmates were directed to exit the cell." (FAC ¶ 37.) "Officers Ponce and Cha saw Mr[.] Anderson's body moving in an abnormal manner," "[h]e was flailing his arms," and "was verbally non responsive. (FAC ¶ 38.) "They asked Mr. Anderson what drugs he had taken." (Id.) "At some point, Officer Cha called via his handheld radio for medical staff to respond." (Id.) These are the only allegations as to Defendant Cha.

Next, Plaintiffs allege that "Officer Thao, a supervisor, and CFMG/Wellpath Registered Nurses Genevieve Garcia and Maria Guerrero arrived." (Id.) "Rather than waiting for an appropriate medical assessment, or better yet, calling for paramedics, the officers stood Mr. Anderson up from the bunk and walked him out of the cell." (Id.) "The custody staff and nurses dismissed the seizure diagnoses and incorrectly attributed the symptoms to drugs." (Id.) "Officer Ponce thought he had 'excited delirium.' " (Id.) "Because of the ongoing seizure activity, Defendants were unable to seat Mr. Anderson in the wheelchair." (Id.) "They told him to stop resisting." (Id.) "What they should have been doing is allow him to lie down and relax, while summoning qualified medical assistance." (Id.) The allegations against Ponce end here.

Next, Plaintiffs allege that "Officer Thao called via her handheld radio and requested a Stryker Chair, which is a devise designed to evacuate disabled people." (FAC ¶ 39.) "A gurney should have been used instead." (Id.) "Officer Her arrived with a Stryker Chair." (Id.) "At some point Sgt. Garcia and Officer Alanis also arrived to assist." (Id.) "Mr. Anderson continued moving his body and remained verbally non responsive." (Id.) "The officers and nurses were unable to secure Mr. Anderson to the chair because of his seizure activity, which they were

aggravating." (Id.) "The officers laid Anderson face down on the floor" (Id.) "Officer Sanchez handcuffed him behind his back." (Id.)

"Sgt. Garcia, requested a restraint chair, which is not a medical device, and Lieutenant Carter authorized it, even though there was clearly a medical emergency rather than a combative inmate." (FAC ¶ 40.) "As the officers and nurses wheeled Mr. Anderson towards the pod door, Nurse Garcia noticed that Mr. Anderson was not breathing." (Id.) "She requested Sgt. Garcia call for a code 3 ambulance." (FAC ¶ 41.) "After the officers and nurses exited the pod they removed Mr. Anderson from the restraint chair in the sally port initiated cardiopulmonary resuscitation (CPR)." (Id.) "CPR compressions were rotated by Officers Leboeuf, Sanchez, Alanis and Her, and two additional CFMG/Wellpath nurses, Gattie and Obodoagha, were now on scene assisting with the patient." (Id.)

Thus, as to Ponce, Plaintiffs allege at an unspecified time, Mr. Anderson told Ponce that remaining in the cell jeopardized his health, and Ponce thought Mr. Anderson had excited delirium while staff and nurses were present in the cell. As to Thao, Plaintiffs allege Thao was told by Mr. Anderson at an unspecified time that remaining in Cell 9 jeopardized his health, that Thao may have been part of the group of officers and nurses that stood Mr. Anderson up, and that Thao requested a Stryker chair via radio, which was not the right medical decision for Mr. Anderson. (FAC ¶¶ 34, 38, 39.) Cha is alleged to have responded to the telephone call for assistance by going to the cell, Cha saw Mr. Anderson moving abnormally, and Cha called via his handheld radio for medical staff to respond. (FAC ¶¶ 37, 38.) The only specific allegation against Her is that Her brought the Stryker Chair, and that Her assisted with the CPR rotation. (FAC ¶¶ 39, 41.) The only specific allegations as to C. Garcia are that he appeared on the scene "[a]t some point," and upon encountering Mr. Anderson suffering from seizures, C. Garcia requested a restraint chair, which was not the correct medical decision. (FAC ¶¶ 39-40.) The only specific allegation against Carter is that Carter authorized this incorrect medical decision. (FAC ¶ 40.) Plaintiffs do not dispute these decisions were made in the presence of nursing staff. The only specific allegations as to Leboeuf are that after the restraint chair was authorized, "Leboeuf brought with [sic] a restraint chair," and that Leboeuf was part of the rotation of

1   officers that performed CPR on Mr. Anderson.  (FAC ¶¶ 40-41.)  The only specific allegations
2   against Alanis are that "[a]t some point Sgt. Garcia and Officer Alanis also arrived to assist," and
3   that Alanis was part of the rotation of officers that performed CPR on Mr. Anderson.  (FAC ¶¶
4   39, 41.)

5          Finally, as for A. Sanchez and J. Sanchez, after they are generally identified as employees
6   of the County, they are thereafter not delineated in the complaint's allegations as to which
7   Sanchez took certain actions, instead only referring generally to "Sanchez."  The most relevant
8   allegation appears to be that "Mr. Anderson turned the slip in to Officer Sanchez, who showed it
9   to Officer Ventura, but did not forward it to classification."  (FAC ¶ 31.)  In addition to not
10  knowing which Sanchez this refers to, it is somewhat unclear who failed to forward the
11  document to classification.  It is further unspecified which Sanchez Mr. Anderson told that
12  remaining in the cell jeopardized his health (FAC ¶ 34), which Sanchez handcuffed Mr.
13  Anderson (FAC ¶ 39), and which Sanchez was part of the CPR rotation (FAC ¶ 41).

14         The Court finds insufficient factual allegations to state a claim for deprivation of
15  substantive due process rights in violation of the Fourteenth Amendment, and recommends
16  dismissal of this cause of action against Franco, Ponce, Thao, Cha, Her, C. Garcia, Carter,
17  Leboeuf, Alanis, A. Sanchez, and J. Sanchez, with leave to amend only to the extent Plaintiffs in
18  good faith believe they can allege facts to satisfy the legal standards explained above.  While the
19  Court does not find these factual allegations would be sufficient to state a claim under the normal
20  deliberate indifference standard, the Court notes that for much of the alleged events that occurred
21  after Mr. Anderson started seizing, it appears that the purpose to harm standard could be
22  applicable to most of the officers' actions, and thus Plaintiffs' pleading would fail under either
23  standard.

24         Accordingly, the Court recommends granting the motion to dismiss the fourth cause of
25  action as to Defendants Franco, Ponce, Thao, Cha, Her, C. Garcia, Carter, LeBeouf, Alanis, A.
26  Sanchez, and J. Sanchez; and recommends denying the motion to dismiss the first cause of action
27  as to Defendants Ventura and Owens.  See Figueira by & through Castillo v. Cnty. of Sutter, No.
28  2:15-CV-00500-KJM-AC, 2015 WL 6449151, at *5 (E.D. Cal. Oct. 23, 2015) (denying motion

1   to dismiss as to one defendant as "jail's staff knew Figueira had a history of mental illness and

2   suicidal tendencies and that they thought this history sufficiently worrisome to evaluate him  . . .

3   that after his arraignment, Figueira's behavior changed . . . [defendant] interacted personally with

4   Figueira both before and after the arraignment, noticed the change, and knew Figueira had a

5   history of mental illness and suicidal tendencies," but granting motion to dismiss as to remaining

6   defendants as "too conclusory . . .  alleg[ing] only that these other defendants knew or should

7   have known, at some unspecified moment, that Figueira posed a danger to himself [which] do

8   little more than frame the elements of deliberate indifference."); see also Schmitz v. Asman, No.

9   220CV00195JAMCKDPS, 2022 WL 2340614, at *6 (E.D. Cal. June 29, 2022) ("Dr. Smith at

10  most negligently approved the EGD consult based on Dr. Rudas' statement.").

11      4.      The Court Recommends Denying Officer Defendants' Motion to Dismiss the
              Eight Cause of Action for Wrongful Death

12

13          Officer Defendants submit that for a wrongful death action to survive a motion to

14  dismiss, the complaint must contain allegations as to all elements of actionable negligence.  See

15  Jacoves v. United Merch. Corp., 9 Cal. App. 4th 88, 105, 11 Cal. Rptr. 2d 468 (1992) ("In any

16  action for wrongful death resulting from negligence, the complaint must contain allegations as to

17  all the elements of actionable negligence [and] [n]egligence involves the violation of a legal duty

18  imposed by statute, contract or otherwise, by the defendant to the person injured, e.g., the

19  deceased in a wrongful death action." (citing Potter v. Richards, 132 Cal. App. 2d 380, 385, 282

20  P.2d 113 (1955))).  Officer Defendants argue the complaint is devoid of any allegations that

21  implicate any of the officers in directly participating in any decisions regarding Mr. Anderson,

22  and instead rely solely on allegations that these defendants are ultimately responsible through a

23  generic formulaic recitation of the elements.  Defendants additionally argue there is a lack of an

24  allegation that the Officer Defendants were the proximate cause of Mr. Anderson's death or

25  injuries, other than a formulaic recitation of the elements.  Lopez v. City of Los Angeles, 196

26  Cal. App. 4th 675, 687–88, 126 Cal. Rptr. 3d 706, 716 (2011) (negligence requires evidence that

27  breach was proximate or legal cause of resulting injury and wrongful death cause of action

28  requires tort such as negligence or other wrongful act and resulting death) (citations omitted).

1  Officer Defendants also contend punitive damages against these defendants based on Plaintiffs'

2  wrongful death claim are not permitted as a matter of law.  Boeken v. Philip Morris USA, Inc.,

3  48 Cal. 4th 788, 796, 230 P.3d 342, 347 (2010) ("Punitive damages are not available, however,

4  in a statutory wrongful death action.").

5      Plaintiffs respond for the reasons already stated, this characterization of the FAC is

6  simply not accurate; and that the Officer Defendants do not address the complaint paragraphs

7  that set forth the factual allegations.  Plaintiffs concede Officer Defendants are correct that

8  punitive damages are not available under California law on a wrongful death claim, however,

9  counter that the eighth cause of action is pled as both a survivor and a wrongful death claim, and

10 California permits punitive damages to be awarded in a survivor action under California Code of

11 Civil Procedure § 377.30.

12     Plaintiffs appear correct that punitive damages are allowed under such provision.

13 Further, County Officer Defendants do not address the arguments regarding punitive damages in

14 their reply, and the Court additionally finds the motion to dismiss the punitive damages claims

15 should thus be denied as an improper manner of dismissing a remedy and not a claim.  See Elias

16 v. Navasartian, No. 115CV01567LJOGSAPC, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17,

17 2017) ("Recent court decisions have held that because a prayer for relief is a remedy and not a

18 claim, a Rule 12(b)(6) motion to dismiss for failure to state a claim is not a proper vehicle to

19 challenge a plaintiff's prayer for punitive damages, because Rule 12(b)(6) only countenances

20 dismissal for failure to state a claim . . . Federal Rule of Civil Procedure 54 underscores the

21 impropriety of dismissing requests for punitive damages under Rule 12(b)(6) . . . based on the

22 foregoing, Plaintiff's request for punitive damages in regard to his 42 U.S.C. § 1983 claims

23 cannot be dismissed under Rule 12(b)(6), and therefore Defendant's 12(b)(6) motion to dismiss

24 should be denied.") (collecting cases); Jones v. Sherman, No. 121CV01093DADEPGPC, 2022

25 WL 783452, at *12 (E.D. Cal. Mar. 11, 2022) ("If a plaintiff need not even include a prayer for

26 punitive damages in his complaint to receive an award of punitive damages, this Court agrees

27 that it 'makes little sense' to require detailed factual allegations to support a demand for punitive

28 damages." (quoting Elias, 2017 WL 1013122, at *5)).

Here, where at least Defendant has provided a legal standard and more specific argument concerning such standard and proximate causation, the Court could proceed to analyze the standard as to each Officer Defendant as it did in the previous section.  However, the Court declines to make determinations under the less onerous standards of negligence, as it did above as to the substantive due process challenge.  Officer Defendants did not provide any analysis as to the facts that are indeed contained in the complaint as to these individual officers.  It is difficult for the Court to analyze the elements and facts when the Officer Defendants do not make arguments as to the factual allegations that *are* applicable to each individual Officer Defendant.  The Court finds the Officer Defendants make overbroad statements concerning the Plaintiffs' complaint, such as that it is "devoid of any allegations that ascertains or implicates any of the individually named defendants . . . that they directly participated in any decisions regarding Mr. Anderson."  As shown in the Court's exercise performed in the preceding section, there are indeed factual allegations indicating that individual Officer Defendants did participate in decisions or actions regarding Mr. Anderson, while it is true the individual causes of action do not contain specific facts, instead incorporating all facts into each cause.

The Court declines to wholesale dismiss the complaint as a shotgun pleading for these reasons, and again finds Officer Defendants have not met their burden.  See Shay, 512 F. Supp. 3d at 1071;Corbett, 567 F. Supp. 3d at 1194; Avalanche Funding, 2017 WL 6040293, at *3 ("In the context of a motion to dismiss, the burden is on the defendant to prove that the plaintiff failed to state a claim.").

Further, at the request of the Court, the parties have already stipulated to rectify the main issues concerning which causes of action are brought against which Defendants, and the parties seem cognizant that the motion to dismiss will be granted in some regards, and an amended complaint will be forthcoming.  Therefore, given leave to amend would likely be granted, and given the movants did not analyze the factual allegations as to each Officer Defendant, the Court declines to perform a defendant by defendant analysis under the negligence and wrongful death standards without the aid of specific arguments as to the factual allegations for each Officer Defendant as applied to the legal standards.  Nonetheless, in any amended complaint, Plaintiffs

are expected to more clearly delineate the factual allegations as to each individual Defendant in bringing specific causes of action they in good faith believe the factual allegations will support as to such specific Defendants, and in turn, Defendants are expected to present more pointed factual arguments tailored to the elements of the cause of action and the Officer Defendant that they seek to dismiss a claim against.

5.     The Court Recommends Granting in Part and Denying in Part the Officer Defendants' Motion to Dismiss the Bane Act Claim for Lack of Standing

Officer Defendants move to dismiss Plaintiffs' eleventh cause of action for violation of the Bane Act, contending the Bane Act does not provide for derivative liability for the parents of a victim, and Plaintiffs lack standing.  See Medrano v. Kern Cnty. Sheriff's Officer, 921 F. Supp. 2d 1009, 1015–16 (E.D. Cal. 2013) ("The California Court of Appeal held that while the Bane Act provides a personal cause of action for a victim of a hate crime, it 'is not a wrongful death provision' and 'does not provide derivative liability for the parents of a victim of a hate crime, or for any other persons not present and not witnessing the actionable conduct.' " (quoting Bay Area Rapid Transit Dist. v. Superior Ct., 38 Cal. App. 4th 141, 144, 44 Cal. Rptr. 2d 887, 889 (1995) ("BART")))).[9]  Accordingly, Officer Defendants argue Plaintiffs lack standing to bring a

_____

[9]  The Court notes that the second quoted clause does not actually appear to be contained in BART, although the message is essentially the same:

> We cannot, however, accept the particular legal theory advanced in support of the Halls' attempt to include a Bane Act cause of action in their lawsuit for wrongful death. The Bane Act is simply not a wrongful death provision. It clearly provides for a *personal* cause of action for the victim of a hate crime. In *Boccato v. City of Hermosa Beach* (1994) 29 Cal.App.4th 1797, 1809, 35 Cal.Rptr.2d 282, the court held that Civil Code section 52.1 must be read in conjunction with section 51.7, which provides that all persons have the right to be free from "violence, or intimidation by threat of violence committed against their persons" because of race, color, religion, ancestry, etc. This reinforces the rational interpretation of the Bane Act, i.e., that it is limited to plaintiffs who themselves have been the subject of violence or threats. The Halls would interpret the statute to fashion derivative liability for persons not present and not witnessing the actionable conduct. As in the cases of bystander recovery for emotional distress (see generally *Thing v. La Chusa* (1989) 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814), one could see the nightmare of trying to determine where the scope and extent of such liability would end. In the absence of a clear legislative intent, we cannot recognize derivative Bane Act liability as requested by the Halls.

BART, 38 Cal. App. 4th at 144–45.  It appears this inaccurate quotation is restated in other cases.  See Wallisa v. City of Hesparia, 369 F. Supp. 3d 990, 1021 n.12 (C.D. Cal. 2019); Bradley v. Cnty. of San Joaquin, No. 2:17-CV-2313-KJM-AC, 2018 WL 4026996, at *14 (E.D. Cal. Aug. 23, 2018).  The misquotation appears to stem from the defendants' briefing in Medrano.  See Defs.' Opp'n, Medrano, 2012 WL 4294030.

1   claim pursuant to section 52.1 on their own behalf.

2       The Officer Defendants further contend that Plaintiff Doris Anderson, even as successor

3   in interest, lacks standing to assert a claim.  See Cal. Civ. Code § 52.1(c) ("Any individual whose

4   exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of

5   rights secured by the Constitution or laws of this state, has been interfered with, or attempted to

6   be interfered with, as described in subdivision (b), may institute and prosecute in their own name

7   and on their own behalf a civil action for damages."); Cal. Civ. Code § 52.1(h) ("An action

8   brought pursuant to this section is independent of any other action, remedy, or procedure that

9   may be available to an aggrieved individual under any other provision of law.").[10]  Defendants

10  emphasize (utilizing the language from the now non-operative provision), that the legislature

11  limited the claims brought to an individual in "his or her own name and on his or her own

12  behalf," (Officer Mot. 8, citing Cal Civ. Code § 52.1(b)), with such language now reading

13  "their," but substantively the same, arguing the plain meaning should govern.  See People v.

14  Prescott, 213 Cal. App. 4th 1473, 1477, 153 Cal. Rptr. 3d 424, 426 (2013) ("If the statutory

15  language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning

16  of the statute governs.' ") (citation omitted).  Defendants emphasize Section 52.1 does not

17  mention California Code of Civil Procedure 377.20 or the terms survival action, decedent,

18  decedent's estate, heirs, legal representative or successor in interest.  Defendants also argue

19  Section 377.20 is a procedural statute which is inapplicable since section 52.1 is independent

20  from any other procedure that may be available under the law, again citing to subsection (g), that

21  is now (h).

22      Officer Defendants acknowledge a disagreement within the Eastern District of

23

---

[10]  The Officer Defendants do not cite to current version of the Bane Act in their briefing.  (Officer Mot. 8.)  Officer Defendants cite to subsection (b), however, the substantive language they quote is, as of January 1, 2019, located in subsection (c), and has further been amended with changes such as utilizing the word "their" instead of "his or her."  The cited subsection (g) has also been moved to subsection (h).  (Compare Enacted Legislation Stats.2014, c. 296 (A.B.2634), § 1, eff. Jan. 1, 2015 Stats.2014, c. 910 (A.B.2617), § 4.5, eff. Jan. 1, 2015, with Enacted Legislation Stats. 2018, c. 776 (A.B.3250), § 4, eff. Jan. 1, 2019, and Enacted Legislation Stats.2021, c. 401 (A.B.1578), § 1, eff. Jan. 1, 2022 Stats.2021, c. 409 (S.B.2), § 3, eff. Jan. 1, 2022.)  The cited version is that from at least prior to January 1, 2019, and the events leading to Mr. Anderson's death occurred in the year 2020.  The substantive content of the provisions remained the same for purposes of the Court's analysis.

California,[11] but submit that based on the plain meaning, the precedent established by former Judge Wanger should be controlling.  See Abston v. City of Merced, No. 09CV00511-OWW-GSA, 2009 WL 3398809, at *5 (E.D. Cal. Oct. 20, 2009) ("A private plaintiff, however, like Ms. Abston, cannot assert a claim on behalf of a decedent under § 52.1 because the claim must be 'on his or her own behalf.' ") (citations omitted).

Plaintiffs respond that the weight of authority in the Ninth Circuit subsequent to the decisions cited by Defendants resolves the question of the survival of the Bane Act claim, or, at a minimum, to the extent there is a disagreement in the Ninth Circuit on this question, Plaintiffs submit that principles of judicial economy warrant denying the motion, so as to avoid duplicate litigation if the issue is subsequently resolved in Plaintiffs' favor.

In reply, Officer Defendants reiterate their position that as wrongful death heirs, Plaintiffs lack standing as a matter of law.  As for the holding in Medrano and the cases highlighted by Plaintiffs concerning the survival action, despite not addressing the reasoning underlying the split in authority in their initial motion, the reply brief only provides the Court with the following statement: "Officer Defendants agree that there is a split in the Eastern District regarding whether the Bane Act can be brought as a survival action and submit the arguments set forth in their moving papers."  (Officer Reply 4.)

The Court finds the Officer Defendants have presented no convincing reason for this Court to depart from its previous findings concerning the issue of whether a parent may bring a survival cause of action under the Bane Act on behalf of a decedent, nor a substantive response to the reasoning contained in the additional caselaw cited in support of Plaintiffs' position.  On the other hand, Plaintiffs do not meaningfully delineate or discuss the ability of Plaintiff James Jenkins or Plaintiff Doris Anderson, in their individual capacities, to bring the Bane Act claim based their own rights "to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments."  (FAC ¶ 129(e).)  Thus, for the reasons

---

[11]  In initial briefing, Officer Defendants do not appear to signify what the conflicting authority is, although they cite to Medrano, and do not attempt directly to explain why those decisions are incorrect.

1   explained below, the Court finds Plaintiff Doris Anderson's Bane Act claim brought as the

2   successor in interest should survive the motion to dismiss, while the Plaintiffs' claims brought on

3   their individual behalf for the violation of their own rights are subject to dismissal.

4        Thus, the Court finds in accord with Plaintiffs that subsequent decisions in this circuit

5   have clarified the applicability of the decision in BART, and have found that Bane Act claims

6   survive and can be asserted by successors in interest.   While Officer Defendants argue Abston

7   should be controlling, there the issue was undisputed, and thus the Court is not persuaded that it

8   should have been the last word on the issue in this district.   See Abston, 2009 WL 3398809, at *5

9   ("Plaintiffs do not challenge that Ms. Abston lacks standing to assert such a claim.").

10       Indeed, the first case cited by the Officer Defendants, Medrano, while as noted above that

11  it restates the holding of Abston and BART, decided in favor of the plaintiff as to the survival

12  cause of action brought on behalf of the decedent:

> However, as pleaded, Plaintiffs' Bane Act claim is in the nature of
> a survival cause of action, rather than a wrongful death cause of
> action. Unlike wrongful death, a survival claim is not a new cause
> of action that vests in heirs on the death of the decedent, but rather
> is a separate and distinct cause of action which belonged to the
> decedent before death but, by statute, survives that event; the
> survival statutes do not create a cause of action, but merely prevent
> abatement of a cause of the injured person and provide for its
> enforcement by or against the personal representative of the
> deceased. *Grant v. McAuliffe,* 41 Cal.2d 859, 864, 264 P.2d 944
> (Cal.1953); *Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256,
> 1264–65, 45 Cal.Rptr.3d 222 (Cal.App.2006).  In *Dela Torre v.*
> *City of Salinas,* the mother of a woman tasered, shot, and killed by
> police officers filed suit alleging, among other things, that the
> defendants had violated the decedent's rights under the Bane Act
> by interfering with her exercise or enjoyment of various rights
> secured by the United States and California Constitutions. *See* No.
> C–09–00626 RMW, 2010 WL 3743762, at *6 (N.D.Cal., Sep. 17,
> 2010). In *Dela Torre,* the court concluded that the decedent's Bane
> Act cause of action survived her death under California Code of
> Civil Procedure § 377.20, and therefore her mother, as successor in
> interest, had standing to assert a claim for violation of § 52.1 on
> the decedent's behalf. *Id.* at *7 (citing *Moore ex rel. Moore v.*
> *County of Kern,* Nos. 1:05–cv–1115–AWI–SMS, 1:06–cv–0120–
> OWW–SMS, 2007 WL 2802167, at *5–6 (E.D.Cal., Sep. 23,
> 2007)); *cf. Arres v. City of Fresno,* No. CVF 10–1628 LJO SMS,
> 2011 WL 284971, at *26 (E.D.Cal., Jan. 26, 2011) (dismissing
> Bane Act claim to the extent plaintiffs sought derivative relief for
> their own injuries caused by police shooting of decedent; *but*
> *see Abston v. City of Merced,* No. 09–CV–00511–OWW–GSA,
> 2009 WL 3398809, at *5–6 (E.D.Cal., Oct. 20, 2009) (finding that

43

1

> decedent's wife lacked standing to bring Bane Act claim on behalf
> of decedent's estate). While there appears to be some disagreement

2

> in this District as to the effect of the *Bay Area Rapid*
> *Transit* decision on a plaintiff's ability to bring a survival cause of

3

> action under the Bane Act on behalf of a decedent, the Court
> agrees with the reasoning set forth in *Dela Torre*. Accordingly, the

4

> County's motion to dismiss the Second Cause of Action is denied.

5

6

Medrano, 921 F. Supp. 2d at 1016.   Plaintiffs note that Dela Torre, cited in Medrano, was

7

brought by the mother of a woman tasered, shot, and killed by police officers.  Dela Torre v. City

8

of Salinas, No. C-09-00626 RMW, 2010 WL 3743762 (N.D. Cal. Sept. 17, 2010).

9

Plaintiffs also highlight this same Court issued findings and recommendations that

10

rejected the arguments that the County Officer Defendants make in this case, at least as to the

11

survival cause of action for the successor in interest:

12

> *Abston* is not persuasive, as it, and the cases cited therein, rely
> upon a misreading of [BART].   The court in [BART] made no

13

> analysis on whether Bane Act claims of a decedent survive the
> death of the decedent pursuant to California Code of Civil

14

> Procedure § 377.20 and pass to the decedent's successor in interest
> pursuant to California Code of Civil Procedure § 377.30. Tellingly,

15

> the concepts of the survival of a cause of action is not discussed
> anywhere in the [BART] opinion nor does the case ever cite

16

> California Code of Civil Procedure §§ 377.20 or 377.30.
> Accordingly, the holding in [BART] appears to be limited to

17

> whether a parent may state their own personal claim under the
> Bane Act on the theory that the death of their child interfered with
> the parents' constitutional right to parent . . .

18

19

> . . . In this case, Norma presents an entirely different theory.
> Norma does not contend that Stephen's death constitutes an

20

> interference with Norma's constitutional right to parent in violation
> of the Bane Act. Norma instead argues that Stephen held a claim

21

> under the Bane Act for the interference with Stephen's
> constitutional right to be free from unconstitutional searches and

22

> seizures. Upon Stephen's death, that claim survived Stephen's
> death pursuant to California Code of Civil Procedure § 377.20 and

23

> passed to Norma pursuant to California Code of Civil Procedure §
> 377.30 . .

24

> . . . The Court finds the reasoning of *Medrano* to be persuasive.
> None of the other cases cited by Defendants fully considered

25

> whether Bane Act claims survive the decedent and pass to a
> successor in interest. Moreover, Defendants' arguments otherwise

26

> are not persuasive . . .

27

> . . . in light of the statutory language governing the survival of
> claims under California law. California Code of Civil Procedure §

28

> 377.20(a) states that "[e]xcept as otherwise provided by statute, a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period." Accordingly, California law provides that survival of claims is the rule, not the exception. Defendants presume the opposite and attempt to argue that Section 377.20 does not apply unless the Bane Act specifically provides for survival of a claim, which runs contrary to the plain language of Section 377.20. Moreover, the Court does not interpret subdivisions (b) or (g) of the Bane Act as negating the effect of Section 377.20. Subdivision (b) merely states a person may bring a private cause of action under the Bane Act while subdivision (g) merely states that relief under the Bane Act is in addition to, as opposed to as a substitute for, relief under other causes of action. Cal. Civ.Code § 52.1(b), (g).
>
> Based upon the foregoing, the Court finds that a cause of action under the Bane Act survives the death of the victim/plaintiff pursuant to California Code of Civil Procedure § 377.20 and passes to the victim's/plaintiff's successor in interest pursuant to California Code of Civil Procedure § 377.30. Accordingly, Norma alleges sufficient facts establishing her standing to assert a Bane Act claim on behalf of the Estate of Stephen Crawley.

Est. of Crawley v. Kings Cnty., No. 1:13-CV-02042-LJO-SAB, 2014 WL 2174848, at *11 (E.D. Cal. May 23, 2014), report and recommendation adopted, No. 1:13-CV-02042-LJO-SAB, 2014 WL 2801046 (E.D. Cal. June 19, 2014). The Court finds no convincing argument to depart from its previous analysis. Further, Plaintiffs highlight a more recent published decision out of the Central District of California. See Wallisa v. City of Hesparia, 369 F. Supp. 3d 990, 1021 n.12 (C.D. Cal. 2019) ("[T]he court agrees with the reasoning set forth in [Dela Torre]and Medrano, that a person's Bane Act claim survives the person's death under California Code of Civil Procedure § 377.20, and thus Schenck's daughter has standing to assert a claim on his behalf."); see also Lopez v. Cty. of Los Angeles, 2015 WL 3913263, at *9 (C.D. Cal. June 25, 2015) ("Cases interpreting BART have held that the decision does not prevent parents from bringing a survival action on behalf of a deceased child whose constitutional rights were violated."); Banks v. Mortimer, No. 18-CV-07391-HSG, 2022 WL 3216401, at *21 (N.D. Cal. Aug. 9, 2022) ("Courts in this Circuit have accordingly found that even though the Bane Act is not a wrongful death provision, a decedent's successor-in-interest has standing to assert a Bane Act claim on the decedent's behalf . . . [and] [t]his Court agrees."); Pogue v. Cnty. of San Diego, No. 21-CV-309 TWR (MDD), 2022 WL 184666, at *7 n.3 (S.D. Cal. Jan. 19, 2022) ("Defendants' position is

1   based on an erroneous interpretation of [BART,]an interpretation that district courts in the Ninth

2   Circuit have repeatedly rejected . . . [and] therefore declines to conclude that Plaintiff lacks

3   standing to assert her Bane Act cause of action on Decedent's behalf.").

4          Plaintiffs do not address or delineate their arguments as to the differences between the

5   Bane Act claim as brought as a successor in interest claim, and where brought directly by

6   Plaintiffs for direct injuries to their own rights.  The Court finds the cases cited, including this

7   Court's holding in Crawley, do not support maintaining such individual claims not brought as a

8   successor in interest of a decedent.  See Est. of Crawley, 2014 WL 2174848, at *11 ("In this

9   case, Norma presents an entirely different theory [as Norma] does not contend that Stephen's

10  death constitutes an interference with Norma's constitutional right to parent in violation of the

11  Bane Act [but] instead argues that Stephen held a claim under the Bane Act for the interference

12  with Stephen's constitutional right to be free from unconstitutional searches and seizures.");

13  Medrano, 921 F. Supp. 2d at 1016 (before siding in favor of plaintiffs as successor in interest,

14  noting "[i]n each of [plaintiff's] cases, the plaintiffs suing under the Bane Act were themselves

15  victims of the alleged excessive force or false arrest, rather than family members of those victims

16  . . . [a]ccordingly, the Court finds that Plaintiffs lack standing to bring a claim under the Bane

17  Act on their own behalf."); Lopez, 2015 WL 3913263, at *9 ("Thus, to the extent plaintiffs

18  allege this claim as the survivors of Gabriel, the claim is cognizable and cannot be dismissed for

19  lack of standing [however,] [p]laintiffs also allege, however, that defendants interfered

20  with *their* rights p[and] [t]o the extent they allege a Bane Act claim in their own right, defendants

21  are correct that plaintiffs' claim is barred by BART.") (footnote omitted); Banks, 2022 WL

22  3216401, at *21 ("BART only held that parents cannot bring a Bane Act claim on a wrongful

23  death basis to recover for a violation of *their own rights*, like the right to parent.  It said nothing

24  about whether parents can recover as successors in interest for a violation of their deceased

25  child's rights, like the right to be free from an unreasonable seizure . . . The distinction makes

26  sense.  Unlike a wrongful death claim, a survival claim is not a new cause of action that vests in

27  heirs after the death of the decedent."); B.R.S. by & through Sznaider v. City of Palm Springs,

28  No. EDCV1301644DMGSPX, 2015 WL 13914947, at *9 (C.D. Cal. Jan. 26, 2015) ("Here,

unlike the [BART] plaintiffs' claim, Plaintiff's cause of action is not based solely on a violation of his own constitution rights, but also on the violation of Sznaider's constitutional rights.") (citing Est. of Crawley, 2014 WL 2174848, at *9).

Here, in addition to the claim as successor in interest to the Decedent's rights, the eleventh cause of action includes claims on behalf of the Plaintiffs directly, in alleging a violation Defendants "violated Plaintiffs' and Decedent's rights," (FAC ¶ 129), and "Plaintiffs' right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments." (FAC ¶ 129(e).) The Court recommends dismissal of the Bane Act claim to the extent it is brought by Plaintiffs for violation of their direct rights, and not as successor in interest.

Accordingly, the Court recommends the Officer Defendants' motion to dismiss be granted in part and denied in part, in that Plaintiff Doris Anderson's Bane Act claim brought as the successor in interest to the Decedent Mr. Anderson should not be dismissed, but Plaintiff Doris Anderson's and Plaintiff James Jenkins' Bane Act claims, to the extent they are brought as individual claims on their own behalf for their own injuries, should be dismissed without leave to amend.

## C.   The CFMG Defendants' Motion to Dismiss

The CFMG Defendants bring various motions to dismiss Plaintiffs' first through sixth causes of action brought pursuant to 42 U.S.C. §1983 and Title II of the Americans with Disabilities Act (ADA), arguing these causes of action fail to state claims upon which relief can be granted.

### 1.   The Court Recommends Denying CFMG Defendants' Motion to Dismiss the First through Fifth Causes of Action

CFMG Defendants move to dismiss the first through fifth causes of action arguing there are no specific allegations as to the CFMG Defendants' conduct related to the Decedent within the stated claims separate and apart from the other Defendants. Defendants argue the FAC should be dismissed for lack of specificity, for being conclusory, and for being a "shotgun"

1  pleading.  (CFMG Mot. 9.)

2    For similar reasons as stated above as to Officer Defendants, in recognition that the

3  claims have been clarified through stipulation, and given leave to amend would likely be granted,

4  the Court declines to wholesale dismiss all five causes of action, and finds the CFMG

5  Defendants have not met their burden in addressing the facts that do appear in the complaint as

6  to the elements of the individual causes of action.   See Shay, 512 F. Supp. 3d at 1071

7  ("Defendants provide summary arguments and analyses seeking dismissal of all causes of action

8  without addressing how they apply to each cause of action [and therefore] fail to meet

9  Defendants' burden under Rule 12(b)(6) to prove that no claim has been presented."); Corbett,

10  567 F. Supp. 3d at 1194 ("Defendant provides summary arguments and analyses seeking

11  dismissal of all causes of action without addressing how its argument apply to each cause of

12  action.").  Nonetheless again, in any amended complaint, Plaintiffs are expected to more clearly

13  delineate the factual allegations as to each individual Defendant.

14    Accordingly, the Court recommends the CFMG Defendants' first motion to dismiss

15  targeted at the first five causes of action (CFM Mot. 9-10), be denied.

16    2.    The Court Recommends Granting CFMG Defendants' Motion to Dismiss the
          First Cause of Action Against Nurse Defendants G. Garcia and Guerrero
17

18    Guerrero and G. Garcia move to dismiss the first cause of action for deliberate

19  indifference to serious medical need, for failure to state a claim.

20    a.    General Basis for Motion

21    Defendants concede that for purposes of this motion, Plaintiffs have sufficiently pled that

22  Mr. Anderson had a disability, the chronic seizure disorder.  While CFMG Defendants again

23  argue that the complaint is an improper shotgun pleading, Defendants also present more specific

24  legal standards and acknowledgement of the facts that are alleged against G. Garcia and

25  Guerrero, and the Court proceeds to analyze the facts alleged as to the first cause of action.

26    CFMG Defendants argue neither the totality of plaintiffs' FAC, nor the factual statements

27  naming Guerrero and G. Garcia at paragraphs 38-41 purporting to lay the basis for a 42 U.S.C.

28  §1983 claim against them, make any allegations as to what these specific individual defendants

did or did not do which was a violation of Plaintiffs' and Decedent's constitutional civil rights. CFMG contends that aside from stating their names in the "Parties" section of the pleading, and that they mis-assessed Mr. Anderson's condition as drug-related rather than seizure, there is no statement as to how these individuals deprived Plaintiffs or Decedent of their civil rights. Defendants argue that Plaintiffs must establish each Ms. Guerrero and Ms. Garcia, through their own individual actions, has violated the constitution, that Plaintiffs have wholly failed to plead any facts to support the nurses' individual liabilities, and that such absentee pleading is in violation of Rule 8 and fails to state a claim against G. Garcia and Guerrero.

CFMG Defendants further argue it does not appear any amendment to the FAC would salvage the first cause of action against Guerrero or G. Garcia, as the totality of the allegations at paragraphs 55-63 concern the claimed deprivation of rights regarding improper conditions of confinement, and improper restraint, and contend neither of the nurses played any role in such, other than in the attempts to perform their medical duties.  CFMG Defendants argue there is no indication that either, as medical staff, have any relation to these claims or issues.

### b.   General Legal Standards

Plaintiffs correctly emphasize a lower standard for a pretrial detainee.  As noted above, pretrial detainee's rights arise under the Fourteenth Amendment's Due Process Clause whereas a convicted prisoner's rights arise under the Eighth Amendment's Cruel and Unusual Punishments Clause.  See Bell, 441 U.S. at 535.  A deliberate indifference test applies to both a pretrial detainee's claim and a prisoner's claim, but for a pretrial detainee it is an objective test, rather than the subjective test which applies to a prisoner's claim.  See Gordon, 888 F.3d at 1124 ("[W]e hold that claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." (quoting Castro, 833 F.3d at 1070)).  A "pretrial detainee need not prove those subjective elements about the officer's actual awareness of the level of risk."  Id. at 1124 n.4 (quoting Castro, 833 F.3d at 1070); see also Scalia v. Cnty. of Kern, 493 F. Supp. 3d 890, 899 (E.D. Cal. 2019) ("The Ninth Circuit has since confirmed in [Gordon] that a pretrial detainee's claim for medical deliberate indifference is subject to a solely

1  objective standard.”).

2  Because Plaintiff claims involves the conditions at the Fresno County Jail as a pretrial

3  detainee, the Court applies the objective deliberate indifference standard.  Under this standard, a

4  pretrial detainee must allege:

5  (i) the defendant made an intentional decision with respect to the
   conditions under which the plaintiff was confined; (ii) those

6  conditions put the plaintiff at substantial risk of suffering serious
   harm; (iii) the defendant did not take reasonable available

7  measures to abate that risk, even though a reasonable official in the
   circumstances would have appreciated the high degree of risk

8  involved—making the consequences of the defendant’s conduct
   obvious; and (iv) by not taking such measures, the defendant

9  caused the plaintiff's injuries.

10  Gordon, 888 F.3d at 1125.  With regard to the third element, the defendant’s conduct must be

11  objectively unreasonable —“a test that will necessarily turn[ ] on the facts and circumstances of

12  each particular case.”  Id. (internal citations and internal quotation marks omitted).  A “mere lack

13  of due care by a state official does not deprive an individual of life, liberty, or property under the

14  Fourteenth Amendment.”  Id.  (quotations and citations omitted).  Thus, the plaintiff must “prove

15  more than negligence but less than subjective intent—something akin to reckless disregard.”  Id.

16  “Under that standard, ‘a plaintiff must show that the defendant disregard[ed] an excessive risk to

17  the plaintiff's health and safety by failing to take ‘reasonable and available measures’ that could

18  have eliminated that risk.’ ”  Pastora v. Cnty. of San Bernardino, No. EDCV211410JGBSPX,

19  2022 WL 2965778, at *3 (C.D. Cal. May 19, 2022) (quoting Fraihat v. U.S. Immigr. & Customs

20  Enf't, 16 F.4th 613, 636 (9th Cir. 2021)).

21  **c.    Factual Allegations and Specific Factual Arguments**

22  The Court excerpts the totality of the specific allegations mentioning G. Garcia and

23  Guerrero after Mr. Anderson began having a seizure:

24  At some point, Officer Cha called via his handheld radio for
   medical staff to respond. Officer Thao, a supervisor, and

25  CFMG/Wellpath Registered Nurses Genevieve Garcia and Maria
   Guerrero arrived.  Rather than waiting for an appropriate medical

26  assessment, or better yet, calling for paramedics, the officers stood
   Mr. Anderson up from the bunk and walked him out of the cell.

27  The custody staff and nurses dismissed the seizure diagnoses and
   incorrectly attributed the symptoms to drugs. Officer Ponce

28  thought he had “excited delirium.” Because of the ongoing seizure

activity, Defendants were unable to seat Mr. Anderson in the wheelchair. They told him to stop resisting. What they should have been doing is allow him to lie down and relax, while summoning qualified medical assistance.

Officer Thao called via her handheld radio and requested a Stryker Chair, which is a devise designed to evacuate disabled people. A gurney should have been used instead. Officer Her arrived with a Stryker Chair. At some point Sgt. Garcia and Officer Alanis also arrived to assist. Mr. Anderson continued moving his body and remained verbally non responsive. The officers and nurses were unable to secure Mr. Anderson to the chair because of his seizure activity, which they were aggravating. The officers laid Anderson face down on the floor. Officer Sanchez handcuffed him behind his back.

Sgt. Garcia, requested a restraint chair, which is not a medical device, and Lieutenant Carter authorized it, even though there was clearly a medical emergency rather than a combative inmate. Defendants should have requested paramedics, with a gurney, to transport Mr. Anderson to the hospital. Officer Leboeuf brought with a restraint chair. The officers seated Mr. Anderson in the restraint chair, with the lap belt secured around his waist and his legs secured. Only then the officers removed the handcuffs that were behind his back. Mr. Anderson was still seizing, and the officers had to force his arms into the chair's restraints. However as we attempted to secure his wrist into the handcuffs that are attached to the chair, he would pull away from our grasps and attempt to push our hands away. Chair placement was complete about 25 minutes after the officers were first notified of the seizure, and Mr. Anderson had been actively seizing throughout.

As the officers and nurses wheeled Mr. Anderson towards the pod door, Nurse Garcia noticed that Mr. Anderson was not breathing. She requested Sgt. Garcia call for a code 3 ambulance. After the officers and nurses exited the pod they removed Mr. Anderson from the restraint chair in the sally port initiated cardiopulmonary resuscitation (CPR). CPR compressions were rotated by Officers Leboeuf, Sanchez, Alanis and Her, and two additional CFMG/Wellpath nurses, Gattie and Obodoagha, were now on scene assisting with the patient. EMS staff arrived shortly after 2:30, took over CPR, and transported Mr. Anderson to the hospital, where he was pronounced dead.

(FAC ¶¶ 38-41.)

Thus to attempt to summarize, after the officers stood Mr. Anderson up, the nurses and custody staff are together alleged to have "dismissed the seizure diagnoses and incorrectly attributed the symptoms to drugs." (FAC ¶ 38.) The sequence of allegations and lack of delineation between Defendants makes it unclear at what point the nurses are alleged to have

1    arrived, as for example, the paragraph concludes: "They told him to stop resisting[,] [w]hat they

2    should have been doing is allow him to lie down and relax, while summoning qualified medical

3    assistance."   (Id.)   "The officers and nurses were unable to secure Mr. Anderson to the chair

4    because of his seizure activity, which they were aggravating."  (FAC ¶ 39.)  "As the officers and

5    nurses wheeled Mr. Anderson towards the pod door, Nurse Garcia noticed that Mr. Anderson

6    was not breathing," "[s]he requested Sgt. Garcia call for a code 3 ambulance," and "[a]fter the

7    officers and nurses exited the pod they removed Mr. Anderson from the restraint chair in the

8    sally port initiated cardiopulmonary resuscitation (CPR)."  (FAC ¶ 41.)

9         The remainder of the paragraphs that Plaintiffs direct the Court to in opposition, as

10   CFMG Defendants correctly point out, do not delineate between all named Defendants.

11   Specifically, Plaintiffs argue as follows:

12        "Clearly, deliberation was practical here. Guerrero and Garcia
          were *told* Mr. Anderson was having a seizure when they arrived.
13        *Id.* ¶¶ 36, 38, 58. They ignored that diagnosis and Mr. Anderson's
          medical history and decided Mr. Anderson was having a drug-
14        related problem. *Id.* Twenty-five minutes elapsed from the time
          Mr. Anderson began seizing until the time of his death. *Id.* ¶¶ 40-
15        41. Some of that period was spent waiting for a restraint device to
          arrive and then for a restraint chair to arrive. Guerrero and Garcia
16        had enough time to consider what might actually be wrong with
          Mr. Anderson, especially because they had been told he was
17        seizing when they arrived. Plaintiffs accordingly allege Guerrero
          and Garcia's deliberate indifference. FAC ¶¶ 72, 75, 80; *see also*
18        *supra* IV.A.1.

19   (Opp'n CFMG 17.)   Plaintiffs also argue that leading up to Mr. Anderson's death, Guerrero,

20   Garcia, and the custodial staff forcibly restrained Mr. Anderson while he was seizing.

21        However, Guerrero and Garcia *did* play a role in improperly
          restraining Mr. Anderson. Defendants do not cite any cases to
22        support their position that "attempt[ing] to perform their medical
          duties," ECF No. 49-1 at 11, somehow shields them from that
23        liability. No cases so hold. Furthermore, the First Amended
          Complaint states that they failed to provide "prompt and emergent
24        care" and failed to "adequately identify or address his seizure."
          FAC ¶¶ 58, 61. Again, the facts in the First Amended Complaint
25        are numerous: Garcia and Guerrero were summoned to Mr.
          Anderson's cell to provide medical care for his active seizure, but
26        they provided none; despite visible signs of an active and ongoing
          seizure, Garcia and Guerrero incorrectly claimed Mr. Anderson
27        was using drugs; Garcia and Guerrero watched jail officers take
          Mr. Anderson in and out of his cell and aggravate his seizure; and
28        Garcia and Guerrero and jail officers forced Mr. Anderson's seized

body into a restraint device and chair while he diminished, if any, control over his body. *Id.* ¶¶ 38-41.

(Opp'n CFMG 15.)

### d.    The Court Recommends Granting the Motion to Dismiss

The Court does not find Plaintiffs' framing supported by the actual allegations in the complaint.  Paragraph 36 only generally alleges cellmates tried to alert staff, but there is no indication of this equating to a fact that the nurses were told he was having a seizure, or that it would equate to a diagnosis they were required to accept as they entered the scene at some point. (FAC ¶ 36 ("During the early hours of June 24, 2020, Kapri Johnson, Mr. Anderson's cellmate, woke up to Mr. Anderson having a seizure.  He was shaking with his fists balled up and was making choking sounds. Mr. Johnson immediately enlisted other inmates to help Mr. Anderson, another cellmate, Crocketts, used the emergency intercom.  There was no immediate response from custodial or medical staff, so he ran over to the control room and pounded on it to get the attention of custody staff."); FAC ¶ 38 ("The custody staff and nurses dismissed the seizure diagnoses and incorrectly attributed the symptoms to drugs.").)  Paragraph 58 does not refer to the nurses and would be conclusory as applied to the nurses: "Defendants knew or should have known that on June 24, 2020, Mr. Anderson was having one or more seizures in his cell and required prompt and emergent care.")  (FAC ¶ 58.)

Recognizing details come out in discovery, the Court finds Plaintiffs' framing in briefing of the 25-minute period as alleging a situation that would allow the nurses to have time to consider what might actually be wrong with Mr. Anderson not specifically supported as to the nurses.  (FAC ¶¶ 36-40 ("There was no immediate response from custodial or medical staff, so he ran over to the control room and pounded on it to get the attention of custody staff . . . [e]ventually MJ3 Security Officer Franco notified Officers Ponce and Cha by telephone that Mr. Anderson in Cell C-09 was 'having a possible seizure[,]' . . . [a]t some point, Officer Cha called via his handheld radio for medical staff to respond . . . Genevieve Garcia and Maria Guerrero arrived . . . [and] [c]hair placement was complete about 25 minutes after the officers were first notified of the seizure.").)

1    As to diagnoses, there are only allegations that the inmate told officers of the seizure

2    (FAC ¶ 37), and no indication what the nurses were actually told, only a statement that officers

3    and the nurses "dismissed the seizure diagnoses."  (FAC ¶ 38.)  Even if the nurses were told of

4    what the inmates had stated, the Court agrees with Defendants that these were not "diagnoses"

5    that the nurses were required to accept, even despite more general allegations concerning

6    awareness of the jail or other medical staff generally, whether from Mr. Anderson's previous

7    incarcerations or specific complaints by Mr. Anderson that night.  The Court finds insufficient

8    facts or allegations made specifically as to G. Garcia or Guerrero in this regard.

9    In consideration of the above facts and the parties' arguments, the Court finds the legal

10   authorities would weigh in favor of granting the motion to dismiss.  See Ervin v. Jones, No.

11   219CV01883KJMCKDPS, 2020 WL 4350137, at *3 (E.D. Cal. July 29, 2020) ("There is no

12   allegation that Dr. Padilla made any intentional decision regarding plaintiff's medical treatment,

13   nor that Dr. Padilla's actions were objectively unreasonable [as] [f]rom all appearances, Dr.

14   Padilla was sympathetic to plaintiff's complaints and attempted to provide plaintiff with the

15   medication he was seeking [and] [a]t best, plaintiff has stated a claim for negligence against Dr.

16   Padilla, which is insufficient under the authority cited above."); Floyd v. Ada Cnty., No. 1:17-

17   CV-00150-DCN, 2020 WL 1991400, at *18 (D. Idaho Apr. 27, 2020) (noting the objective

18   deliberate indifference standard requires not only that an official's conduct be unreasonable, but

19   also that the 'high degree of risk' from that conduct be obvious," and finding "[c]learly, Nurse

20   Twohig could not disregard an obvious risk of failing to provide medications she had no reason

21   to know Floyd was prescribed." (quoting Gordon, 888 F.3d at 1124–25)), aff'd, No. 20-35481,

22   2022 WL 1467979 (9th Cir. May 10, 2022); see also Floyd, WL 1991400, at *16 ("The Court

23   allowed Floyd to proceed against Nurses Dean and Woodcook at the Motion to Dismiss stage

24   because Floyd alleged they treated him as a 'nuisance,' never scheduled him to see a social

25   worker, and merely told Floyd he was scheduled to see a social worker 'to pacify [him] until he

26   was released from the Ada county jail,' the record on summary judgment shows such allegations

27   are false."); Pastora, 2022 WL 2965778, at *3 (conclusory allegations "that Individual

28   Defendants were on duty while Pastora was in jail . . . that Individual Defendants were aware of

54

facts that a substantial risk of harm existed for inmates . . . and that Individual Defendants made intentional decisions as to Pastora's conditions of confinement and her medical care, which placed her at a substantial risk of harm," "fail[ed] to show that any of the Individual Defendants personally played a role in violating Pastora's rights.") (quotation marks omitted).

As to Defendants G. Garcia and Guerrero specifically, who are not alleged to have been part of the decision on where to house Mr. Anderson, are not alleged to delay responding to Mr. Anderson's requests for medical assistance, nor in coming to his assistance when radioed, the Court finds the facts distinguishable from Miller, where the claim survived a motion to dismiss:

> The plaintiffs allege Sutter County transferred Miller to Nevada County Jail because Sutter County feared it could not give her the treatment she needed. See SAC ¶ 92. When Miller arrived, Nevada County staff learned she suffered from seizures and chronic pain, was taking medication for both conditions and was misusing opioids. See id. ¶¶ 93–96. She was nevertheless assigned to a cell in the general population. See id. That night, staff waited for several hours while Miller suffered in pain, called for help, and became unresponsive before they called paramedics and sent her to the hospital. See id. ¶¶ 99–100. These allegations satisfy the elements of a claim for deliberate indifference: (1) staff decided not to intervene despite Miller's calls for help; (2) their inaction put Miller at a substantial risk of serious harm from opioid overdose or withdrawal; (3) jail staff knew Miller was in pain, had been misusing opioids, and was suffering from seizures; and (4) because staff did not intervene, Miller suffered needlessly, became unresponsive, and was hospitalized.

Est. of Miller v. Cnty. of Sutter, No. 220CV00577KJMDMC, 2022 WL 493077, at *3 (E.D. Cal. Feb. 17, 2022); see also Trujillo v. California Forensic Med. Grp., No. EDCV202131JGBSHKX, 2021 WL 4803484, at *3 (C.D. Cal. July 8, 2021) (in action involving pretrial detainee, finding where "Plaintiff alleges that Defendants Moore, Pappas, and Norris, like all other individually-named Defendants, were on duty at some point during Decedent's confinement . . . [that] the SAC contains no allegations—other than boilerplate recitations of Section 1983 standards—that Defendants Moore, Pappas, or Norris made intentional decisions about Decedent's confinement.").

Even at the pleading stage and construing the facts in favor of Plaintiffs, the Court finds the distinctions here to the allegations from Scalia to be particularly instructive, wherein the

court denied summary judgment on a claim for deliberate indifference to medical need:

> First, it is undisputed that Nurse Blakely made numerous intentional decisions with respect to the denial of Ms. Scalia's medical care, most critically the decision to return Ms. Scalia to a cell after the first examination, despite knowing that Ms. Scalia had fallen from the top bunk and suffered a head injury from hitting the concrete floor. [citations] There are also factual disputes regarding Nurse Blakely's intentional decisions to not act during both of her examinations, such as deciding to not call a physician nor perform a formal neurological assessment. [citations]

> Second, there are genuine material factual disputes regarding whether the alleged denial of needed medical care put plaintiff at substantial risk of suffering serious harm. Ultimately, Plaintiff provides evidence that that Ms. Scalia suffered serious head trauma, that Nurse Blakely's intentional decisions delayed treatment and exacerbated the injury, and that earlier detection and treatment of the head injury would have saved Ms. Scalia's life. [citations]

> Third, at a minimum, there are genuine material factual disputes regarding whether Nurse Blakely did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of her conduct obvious. Ms. Scalia fell from about five feet onto bare concrete, hitting her head against the concrete. *See* ECF No. 69 ¶ 12. Ms. Scalia was transported to the infirmary by wheelchair because she was unable to walk on her own, which Nurse Blakely observed. *See id.* ¶¶ 13, 15. But Nurse Blakely's first examination lasted several minutes at most, and Nurse Blakely did not perform a formal neurological assessment, did not ask Ms. Scalia why she was in a wheelchair, did not ask Ms. Scalia whether she had been unconscious, did not ask Ms. Scalia to attempt to walk without assistance, did not keep Ms. Scalia in the infirmary for observation, and did not call a physician at any time. [citations] Even after the second examination when Ms. Scalia's symptoms were far more severe, Nurse Blakely did not call a physician, and her referral to the hospital did not state Ms. Scalia had hit her head, that Ms. Scalia could not walk during the initial exam, nor that Ms. Scalia was unconscious and non-responsive during the second exam. [citations] It is undisputed that Nurse Blakely failed to take these reasonable, available measures to abate the risk of serious harm, and there is a genuine dispute of material fact whether a reasonable nurse would have appreciated the high degree of risk involved, making the consequences of such conduct obvious. *See also* ECF No. 73-1 ¶¶ 147-53. There is enough evidence for the jury to decide that a reasonable nurse would have responded with more urgency and more careful testing of Ms. Scalia's condition given the obviously high risk of severe consequences from a possible traumatic head injury, and that Nurse Blakely's actions were objectively unreasonable and reckless.

1    Scalia v. Cnty. of Kern, 493 F. Supp. 3d 890, 899–900 (E.D. Cal. 2019).

2          Plaintiffs argue the Nurses failure to treat Mr. Anderson's condition resulted "in further

3    significant injury" and "the unnecessary and wanton infliction of pain," as described by the

4    Ninth Circuit; that within 25 minutes, Mr. Anderson was dead; leading up to his death, Guerrero,

5    Garcia, and the custodial staff forcibly restrained Mr. Anderson while he was seizing.  Plaintiffs

6    argue they have satisfied the requirement of showing the Nurses actions or failures to respond to

7    Mr. Anderson's serious medical need caused harm—is also satisfied because: CFMG

8    documented Mr. Anderson's history; anyone in Fresno knew that the temperature had been

9    dangerously high, and Mr. Anderson's medical chart made clear that such high heat would

10   trigger a debilitating seizure; that on arriving in Mr. Anderson's cell, Guerrero and Garcia should

11   have performed a "differential diagnosis" by determining ("ruling out") whether Mr. Anderson

12   was having a seizure and required prompt and emergent care (FAC ¶ 58); and they were told that

13   Mr. Anderson was having a seizure and ignored that correct diagnosis, incorrectly attributing the

14   symptoms to drugs or excited delirium.  (FAC ¶¶ 36, 38, 58.)  Plaintiffs also argue Guerrero and

15   Garcia supported the custodial staff in forcing Mr. Anderson into two restraint devices, even

16   though both nurses were—or should have been—well aware that the official policy required that

17   restraint chairs "not be used for medical purposes."  (FAC ¶ 23.)

18         The Court already addressed the lack of specificity as to the paragraphs above and the

19   issues the Court sees with the factual framing and arguments even taking the allegations in the

20   most favorable light.  In relation to the above, the Court finds the caselaw generally, and the

21   principles enunciated in the cases proffered by Plaintiffs, supports dismissal as to the nurses,

22   based on the facts as alleged.  See Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012)

23   (generally, deliberate indifference "may appear when prison officials deny, delay or intentionally

24   interfere with medical treatment, or it may be shown by the way in which prison physicians

25   provide medical care." (quoting Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006))); see also

26   Wilhelm, 680 F.3d at 1122–23 (noting that in Jett, "the prison doctor recognized the plaintiff's

27   need to see a specialist (in that case, an orthopedist), as evidenced by the prison doctor's own

28   referral, but the plaintiff was not taken to see the specialist for at least six months," and that the

1   Ninth Circuit there "concluded that a trier of fact could find that the doctor was aware of the
2   plaintiff's need for treatment and that the doctor's 'failure to see [the plaintiff] to ensure
3   [administration of the prescribed treatment] was deliberate indifference to a serious medical
4   condition.' ") (quoting <u>Jett</u>, 439 F.3d at 1097–98).

5          "The deliberate indifference doctrine is limited in scope." <u>Wilhelm</u>, 680 F.3d at 1122. "
6   '[A]n *inadvertent* failure to provide adequate medical care' does not, by itself, state a deliberate
7   indifference claim for § 1983 purposes." <u>Id.</u> (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060
8   (9th Cir. 1992) (alteration added by quoting source) (emphasis in quoted source); <u>see also</u> <u>Estelle</u>
9   <u>v. Gamble</u>, 429 U.S. 97, 105–06, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976) ("[I]n the medical
10  context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an
11  unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' ").

12         "[A] complaint that a physician has been negligent in diagnosing or treating a medical
13  condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as]
14  [m]edical malpractice does not become a constitutional violation merely because the victim is a
15  prisoner." <u>Wilhelm</u>, 680 F.3d at 1122 (quoting <u>Estelle</u>, 429 U.S. at 106).[12] "Thus, 'a plaintiff's
16  showing of nothing more than a difference of medical opinion as to the need to pursue one
17  course of treatment over another [is] insufficient, as a matter of law, to establish deliberate
18  indifference.' " <u>Wilhelm v. Rotman</u>, 680 F.3d at 1122 (quoting <u>Jackson v. McIntosh</u>, 90 F.3d
19  330, 332 (9th Cir.1996)).

20         Taking the allegations in the light most favorable to Plaintiffs, the Court does not find it
21  plausible that the nurses were deliberately indifferent to Mr. Andersons serious medical needs.
22  <u>See</u> <u>Wilhelm</u>, 680 F.3d at 1123 ("By contrast, the allegations against Dr. Schuster are directed at
23  a misdiagnosis . . . Dr. Schuster decided not to operate because he thought that Plaintiff was not
24  suffering from a hernia . . . [thus the] alleged failure was negligent misdiagnosis, or a
25  disagreement with Dr. Rotman [and] insufficient to establish deliberate indifference."); <u>Akhtar v.</u>

26

27  ───────────────
    [12]  The Court recognizes much of the caselaw developed in the Eighth Amendment context, and the Court finds
28  Plaintiffs have not stated claim for deliberate indifference even under the objective standard applicable to pretrial
    detainees for all the reasons stated herein.

1  <u>Mesa</u>, 698 F.3d 1202, 1213 (9th Cir. 2012) ("This second prong ... is satisfied by showing (a) a

2  purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

3  caused by the indifference." (quoting <u>Jett</u>, 439 F.3d at 1096)).

4      <u>Sandoval</u>, cited by Plaintiffs, describes the development of the legal standards derived

5  from the caselaw in the Ninth Circuit:

> We have applied this standard on several occasions. In *Clement v.
> Gomez*, we held that correctional officers could be liable for failing
> to provide constitutionally adequate medical care when they knew
> that inmates had been exposed to pepper spray but waited four
> hours before allowing them to leave their cells to shower. 298 F.3d
> 898, 902, 904–05 (9th Cir. 2002). Similarly, in *Jett v. Penner*, we
> held that a doctor could be held liable for a constitutional violation
> when he knew that an inmate's thumb was fractured but failed to
> ensure that the fracture was set and cast. 439 F.3d at 1097–98; *see
> also Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)
> (plaintiff could establish a constitutional violation when prison
> officials were aware that he was suffering from bleeding gums and
> broken teeth as a result of broken dentures but "failed to take any
> action to relieve his pain or to prescribe a soft food diet until new
> dentures could be fitted"). The rule reflected in these decisions is
> clear: a prison official who is aware that an inmate is suffering
> from a serious acute medical condition violates the Constitution
> when he stands idly by rather than responding with reasonable
> diligence to treat the condition.

16  <u>Sandoval v. Cnty. of San Diego</u>, 985 F.3d 657, 679–80 (9th Cir. 2021).  The Court finds no

17  allegations such as that would support an inference that G. Garcia and Guerrero sat "idly by

18  rather than responding with reasonable diligence to treat the condition."  <u>Id.</u>

19      Plaintiffs cite to <u>Ortiz</u> for the proposition that [g]iven Plaintiffs' extensive allegations of

20  deliberate action and inaction by Guerrero and Garcia, the questions of whether and to what

21  degree that behavior caused Mr. Anderson's death are issues properly resolved by a jury, given

22  the reversal of summary judgment in <u>Ortiz</u>.  The Court finds the facts as alleged wholly

23  distinguishable as to G. Garcia and Guerrero.  <u>See Ortiz v. City of Imperial</u>, 884 F.2d 1312, 1314

24  (9th Cir. 1989) ("Because the nurses and Dr. Reid knew of Ortiz's head injury but disregarded

25  evidence of complications to which they had been specifically alerted and, without an

26  examination, prescribed sedatives that were contraindicated, we cannot say as a matter of law

27

28

they were not deliberately indifferent to Ortiz's medical needs.")[13]

Accordingly, the Court recommends granting the motion to dismiss the first cause of action as against G. Garcia and Guerrero.  See Trujillo, 2021 WL 4803484, at *3; Ervin, 2020 WL 4350137, at *4 ("Dr. Nugent is correct that plaintiff has only pleaded a difference of medical opinion, which, without more, cannot survive a motion to dismiss." (citing Wilhelm, 680 F.3d at 1123; Hollis v. Dir. of Corr., 560 F. Supp. 2d 920, 926 (C.D. Cal. 2008))); Wilhelm, 680 F.3d at 1123 ("By contrast, the allegations against Dr. Schuster are directed at a misdiagnosis."); Floyd, 2020 WL 1991400, at *18 ("Clearly, Nurse Twohig could not disregard an obvious risk of failing to provide medications she had no reason to know Floyd was prescribed.").

### 3.   The Court Recommends Granting the Motion to Dismiss the Monell Claim Against Defendant CFMG with Leave to Amend

CFMG argues Plaintiffs do not allege sufficient facts to support a claim of an unconstitutional policy pursuant to Monell.

---

[13]  Even applying the objective standard and taking the allegations in the light most favorable to Plaintiffs, the Court finds the facts in Ortiz wholly distinguishable given the clear notice and warnings, the duration of time in relation to such specific notice, and the repeated failures to adhere to the guidelines over such time period:

Ortiz was released to police custody two hours later. Dr. Alm gave the sheriff a Patient After Care Sheet. On the sheet, the words "HEAD INJURY" were circled in ink and marked with a star. Following that heading, the sheet read:
Problems from such injuries can occur sometime later. Report to your doctor immediately or the emergency room if anything listed occurs.

—INCREASED DROWSINESS OR CONFUSION
—PERSISTENT HEADACHE OR BLURRED VISION
—UNCONTROLLED VOMITING, STIFF NECK, FEVER (VOMITING ONCE OR TWICE IS NOT UNCOMMON)
NOTE: WAKEN PATIENT EVERY 2 HOURS FIRST NIGHT TO CHECK FOR THESE SIGNS

Ortiz was returned to his cell. He fell again an hour later and was placed in the infirmary.  The parties do not dispute Ortiz received medical care in the following two days—his medical charts show jail medical personnel monitored him closely. The parties dispute the significance of the care he received.

All medical personnel caring for Ortiz—nurses Phillips, Beltran and Brown and Dr. Reid—were aware of Ortiz's head injury. In addition, the nurses had the Patient After Care Sheet. Yet when Ortiz began to exhibit the symptoms identified on the sheet, they did not call the emergency room or Dr. Alm. Instead, they called Dr. Reid, who on three occasions prescribed sedatives for Ortiz over the telephone without examination. Sedatives are an appropriate remedy for alcohol withdrawal symptoms, but are inappropriate for head injuries since they mask the symptoms of serious complications from such injuries.  Two days after falling, Ortiz was found unconscious with blood coming from his mouth.

Ortiz, 884 F.2d at 1313.

1        **a.      General Legal Standards**

2        "In order to state a claim under <u>Monell</u>, a party must (1) identify the challenged policy or

3    custom; (2) explain how the policy or custom is deficient; (3) explain how the policy or custom

4    caused the plaintiff harm; and (4) reflect how the policy or custom amounted to deliberate

5    indifference, i.e. show how the deficiency involved was obvious and the constitutional injury

6    was likely to occur." <u>Harvey v. City of S. Lake Tahoe</u>, No. CIV S-10-1653 KJM, 2012 WL

7    1232420, at *3 (E.D. Cal. Apr. 12, 2012) (citing <u>Young v. City of Visalia</u>, 687 F. Supp. 2d 1141,

8    1148 (E.D. Cal. 2009) (stating the allegations in the pre-<u>Iqbal</u> case of <u>Lee v. City of Los Angeles</u>,

9    250 F.3d 668, 681 (9th Cir. 2001), which met these four elements, "would still pass muster"

10    following <u>Iqbal</u>)); <u>Bradley v. Cnty. of San Joaquin</u>, No. 2:17-CV-2313-KJM-AC, 2018 WL

11    4026996, at *9 (E.D. Cal. Aug. 23, 2018) (same); <u>Lucas v. City of Visalia</u>, No. 1:09-CV-

12    1015AWIDLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010) (same).  "In other words, a

13    plaintiff must plead (1) that the plaintiff 'possessed a constitutional right of which [he or she]

14    was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

15    indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force

16    behind the constitutional violation.' " <u>Bradley</u>, 2018 WL 4026996, at *9 (quoting <u>Plumeau v.</u>

17    <u>Sch. Dist. No. 40 Cnty. of Yamhill</u>, 130 F.3d 432, 438 (9th Cir. 1997)).

18        CFMG does not dispute that it could be found liable if there was a policy or custom

19    behind the violation.  <u>See</u> <u>Tsao v. Desert Palace, Inc.</u>, 698 F.3d 1128, 1139 (9th Cir. 2012)

20    ("Every one of our sister circuits to have considered the issue has concluded that the

21    requirements of <u>Monell</u> do apply to suits against private entities under § 1983 . . . [and] [l]ike

22    those circuits, we see no basis in the reasoning underlying <u>Monell</u> to distinguish between

23    municipalities and private entities acting under color of state law."); <u>Oyenik v. Corizon Health</u>

24    <u>Inc.</u>, 696 F. App'x 792, 794 (9th Cir. 2017) ("Oyenik is suing Corizon, a corporation contracted

25    by the State of Arizona to provide medical treatment to state prisoners[,] . . . a function is 'fairly

26    attributable to the State' and can therefore give rise to § 1983 liability." (quoting <u>West v. Atkins</u>,

27

28

1   487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988))).[14]

2          "Absent a formal governmental policy, [a plaintiff] must show a longstanding practice or

3   custom which constitutes the standard operating procedure of the local government entity . . .

4   [and] [t]he custom must be so persistent and widespread that it constitutes a permanent and well

5   settled city policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (internal quotations and

6   citations omitted); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915,

7   926, 99 L. Ed. 2d 107 (1988) ("[A] plaintiff may be able to prove the existence of a widespread

8   practice that, although not authorized by written law or express municipal policy, is so

9   permanent and well settled as to constitute a custom or usage with the force of law . . . [and]

10  [t]hat principle, which has not been affected by Monell or subsequent cases, ensures that most

11  deliberate municipal evasions of the Constitution will be sharply limited.") (internal citations and

12  quotation marks omitted).  "It is not sufficient for a plaintiff to identify a custom or policy,

13  attributable to the municipality, that caused his injury [but] must also demonstrate that the

14  custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the

15  jail's] inhabitants.' " Castro v. Cnty. of Los Angeles, 833 F.3d at 1076 (quoting City of Canton,

16  Ohio v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989)).

17         "A single mistake does not give rise to municipal liability; 'proof of random acts or

18  isolated events are insufficient to establish custom' under Monell." Vandenburg v. Cnty. of

19  Riverside, 722 F. App'x 657, 658 (9th Cir. 2018) (quoting Thompson v. City of Los Angeles,

20  885 F.2d 1439, 1444 (9th Cir. 1989)); Castro v. City of Hanford, 546 F. Supp. 2d 822, 826 (E.D.

21  Cal. 2008) (same); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir.

22  1990) ("Consistent with the commonly understood meaning of custom, proof of random acts or

23  isolated events are insufficient to establish custom"); see also City of Oklahoma City v. Tuttle,

24  471 U.S. 808, 823–24, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985) ("Proof of a single

25

26  [14]  See also Oyenik, 696 F. App'x at 794 n.1 ("But because Monell does not apply to state governments (which are
    immune from suit under the Eleventh Amendment . . . and we did not specifically state in Tsao that the *respondeat*
27  *superior* preclusion extends to private entities acting on behalf of state governments, we assume without deciding
    that the *Monell* standard applies in this case.  If *Monell* does not apply, then traditional *respondeat superior* analysis
28  would apply.  Therefore, there is no need for us to reach the issue because *Monell* is a more demanding standard
    (i.e., Oyenik would satisfy *respondeat superior* if he satisfies the requirements of *Monell*).").

1    incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless

2    proof of the incident includes proof that it was caused by an existing, unconstitutional municipal

3    policy, which policy can be attributed to a municipal policymaker."); <u>Trevino</u>, 99 F.3d at 918

4    ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must

5    be founded upon practices of sufficient duration, frequency and consistency that the conduct has

6    become a traditional method of carrying out policy.").

7            i.      <u>The Osuna Action</u>

8            The Court turns to the <u>Osuna</u> opinion given the parties' focus on the case.  Plaintiffs

9    emphasize that at the pleading stage, "the policy or custom itself need only be alleged in general

10   terms."  <u>Est. of Osuna v. Cnty. of Stanislaus</u>, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019).

11   Plaintiffs highlight the <u>Osuna</u> court's statement that "[i]t is a rare plaintiff who will have access

12   to the precise contours of a policy or custom prior to having engaged in discovery, and requiring

13   a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated

14   guesswork."  <u>Id.</u> at 1174-75 ("[I]nformation concerning a town's customs or policies, the

15   policymakers' motivations behind such policies, or the facts surrounding police department

16   customs, are typically unavailable to an outsider.' " (quoting <u>Mitchell v. Twp. of Pemberton</u>, No.

17   CIV.09-810(NLH)(AMD), 2010 WL 2540466, at *6 (D.N.J. June 17, 2010))).

18           Nonetheless, that recognition in <u>Osuna</u> pertains to the "*precise* contours," or "details" of

19   the custom or policy: "[t]he court concludes that the details of the alleged policy or custom,

20   however, is a topic properly left to development through discovery."  392 F. Supp. 3d at 1174-75

21   (emphasis added).  The <u>Osuna</u> court also noted that "[a]s one district court has thoughtfully

22   concluded, a complaint alleging a <u>Monell</u> claim must 'pair general averments of a policy or

23   custom with particular examples.' "  392 F. Supp. 3d at 1175 (quoting <u>Ulloa v. Prince George's</u>

24   <u>County</u>, No. CV DKC 15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015)).  The court

25   then held that "[t]hus, although factual allegations of the complaint must plausibly allege the

26   existence of a policy or custom that was the moving force behind the constitutional violation at

27   issue, the policy or custom itself need only be alleged in general terms."  392 F. Supp. 3d at

28   1175.

1       The <u>Osuna</u> court found the plaintiff there had "identified multiple prior instances of

2 alleged misconduct by Stanislaus County and the Sheriff's Department in the complaint," that

3 additionally "the complaint alleges that these actions occurred due to either a lack of training, or

4 a policy of employing excessive and unreasonable force," and "[t]hese descriptions of the

5 policies and customs at issue, although not particularly detailed, are sufficient at this stage of the

6 litigation to place defendants on notice of the nature of the claims against them and allow them

7 to prepare an adequate defense." <u>Id.</u>  Specifically, as noted earlier in the opinion, "[a]s examples

8 of previous incidents involving excessive use of force by Stanislaus County and Sheriff's

9 Department employees, plaintiffs point to numerous prior cases in which defendants were either

10 found liable or agreed to pay a substantial monetary sum to resolve excessive use of force claims

11 brought against them." <u>Id.</u> at 1173.

12       **b.**    **The Parties' Primary Arguments**

13       CFMG argues Plaintiffs do not meet their burden of identifying any deficient CFMG

14 policy or custom that contributed to the subject incident; that the vague allegations of failing to

15 properly staff, failing to properly have intake screenings to identify seizure disorders, failing to

16 have adequate medical treatment addressing the risk of seizures, and failing to properly respond

17 to emergencies are not only impermissibly vague, but also illogical in the context of this action.

18 CFMG argues Plaintiffs' referenced allegations are directed generally at all Defendants, and in

19 addition to deficient shotgun pleading, the allegations also do not satisfy pleading requirements

20 as to CFMG because Plaintiffs have affirmed the nurses did respond to Mr. Anderson's

21 emergency.  (FAC ¶ 38.)  CFMG argues there is no indication in the FAC that the initial two

22 responding nurses, or the later responding medical staff were of insufficient in number or

23 credentialing such that staffing issues are implicated.

24       Plaintiffs respond that CFMG ignores "numerous allegations regarding the County,

25 CFMG, and HIG's specific unconstitutional customs, practices, and policies."  (Opp'n CFMG

26 19.)  Plaintiffs proffer they have identified twelve distinct policies, practices, and customs in

27 paragraph 85 of the FAC:

28               Defendants failed to staff the Jail with sufficient numbers of

qualified, competent, and appropriately-supervised medical staff to provide adequate medical care to inmates.

Defendants failed to staff the Jail with sufficient numbers of qualified, competent, and appropriately-supervised custodial staff to provide adequate supervision and care to inmates.

Defendants failed to properly train and supervise staff regarding policies, procedures, and practices necessary for the provision of medical treatment, including treatment of seizure disorders.

Defendants failed to ensure staff provided medical treatment meeting standards of care.

Defendants failed to adequately screen and identify inmates with seizure disorders and timely refer them for appropriate housing, medication, assessment and treatment.

Defendants failed to utilize proper screening forms and failed to refer inmates for medical evaluations, provision of necessary medication, and housing assessment in a consistent or timely manner.

Defendants failed to provide adequate medical assessment or treatment, including but not limited to delaying and/or denying the continuation of community-prescribed medications, failing to timely prescribe necessary medications, and failing to appropriately monitor the inmates identified as having a seizure disorder.

Defendants failed to properly house inmates who have a history of seizures in locations that account for their sensitivities to temperature and other conditions.

Defendants failed to implement a system where staff are on-call at all times to receive emergency communications from inmates and to immediately respond to inmate medical emergencies.

Defendants failed to provide timely and appropriate access to inpatient care or emergency hospitalization for inmates in acute medical distress relating to a seizure disorder.

Defendants failed to provide timely and appropriate assessment and crisis intervention for inmates exhibiting signs or symptoms indicating a serious seizure disorder.

Defendants failed to establish "man down" roll-out teams staffed and equipped to provide inmates with necessary lifesaving services at the location of the emergency, including gurneys, so that inmates are not forced to stand or walk, or be transported in inappropriate equipment, such as a restraint chair designed for combative inmates.

(FAC ¶ 85.)[15]  This paragraph concludes that: "Defendants' failure to correct their policies, procedures, and practices regarding seizure disorders and how to respond to inmates experiencing seizures, despite notice of significant and dangerous problems, evidences deliberate indifference in the provision of mental health treatment."  (Id.)

Plaintiffs further argue other paragraphs also describe and refer to these policies, practices, and customs.  (Opp'n CFMG 21, citing FAC ¶¶ 23, 25, 55, 61, 71, 75.)  The Court notes that paragraphs 23 and 25 refer to the Consent Decree in the Hall action, discussed above. The other paragraphs allege:

> 55.    Defendants have inadequate policies, procedures, and practices for identifying inmates in need of medical treatment and providing appropriate medical treatment. Defendants do not maintain an adequate system of delivering potentially lifesaving medical treatment to inmates at their location, and do not have gurneys to transport inmates in medical distress. Instead inmates are forced to walk or are transported in restraint chairs. Defendants fail to appropriately train and supervise staff regarding the provision of treatment to inmates with medical issues.

> 61.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Anderson with the appropriate medical assessment, treatment and housing, and failure to adequately identify or address his seizure, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to provide treatment and identify risk of seizures, constituted deliberate indifference to Mr. Anderson's serious medical needs, health, and safety.

> 71.   Defendants failed to have minimally necessary policies and procedures concerning the adequate treatment of Mr. Anderson, whom they knew or should have known was in need of medical attention for his seizure disorder and the extreme heat inside his cell.

> 75.    The acts and/or omissions of Defendants as alleged herein, including but not limited to their failure to provide Mr. Anderson with appropriate medical care, failure to promulgate appropriate policies and procedures in order to provide treatment to inmates with seizure disorders, failure to promulgate and follow a minimally adequate lifesaving treatment plan, and failure to

[15]  The Court notes that in briefing, the policies are identified as "failure to staff," "failure to properly train . . . ," and so on, instead of how the allegations actually are stated in the complaint. (Opp'n CFMG 20.)  In the complaint the policies are stated as: "Defendants failed to staff," and so on.  While a minor grammatical change, it appears the wording utilized in the complaint is a more generalized allegation of what unspecified Defendants failed to do, rather than clearly identifying a policy.  The way the allegations are phrased in the complaint would appear to be more in line with a custom or practice, rather than a policy.

1
2

> appropriately train and/or supervise their staff, constituted deliberate indifference to Mr. Anderson's serious medical needs, health and safety.

3  (FAC ¶¶ 55, 61, 71, 75.)  Plaintiffs argue these allegations belie CFMG's claim that the FAC

4  contains only vague allegations of failing to properly staff, failing to proper have intake

5  screening to identify seizure disorders, failing to have adequate medical treatment addressing the

6  risk of seizures, and failing to properly respond to emergencies.  Plaintiffs submit that CFMG is

7  the jail's healthcare provider and, in collaboration with the County and its parent company HIG,

8  makes, implements, and ratifies these policies, practices, and customs.  As for CFMG's argument

9  that Plaintiffs fail to plead to any specific facts or prior incidents to prove the existence of a

10  widespread practice of unconstitutional conduct by CFMG, Plaintiffs respond they have pled that

11  the unconstitutional conduct is widespread as they devote an entire section of the FAC to the

12  Jail's history of inadequate correctional and medical care, including the <u>Hall</u> class action lawsuit

13  that alleged a policy and practice of failing to prescribe medically necessary medication,

14  including for seizure disorders.  (FAC ¶¶ 22-25.)

15       **c.**      **The Court Recommends Granting CFMG's Motion to Dismiss <u>Monell</u> Claim**

16       The Court first notes that County Defendants have not joined in moving to dismiss the

17  <u>Monell</u> claim despite moving to strike references to the Consent Decree.  It thus appears that the

18  County Defendants find the allegations sufficient against it to state a <u>Monell</u> claim at this stage

19  of the pleadings.  As noted in the complaint and above, the <u>Hall</u> action was brought against

20  Sheriff Mims and the public health director.  (FAC ¶ 23.)  No private entity health companies

21  such as CFMG, HIG, or their predecessors, were involved in the <u>Hall</u> action.  The Court finds

22  this relevant to the legal standards concerning prior similar incidents.

23       i.      <u>Policy or Custom</u>

24       The Court finds the <u>Monell</u> claim based on a policy or custom deficient as against

25  CFMG, largely due to the allegations being generically directed to all Defendants, and because

26  they contain no specific facts concerning such policies or customs in relation to CFMG's actual

27  relationship with the jail, nor any specific allegations of incidents that did occur in relation to

28  CFMG or while CFMG was providing health care in the jail.  The Court finds the FAC's

allegations, including references to the <u>Hall</u> action and Consent Decree, do not even arise to the

level of the allegations in <u>Lozano</u> that were rejected, wherein the complaint relied on a previous

class action and a commission report on jail conditions:

> Plaintiffs argue that they have "alleged dozens of denials and delays of medical treatment during Johnny's incarceration" and that "[t]he entire timeline of alleged events evinces a disturbing pattern of practices establishing a custom." MTD Opp. at 22. Relying on *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792 (9th Cir. 2017), for the proposition that the Ninth Circuit "ha[s] not established what number of similar incidents would be sufficient to constitute a custom or policy," 696 F. App'x at 794, they argue that their allegations here are sufficient to establish a plausible *Monell* claim, MTD Opp. at 22. Because the *Oyenik* court concluded that where the plaintiff had alleged "at least a dozen instances of ... denying or delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of almost a year," a reasonable jury could conclude that "such delay tactics amount to a ... custom or practice of deliberate indifference," *id.* at 794–95 (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)), and because Plaintiffs have similarly "alleged dozens of denials and delays of medical treatment during Johnny's incarceration," Plaintiffs contend that their pleadings are sufficient "to plead a plausible *Monell* claim." MTD Opp. at 22.

> However, Plaintiffs' Complaint has not alleged any denial of care adequate to establish a constitutional violation, nor has it alleged delays that would rise to that level. Plaintiff has not identified an official policy or decision crafted by a final policymaking authority; nor has Plaintiff stated facts sufficient to establish a "widespread" and "well-settled" custom by county officials. *See Bedford*, 2012 WL 4901434, at *13. Aside from making cursory reference to a class action brought against the county regarding inadequate medical care and a "Blue Ribbon Commission" report (that is neither included with nor explained in the Complaint), Plaintiff has not alleged that any other person was subjected to similar treatment. While Plaintiff does allege "dozens of denials and delays of medical treatment," even when taken together, those incidents—as currently alleged—do not evince a well-settled custom on the part of the County. Particularly in light of the progressive nature of Mr. Lozano's illness, the allegations contained in the Complaint do not—again, as currently stated— carry Plaintiffs' claims into the realm of plausibility for a *Monell* claim.

<u>Lozano v. Cnty. of Santa Clara</u>, No. 19-CV-02634-EMC, 2019 WL 6841215, at *18 (N.D. Cal.

Dec. 16, 2019), <u>aff'd,</u> No. 20-15992, 2021 WL 4077000 (9th Cir. Sept. 8, 2021) ("[P]laintiffs

have not indicated that they would be able to allege additional facts that could redeem their

1  claims[,] [t]hus, we conclude the district court did not abuse its discretion by denying leave to

2  amend the constitutional claims, as granting leave to amend would likely be futile.").

3        In <u>Oyenik</u>, cited by <u>Lozano</u>, the Ninth Circuit noted there was "no case law indicating

4  that a custom cannot be inferred from a pattern of behavior toward a single individual," <u>Oyenik</u>,

5  696 F. App'x at 794 ("While one or two incidents are insufficient to establish a custom or policy

6  . . . we have not established what number of similar incidents would be sufficient to constitute a

7  custom or policy." (citing <u>Davis v. City of Ellensburg</u>, 869 F.2d 1230, 1234 (9th Cir. 1989);

8  <u>Meehan v. Cty. of Los Angeles</u>, 856 F.2d 102, 107 (9th Cir. 1988))).  Oyenik had "shown at least

9  a dozen instances of [the private health care provider] Corizon denying or delaying consultations,

10  biopsies, and radiation treatment for his prostate cancer over the course of almost a year."  696 F.

11  App'x at 794.  The Ninth Circuit concluded in the unpublished opinion that "a reasonable jury

12  may conclude that such delay tactics amount to a Corizon custom or practice of deliberate

13  indifference to prisoners' serious medical needs."  <u>Id.</u> at 795 (citing <u>Oviatt By & Through</u>

14  <u>Waugh v. Pearce</u>, 954 F.2d 1470, 1478 (9th Cir. 1992)).

15        The Court agrees with CFMG that Plaintiffs have not alleged specific facts showing the

16  similarities between any prior incidents that are connected to CFMG staff at the Fresno County

17  Jail improperly treating or responding to an inmate with seizures resulting in harm or death to

18  that inmate, and even if Plaintiffs alleged a prior incident, a single prior similar incident is

19  insufficient to provide the CFMG with adequate notice of any issues that existed with respect to

20  restraint of a seizing inmate.  <u>See</u> <u>Castro v. Cnty. of Los Angeles</u>, 833 F.3d at 1076 (a plaintiff

21  "must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to

22  the constitutional rights of [the jail's] inhabitants.' " (quoting <u>City of Canton, Ohio v. Harris</u>, 489

23  U.S. at 392)); <u>Praprotnik</u>, 485 U.S. at 127 ("[A] plaintiff may be able to prove the existence of a

24  widespread practice that, although not authorized by written law or express municipal policy, is

25  so permanent and well settled as to constitute a custom or usage with the force of law.");

26  <u>Vandenburg</u>, 722 F. App'x at 658 ("A single mistake does not give rise to municipal liability;

27  'proof of random acts or isolated events are insufficient to establish custom' under <u>Monell</u>."

28  (quoting <u>Thompson</u>, 885 F.2d at 1444)); <u>Tuttle</u>, 471 U.S. at 823–24; <u>Osuna</u>, 392 F. Supp. 3d at

1174 ("Certainly, the complaint must contain sufficient factual allegations to plausibly suggest a
policy or custom, as opposed to merely random, unconnected acts of misconduct.").

The Court acknowledges, as noted elsewhere herein, that CFMG should be on notice of
the Consent Decree or Fresno County should have a duty to put CFMG on notice as they play a
significant role in jail's health care.  However, the Court finds this does not change the analysis
weighing toward dismissal of the <u>Monell</u> claim, as applied to CFMG, as there are no specific
allegations that would support a finding that CFMG has a custom or policy.  <u>See</u> <u>id.</u>  A private
healthcare provider was not separately part of the <u>Hall</u> lawsuit, let alone CFMG, and thus
CFMG's arguments regarding shotgun pleading are more well-taken here given the lack of
delineation between "Defendants" in the FAC.  Indeed, even in consideration of the facts alleged
pertaining to the Consent Decree, that section is entitled "Fresno County Jail's History of
Inadequate Correctional and Medical Care," and does not mention CFMG or the potential
significance of such allegations in relation to Defendant CFMG in sufficient detail as to plausibly
support <u>Monell</u> allegations against CFMG.  (FAC at p. 7.)  In that regard, the allegations in
paragraphs 23, 25, 55, 61, 71, and 75, even taken in the light most favorable to Plaintiffs, are
where the generic references to "Defendants" are particularly deficient in supporting the <u>Monell</u>
claim.  Because of the references to "Defendants" generally, the allegations are impermissibly
vague and conclusory as applied to CFMG.  There are no allegations against CFMG or its staff
concerning the housing of Mr. Anderson or his complaints regarding housing in the hot cell, only
against the Officer Defendants, as summarized above.  Further, the allegations against the
Officer Defendants and the CFMG nurses, summarized above, are impermissibly vague
concerning restraints or medication as to establish <u>Monell</u> liability for CFMG based on a custom
or policy under the standards above.

The Court concludes Plaintiffs have not alleged sufficient facts to render their allegations
of an unconstitutional custom or practice plausible as to CFMG.  <u>AE ex rel. Hernandez v. Cnty.</u>
<u>of Tulare</u>, 666 F.3d 631, 637 (9th Cir. 2012) ("[T]he factual allegations that are taken as true
must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing
party to be subjected to the expense of discovery and continued litigation . . . . [t]his standard

1  applies to *Monell* claims." (quoting <u>Starr</u>, 652 F.3d at 1216)); <u>Osuna</u>, 392 F. Supp. 3d at 1174

2  ("Certainly, the complaint must contain sufficient factual allegations to plausibly suggest a

3  policy or custom, as opposed to merely random, unconnected acts of misconduct.").  The Court

4  finds based on its own review of the twelve proffered policies or customs, and the overarching

5  legal standards discussed above, that Plaintiffs have failed to state a claim against CFMG.

6  <u>Praprotnik</u>, 485 U.S. at 127; <u>Thompson</u>, 885 F.2d at 1444; <u>Tuttle</u>, 471 U.S. at 823–24; <u>Trevino</u>,

7  99 F.3d at 918; <u>AE ex rel. Hernandez</u>, 666 F.3d at 637 n.5 ("The First Amended Complaint did

8  not put forth additional facts regarding the specific nature of this alleged 'policy, custom or

9  practice,' other than to state that it related to 'the custody, care and protection of dependent

10  minors[,]' . . . [and] [t]hese naked assertions make no sense in the context of this case.").

11        More specifically, as to Plaintiffs' reliance on <u>Osuna</u>, the Court finds it currently

12  distinguishable in that the allegations found to be sufficient there had "identified multiple prior

13  instances of alleged misconduct by Stanislaus County and the Sheriff's Department in the

14  complaint."  <u>Osuna</u>, 392 F. Supp. 3d at 1175.  There, "[a]s examples of previous incidents

15  involving excessive use of force by Stanislaus County and Sheriff's Department employees,

16  plaintiffs point to numerous prior cases in which defendants were either found liable or agreed to

17  pay a substantial monetary sum to resolve excessive use of force claims brought against them."

18  <u>Id.</u> at 1173.  Significantly, "[a]ll of the[] alleged incidents appear to involve allegations of

19  excessive use of force, and all of them occurred in the time period since defendant Christianson

20  became the Stanislaus County Sheriff."   <u>Id.</u> ("These include, but are not limited to: (1) a

21  $565,000 settlement paid to plaintiffs in a case where Stanislaus County Sheriff's deputies

22  allegedly used tasers and pepper spray against a mentally-ill detainee, resulting in his death; (2) a

23  $200,000 settlement in which the plaintiffs alleged that Stanislaus County Sheriff's deputies used

24  tasers against an individual suffering from a seizure, resulting in death; and (3) a $160,000

25  settlement in which the plaintiffs alleged that Stanislaus County Sheriff's deputies made false

26  arrests and used excessive force against two individuals.").

27        The <u>Osuna</u> court found that "[w]hether these previous cases are all manifestations of the

28  same policy or custom, and whether that policy or custom was the moving force behind the

1   injury to decedent in this case, are factual issues to be determined following the discovery phase
2   of this litigation," but that there were "sufficient factual allegations in this regard to plausibly
3   allege the existence of a policy or custom." Id. at 1173-74.  Most pertinent, here, there are no
4   allegations of similar incidents since CFMG has been in place at the Fresno County Jail.  See
5   Osuna, 392 F. Supp. 3d at 1173 ("All of these alleged incidents appear to involve allegations of
6   excessive use of force, and all of them occurred in the time period since defendant Christianson
7   became the Stanislaus County Sheriff.").

8       Accordingly, the Court finds Plaintiffs have not alleged sufficient facts to support a
9   Monell claim against CFMG for an unconstitutional policy or custom.  The Court now turns to
10   briefly address the parties' arguments concerning whether there are sufficient facts showing
11   ratification or insufficient training to support a Monell claim against CFMG.

12       ii.   Ratification

13       "If the authorized policymakers approve a subordinate's decision and the basis for it,
14   their ratification would be chargeable to the municipality because their decision is final."
15   Praprotnik, 485 U.S. at 127.

16       CFMG argues the entirety of Plaintiffs' ratification allegations are contained within one
17   paragraph of the complaint.  This paragraph reads: "Defendants tacitly encouraged, ratified
18   and/or approved of the acts and/or omissions alleged herein, including by way of their
19   inadequate investigation and conclusion thereto by failing to adequately interview witnesses,
20   improperly weighting [sic] evidence and statements, and failing to consider evidence."  (FAC ¶
21   87.)  CFMG thus argues Plaintiffs allege no specific facts that would give rise to a plausible
22   inference that any official with policy-making authority made a deliberate choice or approved the
23   basis for the unconstitutional conduct alleged by Plaintiffs as would be required to hold the
24   CFMG liable on a theory of ratification.

25       Plaintiffs respond by pointing to the same allegations summarized in the preceding
26   section, regarding what they argue are several CFMG policies that are highly deficient.  (FAC ¶¶
27   85.)  Plaintiffs argue CFMG's failure to discipline Guerrero and G. Garcia sufficiently supports
28   Plaintiffs' ratification theory at the pleading stage.  See Dorger v. City of Napa, No. 12-CV-440

1   YGR, 2012 WL 3791447 (N.D. Cal. Aug. 31, 2012).

2       The Court finds paragraph 87, in addition to being vague in referring to "Defendants"

3 generally, is impermissibly conclusory as to CFMG, to support a ratification theory of <u>Monell</u>

4 liability.  For that reason, as well as for similar reasons expressed in the preceding section

5 concerning other allegations in the complaint (FAC ¶¶ 23, 25, 55, 61, 71, 75, 85), the Court does

6 not find Plaintiffs have plausibly alleged ratification by CFMG.  <u>See</u> <u>Garcia v. City of Imperial</u>,

7 No. 08CV2357 BTMPCL, 2010 WL 3911457, at *2 (S.D. Cal. Oct. 4, 2010) (noting in a case

8 where an officer "shot a suspect who was attempting to drive away in his jeep, the Ninth Circuit

9 held that there were no facts in the record to 'suggest that the single failure to discipline Haugen

10 rises to the level of such a ratification[,]' [thus] [i]n other words, in order for there to be

11 ratification, there must be 'something more' than a single failure to discipline or the fact that a

12 policymaker concluded that the defendant officer's actions were in keeping with the applicable

13 policies and procedures." (quoting <u>Haugen v. Brosseau</u>, 351 F.3d 372, 393 (9th Cir. 2003)));

14 <u>Sheehan v. City & Cnty. of San Francisco</u>, 743 F.3d 1211, 1231 (9th Cir. 2014) ("Ratification,

15 however, generally requires more than acquiescence[,] [t]here is no evidence in the record that

16 policymakers 'made a deliberate choice to endorse' the officers' actions[,] [and] [t]he mere

17 failure to discipline [] does not amount to ratification of their allegedly unconstitutional actions."

18 (quoting <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348 (9th Cir.1992))) (<u>reversed in part on other</u>

19 <u>grounds</u>, <u>City & Cty. of San Francisco, Calif. v. Sheehan</u>, 575 U.S. 600 (2015)).

20       Plaintiffs cite to <u>Dorger</u>, but the Court finds the facts distinguishable:

> Here, Plaintiffs have alleged that the City delayed its investigation
> and disregarded evidence adduced during the investigation,
> particularly eyewitness testimony that contradicted the testimony
> of the officers involved. (SAC ¶ 56.) The City exonerated the
> officers, despite eyewitness reports that Mr. Poccia posed no threat
> to them or to others at the time he was shot and killed. (SAC ¶ 57.)
> The Grand Jury's report after its investigation criticized the Police
> Department for being "delinquent" in delaying its internal affairs
> report for over 16 months, "preclud[ing] a full investigation by the
> Grand Jury into the shooting." (SAC ¶ 29.) The Grand Jury further
> criticized the Police Department for failing to take an objective,
> unbiased look at what transpired. (SAC ¶ 59.) The allegations go
> beyond just a bare assertion of failure to reprimand. They are
> sufficient to state a plausible basis for a *Monell* claim against
> the City based upon ratification. Therefore, the motion

1                is **DENIED.**

2

3 Dorger, 2012 WL 3791447, at *6; see also Quinto-Collins v. City of Antioch, No. 21-CV-06094-VC, 2022 WL 18574, at *1 (N.D. Cal. Jan. 3, 2022) ("The plaintiffs have sufficiently alleged that the Police Chief ratified the officers' conduct [by alleging] the Chief intentionally covered up the actions of the individual officers by misrepresenting what happened when the officers arrived at Quinto's house . . . [as] [a]n intentional cover-up sends a message to individual officers that the behavior that led to Quinto's death is permissible within the department[,] [i]f these allegations prove to be true, a reasonable jury could find that the Chief's statements and actions were evidence of a pre-existing policy approving the actions that led to Quinto's death.").

        The Court does not find the vague reference to an inadequate investigation (FAC ¶ 87), to plausibly support a ratification claim against CFMG.  See Dorger, 2012 WL 3791447, at *5 ("[W]hile failure to reprimand, standing on its own, may not be sufficient to establish ratification, additional evidence of agreement or acquiescence to the conduct will support a finding of ratification."); Lopez v. City of Fontana, No. EDCV191727JGBSPX, 2020 WL 6694337, at *4 (C.D. Cal. Sept. 17, 2020) ("[T]he mere failure to discipline employees, without more, is insufficient to establish ratification sufficient to give rise to municipal liability.").

        Accordingly, the Court finds consideration of the ratification theory of Monell liability against CFMG weighs in favor of granting the motion to dismiss the Monell claim as stated against CFMG.  Lopez, 2020 WL 6694337, at *5 ("Though a Rule 12(b)(6) Motion requires all inferences be drawn in the non-moving party's favor, there are no inferences to be drawn from the facts alleged that the City has ratified the officer behavior outlined in the SAC[;] [r]atification requires some level of supervisory approval—either explicit or tacit—that is not properly alleged here.").

        iii.    <u>Failure to Train</u>

        "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct.

1350, 1359, 179 L. Ed. 2d 417 (2011).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id. (citing Tuttle, 471 U.S. at 822–823.)  A policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell."  Id. (quoting Tuttle, 471 U.S. at 822–823.)

"To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' "  Connick, 563 U.S. at 61 (quoting Canton, 489 U.S. at 388).  "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.' "  Id. (quoting Canton, 489 U.S. at 388).  "[P]ermitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in Monell."  Canton, 489 U.S. at 392.  "It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs[,] an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism."  Id.  Nonetheless, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  Canton, 489 U.S. at 390.

CFMG argues Plaintiffs have alleged no specific facts regarding the type of training that was deficient, the nature of the alleged deficiencies, or how the allegedly unconstitutional conduct of nurses G. Garcia and Guerrero resulted from the training.  Defendants contend a negligent failure to train is not sufficient to establish an unconstitutional policy; rather, faulty training can support a Monell claim only where it rises to the level of deliberate indifference; and thus the allegations do not give rise to a plausible inference that CFMG can be held liable on the basis of any inadequate training program.

Plaintiffs respond emphasizing we are at the pleadings stage.  See Cook v. City of

1    Fairfield, No. 215CV02339KJMKJN, 2017 WL 4269991, at *7 (E.D. Cal. Sept. 26, 2017)

2    ("Defendants' arguments to the contrary attempt to impose an inappropriate evidentiary burden

3    on plaintiffs at this stage.").  Plaintiffs also submit that Solis v. City of Vallejo, No. 2:14-CV-

4    00483-KJM-KJ, 2014 WL 2768847, at *6 (E.D. Cal. June 18, 2014), stands for the finding that,

5    generally, notice of a deficiency and failure to rectify it can give rise to a failure to train claim.

6          The Court finds the standards expressed in Solis reflect that a pattern of similar violations

7    is generally necessary to meet the stringent standard:   Solis, 2014 WL 2768847, at *6

8    ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor

9    disregarded a known or obvious consequence of his action . . . [and thus] [a] pattern of similar

10    constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

11    deliberate indifference for purposes of failure to train" (quoting Connick, 563 U.S. at 61-62));

12    see also Flores v. Cnty. of Los Angeles, 758 F.3d 1154, 1159 (9th Cir. 2014) (plaintiff "must

13    allege facts to show that the County and Baca 'disregarded the known or obvious consequence

14    that a particular omission in their training program would cause [municipal] employees to violate

15    citizens' constitutional rights." (quoting Connick, 563 U.S. at 61)).

16          Plaintiffs further argue CFMG may also be liable without notice if the need for training is

17    so obvious and the constitutional violation resulting from the failure to train is highly predicable.

18    Plaintiffs argue they plead such a lack of training in sufficient detail to survive CFMG's motion.

19    Given the standards underlying a Monell claim based on a theory of failure to train, and for

20    similar reasons expressed in the preceding sections, the Court finds Plaintiffs complaint does not

21    contain sufficient factual allegations to plausibly allege a failure to train as to establish Monell

22    liability against Defendant CFMG.  See Osuna, 392 F. Supp. 3d at 1172 ("A municipality's

23    culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to

24    train." (quoting Connick, 563 U.S. at 61)).  Like the other theories of Monell liability discussed

25    above, there are insufficient allegations of prior conduct or notice to CFMG that would amount

26    to deliberate indifference under the relevant standards pertaining to training.  See Connick, 563

27    U.S. at 61 (policy of inadequate training is "far more nebulous, and a good deal further removed

28    from the constitutional violation, than was the policy in Monell." (quoting Tuttle, 471 U.S. at

1 822–823)); <u>Flores</u>, 758 F.3d at 1159 ("known or obvious consequence that a particular omission

2 in their training program would cause . . . employees to violate citizens' constitutional rights."

3 (quoting <u>Connick</u>, 563 U.S. at 61)).

4          Plaintiffs rely on <u>Cook</u>, however, the Court finds it distinguishable.  There, the complaint

5 contained allegations concerning the training of specific officers and "allege[d] the City failed to

6 retrain officers involved in prior lawsuits, including Officer Grimm, and instead promoted

7 officers to the role of Sergeant, including Bertsch."  <u>Cook</u>, 2017 WL 4269991, at *7 ("Given the

8 alleged history of constitutional violations both before and since the relevant incident, these

9 allegations support the claim of the City's deliberate indifference to the rights of citizens."); <u>see</u>

10 <u>also id.</u> at *6 ("For example, plaintiffs allege a 'code of silence' among law enforcement officers

11 and police department personnel, whereby an officer or member of the department does not

12 provide adverse information against a fellow officer . . . [an] allegation [that] describes a regular

13 practice by police officers, is susceptible to factual proof or disproof later on . . . . . [and] also

14 allege defendants had a regular practice of filing incomplete and inaccurate police reports . . .

15 [which is] also is a factual allegation whose truth the court must assume for the purposes of this

16 motion.").

17          Again, there are no allegations CFMG staff were involved in the alleged failure to house

18 Mr. Anderson in more appropriate housing when he made direct complaints.  As to CFMG,

19 Plaintiffs' allegations do not plausibly demonstrate a need to train was "obvious and the failure

20 to do so made a violation of constitutional rights likely."  <u>Dougherty v. City of Covina</u>, 654 F.3d

21 892, 900-01 (9th Cir. 2011) ("The Complaint lacked . . . any facts demonstrating that his

22 constitutional deprivation was the result of a custom or practice of the City of Covina or that the

23 custom or practice was the 'moving force' behind his constitutional deprivation.").  Above, the

24 Court found insufficient allegations to support a deliberate indifference claim against G. Garcia

25 and Guerrero.   That finding also supports the Court's conclusion that Plaintiffs have not

26 sufficiently alleged a plausible claim for failure to train.  <u>See Connick</u>, 563 U.S. at 61 ("To

27 satisfy the statute, a municipality's failure to train its employees in a relevant respect must

28 amount to 'deliberate indifference to the rights of persons with whom the [untrained employees]

1   come into contact.' " (quoting Canton, 489 U.S. at 388)).

2       Accordingly, the Court finds Plaintiffs' allegations do not give rise to a plausible

3   inference that CFMG can be held liable under Monell on the basis of any inadequate training

4   program.  Connick, 563 U.S. at 61; Tuttle, 471 U.S. at 822–823; Flores, 758 F.3d at 1159.

5       For all of the above reasons, the Court recommends Defendant CFMG's motion to

6   dismiss the fifth cause of action for Monell liability be granted.

7       4.    The Court Recommends Granting CFMG Defendants' Motion to Dismiss the
            Third and Fourth Causes of Action as Against G. Garcia and Guerrero
8

9       Plaintiffs' third cause of action is for failure to protect from harm in violation of the

10  Eighth and Fourteenth Amendments, and Plaintiffs' fourth cause of action is for deprivation of

11  substantive due process rights in violation of Fourteenth Amendment for the loss of the

12  parent/child relationship.

13      CFMG Defendants submit that for reasons similar to those discussed above as to the

14  deliberate indifference claim, Plaintiffs' third and fourth causes of action fail against Guerrero

15  and G. Garcia.  As to the substantive due process claim, CFMG Defendants argue the standard

16  for this violation is even higher than that of deliberate indifference, to ensure that these kinds of

17  third-party claims for the incidental impacts of an alleged constitutional violation are reserved

18  for only the most egregious official conduct.  Lewis, 523 U.S. at 846 ("Our cases dealing with

19  abusive executive action have repeatedly emphasized that only the most egregious official

20  conduct can be said to be 'arbitrary in the constitutional sense.' ").  Thus, because Plaintiffs have

21  not adequately alleged deliberate indifference, for the first or fifth causes of action, Defendants

22  argue Guerrero and G. Garcia cannot be liable for any incidental interference with Plaintiffs'

23  familial relationship.  See J.P. ex rel. Balderas v. City of Porterville, 801 F. Supp. 2d 965, 988–

24  89 (E.D. Cal. 2011) ("Where a claim for interference with familial relationships is integrally

25  predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding

26  that the other conduct was constitutional generally will preclude recovery for interference with

27  familial relationship.").  Lastly, CFMG Defendants contend the third cause of action for failure

28  to protect from harm similarly fails as too conclusory to provide notice as to Guerrero or G.

1  Garcia's actions or inactions causing or contributing to the alleged constitutional violation.

2  Plaintiffs respond that deliberation was practical here based on allegations that Guerrero

3  and G. Garcia were told Mr. Anderson was having a seizure when they arrived, and that that they

4  ignored that diagnosis and Mr. Anderson's medical history and decided Mr. Anderson was

5  having a drug-related problem.  Plaintiffs again emphasize the 25-minute period from when Mr.

6  Anderson began seizing until the time of death, and that some of that period was spent waiting

7  for a restraint device and restraint chair to arrive.  Plaintiffs contend they have alleged deliberate

8  indifference.[16]

9  CFMG Defendants reply that G. Garcia and Guerrero were faced with a situation where

10  medical assistance was needed by Mr. Anderson; that unnecessary delay in providing that

11  medical assistance would only make matters worse; to provide that assistance, Mr. Anderson

12  needed to be brought under control before he hurt himself, or nurses, or custody staff, or other

13  inmates; and thus they were in a situation where a quick medical decision had to be made,

14  namely, to bring Mr. Anderson under control, before any further medical assistance could be

15  provided.  Therefore, G. Garcia and Guerrero submit that to find that their behavior shocks the

16  conscience, a finding of intent to harm must be found, and Plaintiffs have failed to allege any

17  facts which could rise to a finding of intent to harm.

18  As for the fourth cause of action, the Court incorporates the discussion above, *supra*

19  Section IV(B)(3), regarding substantive due process claims, and particularly the Court's

20  discussion regarding Wilkinson, given the parties' focus on the case in briefing.  See Wilkinson,

21  610 F.3d at 554 ("Where actual deliberation is practical, then an officer's 'deliberate

22  indifference' may suffice to shock the conscience[,] [b]ut [o]n the other hand, where a law

23  ──────────────

24  [16] Plaintiffs take issue with Defendants' reliance on Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1079 (9th Cir. 2011).  Plaintiffs emphasize that case only involved officers briefly separating a father from his child, hardly the situation Mr. Anderson's parents are in given they will never see their son again; never hear his voice or be able to

25  embrace him; and he came in a pretrial detainee who had not yet posted bail, and "left without a heartbeat." (Opp'n CFMG 17.)  The Court does not suggest Mr. Anderson's experience and his parents' grief are equivalent to those in

26  any of the cases herein, and agrees the facts are dissimilar.  Nonetheless, the legal standards are accurately stated therein.  Rosenbaum, 663 F.3d at 1079 ("To amount to a violation of [the] substantive due process [right to family

27  integrity or to familial association,] the harmful conduct must 'shock [ ] the conscience' or 'offend the community's sense of fair play and decency.' ") (quoting Rochin v. California, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183

28  (1952))).

1   enforcement officer makes a snap judgment because of an escalating situation, his conduct may

2   only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate

3   law enforcement objectives."); Porter, 546 F.3d at 1140 ("In sum, once Casey's evasive actions

4   began the officers had to react quickly [and thus] whether Osborn's conduct shocks the

5   conscience must be evaluated under the purpose to harm standard of culpability."); Lemire, 726

6   F.3d at 1075 ("A prison official's deliberately indifferent conduct will generally 'shock the

7   conscience' so as long as the prison official had time to deliberate before acting or failing to act

8   in a deliberately indifferent manner.") (citations omitted); Prasad, 958 F. Supp. 2d at 1126 ("In a

9   prison setting, deliberate indifference to an inmate's basic human and medical needs constitutes

10  'constitutionally shocking' action." (quoting Lewis, 523 U.S. at 851–52)).

11      Neither party discusses the standards as to the third cause of action for failure to protect

12  from harm., nor the fact it is brought both under the Eighth Amendment and Fourteenth

13  Amendments.   In the Eighth Amendment context for prisoners, the standard is deliberate

14  indifference.  See Chavez v. McDonald, No. CIV S-10-1227 KJM P, 2010 WL 5317386, at *2

15  (E.D. Cal. Dec. 20, 2010); Swanigan v. Bailey, No. CV-11-5073-EFS, 2012 WL 5449615, at *6

16  (E.D. Wash. Nov. 7, 2012) ("[A]lthough a 42 U.S.C. § 1983 claim may not typically be based on

17  a state actor's failure to protect an individual from third parties, a plaintiff can bring a §

18  1983 Fourteenth Amendment failure-to-protect-from-harm-to-health-or-safety claim if a special

19  relationship exists between the plaintiff and the state (the special-relationship exception), or

20  when the state affirmatively places the plaintiff in danger by acting with deliberate indifference

21  to a known or obvious danger (the state-created danger exception)." (citing Patel v. Kent Sch.

22  Dist., 648 F.3d 965, 971–72 (9th Cir.2011))).

23      Mr. Anderson was a pretrial detainee, and thus if the deliberate indifference standard

24  applies, it would be with the objective state of mind component under the Fourteenth

25  Amendment.   Therefore, the Court's summary of the legal standards from above would be

26  applicable.  Supra Section IV(C)(2)(b); see also Gordon, 888 F.3d at 1124 ("[T]he Supreme

27  Court has treated medical care claims substantially the same as other conditions of confinement

28  violations including failure-to-protect claims . . . we hold that claims for violations of the right to

adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." (quoting Castro, 833 F.3d at 1070)); Castro, 833 F.3d at 1071 ("Thus, the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard."); Pajas v. Cnty. of Monterey, No. 16-CV-00945-BLF, 2018 WL 5819674, at *4 (N.D. Cal. Nov. 5, 2018) ("Thus, claims for failure to provide medical care and failure to protect are evaluated under the same legal standards.").

The Court already found above that Plaintiffs allegations do not demonstrate deliberate indifference by G. Garcia, and Guerrero, and specifically addressed the facts that are again emphasized by Plaintiffs in briefing.  Further, it is likely that as to G. Garcia and Guerrero, assuming the delineation of standards under Wilkerson applies, the purpose to harm standard would apply given the limited amount of time, the fast-paced situation, and amount of alleged interaction they, versus the other officers or unidentified medical staff, had with Mr. Anderson. (See FAC ¶¶ 29-41.)  The Court also agrees the allegations concerning the restraint chair and Stryker chair are impermissibly vague as to G. Garcia and Guerrero to state a claim under the above standards.  The Court therefore finds the facts alleged as applied to any of the applicable legal standards weigh in favor of dismissal of these claims as against G. Garcia and Guerrero. See J.P. ex rel. Balderas, 801 F. Supp. 2d at 988–89 ("[A] finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship . . . [f]urther, while the standards for reviewing claims under the Fourth Amendment and the Fourteenth Amendment are not identical, a finding that conduct was objectively reasonable leads to the conclusion that the same conduct does not offend the more stringent standard applicable to substantive due process claims . . . [and] [t]he evidence does not indicate that Hall and/or Dowling acted with a purpose to harm that was unrelated to the legitimate law enforcement objective."); Castro, 833 F.3d at 1071 ("[A] pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard.").

1    Accordingly, the Court recommends granting the CFMG Defendants' motion to dismiss

2  the third and fourth causes of action as against G. Garcia and Guerrero.

3       5.     The Court Recommends Granting the CFMG Defendants' Motion to Dismiss the
              Excessive Force Claim Against G. Garcia and Guerrero Based on Qualified
4             Immunity

5    A defendant is "entitled to qualified immunity under § 1983 unless (1) they violated a

6  federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly

7  established at the time.' "   D.C. v. Wesby, 199 L. Ed. 2d 453, 138 S. Ct. 577, 589 (2018)

8  (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)).   "

9  'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently

10 clear that every reasonable official would understand that what he is doing' is unlawful."

11 Wesby, 138 S. Ct. at 589 (quoting "Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074,

12 2083, 179 L. Ed. 2d 1149 (2011)).   "In other words, existing law must have placed the

13 constitutionality of the officer's conduct 'beyond debate.' "   Id.   "This demanding standard

14 protects 'all but the plainly incompetent or those who knowingly violate the law.' "   Wesby, 138

15 S. Ct. at 589 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271

16 (1986)).   "Because the focus is on whether the officer had fair notice that her conduct was

17 unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."

18 Kisela v. Hughes, 200 L. Ed. 2d 449, 138 S. Ct. 1148, 1152 (2018) (quoting Brosseau v. Haugen,

19 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).

20    CFMG Defendants direct the Court to the discussion in Kingsley.   See Kingsley v.

21 Hendrickson 576 U.S. 389, 396–97, 135 S. Ct. 2466, 2472–73, 192 L. Ed. 2d 416 (2015) ("In

22 deciding whether the force deliberately used is, constitutionally speaking, 'excessive,' should

23 courts use an objective standard only, or instead a subjective standard that takes into account a

24 defendant's state of mind? . . . [W]e hold that courts must use an objective standard . . . a pretrial

25 detainee must show only that the force purposely or knowingly used against him was objectively

26 unreasonable.").   The Supreme Court discussed that in practice, "[a] court (judge or jury) cannot

27 apply this standard mechanically."   Kingsley, 576 U.S. at 397 (citing Lewis, 523 U.S. at 850).

28 "Rather, objective reasonableness turns on the 'facts and circumstances of each particular

case[,]' " and a "court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley, 576 U.S. at 397 (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.' " (quoting Bell, 441 U.S. at 540)) "[A] pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley, 576 U.S. at 398.

CFMG Defendants, acknowledging the vast majority of cases discussing excessive force deal with law enforcement officers, submit that what is objectively reasonable is measured against what a reasonable peace officer, or custodial medical personnel, would do in similar circumstances, with similar knowledge; and that this is also the baseline for determining whether an officer is entitled to qualified immunity. Thus, Defendants argue that if a reasonable peace officer *could* believe he had the right to use that level of force, and no Court had determined that that level of force in the situation faced by the officer constituted excessive force, then the officer (or medical professional here), is entitled to qualified immunity.

CFMG Defendants also submit that the law must be clearly defined with regard to the constitutional right that the officer is violating; and because the law concerning the standard for determining deliberate indifference has changed since the Kingsley Court issued its decision, it is necessary to determine whether the analysis of entitlement to qualified immunity has been effected by the change in the law. Here, CFMG's briefing is very confusing. For example, through multiple paragraphs, Defendants appear to quote directly from a case but the formatting makes it wholly unclear where the quotation begins (ECF No. 49-1 at 21-22), and additionally what case precisely is being quoted (ECF No. 49-1 at 21:6-7). The Court excerpts what appears to be the conclusion of the quoted material, a portion of a concurring opinion in Sandoval:

But the situation is different if, *after* the defendant acted, the

subjective element of the liability standard is modified or eliminated. In that circumstance, the merits inquiry (which no longer has that subjective element) will *not* overlap completely with the qualified immunity inquiry (which, because it examines the law at the time the defendant acted, still does have a subjective element). Thus, in contrast to the situation in *Hamilton* and *Estate of Ford*, the merits and qualified immunity inquiries in the change-of-law scenario do not collapse into each other with respect to the previously applicable subjective element of the liability test. In such a case, the court therefore must separately consider at the qualified immunity stage whether the Defendants violated the law *at the time* of the conduct, which includes a consideration of the since-rejected *subjective* deliberate indifference standard.

Sandoval v. Cnty. of San Diego, 985 F.3d 657, 687-88 (9th Cir. 2021) (Collins, J., concurring). The Court doesn't quite fully comprehend in CFMG Defendants' briefing as to the conclusion they make and what their conclusion's significance is pertaining to the concurring opinion in Sandoval, as applied to whether any specific change in the law impacts the analysis herein.   It appears CFMG Defendants may mean to emphasize any subsequent change to the deliberate indifference objective/subjective standards does not impact the "clearly established inquiry" under the standard for excessive force stated in Kingsley, as would be applicable to G. Garcia and Guerrero at the time of the incident.  (See CFMG Mot. 19:14-20.)

In either regard, Plaintiffs do not address Sandoval in briefing or Kingsley, or any impact of changes in the law.  More importantly for the Court's ultimate determination here, Plaintiffs have not identified a similar case where medical staff were acting under similar circumstances and were found have used excessive force in the violation of the Fourth Amendment, that the Supreme Court has consistently reminded lower courts that clearly established law should not be defined at a high level of generality.  See Kisela, 138 S. Ct. at 1152 ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (citations and quotation marks omitted).

Plaintiffs argue qualified immunity is generally not to be resolved at the pleadings stage. Williams v. O'Donnell, No. 3:19-CV-00418-BR, 2020 WL 6686416, at *12 (D. Or. Nov. 12, 2020) ("[Q]ualified immunity is almost always inappropriate at the pleading stage.").  It is true the Ninth Circuit has stated that "[d]etermining claims of qualified immunity at the motion-to-

1    dismiss stage raises special problems for legal decision making."   Keates v. Koile, 883 F.3d

2    1228, 1234 (9th Cir. 2018).   On the other hand, the Supreme Court has stated issues of qualified

3    immunity should be resolved at the earliest possible stage of litigation.   Hunter v. Bryant, 502

4    U.S. 224, 227 (1991) (because it is immunity from suit and not a defense to liability, "[w]e

5    repeatedly have stressed the importance of resolving immunity questions at the earliest possible

6    stage in litigation.")   "When, as here, defendants assert qualified immunity in a motion to dismiss

7    under Rule 12(b)(6), dismissal is not appropriate unless we can determine, based on the

8    complaint itself, that qualified immunity applies."   O'Brien v. Welty, 818 F.3d 920, 936 (9th Cir.

9    2016) (citation and internal quotation marks omitted).   "Thus, the plaintiff is entitled to all

10   reasonable inferences from the facts alleged, not only those that support his claim, but also those

11   that defeat the immunity defense."   McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004).   "If

12   the operative complaint 'contains even one allegation of a harmful act that would constitute a

13   violation of a clearly established constitutional right,' then plaintiff[ is] 'entitled to go forward'

14   with [his] claims."   Keates, 883 F.3d at 1235 (quoting Pelletier v. Fed. Home Loan Bank of San

15   Francisco, 968 F.2d 865, 872 (9th Cir. 1992)).

16          Given the stage of pleadings, Plaintiffs argue dismissal is not appropriate because Mr.

17   Anderson was seizing and had severely diminished control over his own physical movements;

18   Guerrero, G. Garcia, and the custody officers forced him into a restraint device and a restraint

19   chair; and whether the force was excessive will be developed during discovery and is for a jury,

20   or the Court on summary judgment, to decide.   Plaintiffs also take issue with CFMG Defendants'

21   reference to "being combative," arguing they provide *no evidence* in support of this position, and

22   emphasize allegations the nurses were informed upon arriving at Mr. Anderson's cell that he was

23   having a seizure.

24          The Court agrees there are no facts that appear to suggest combativeness, but at end,

25   CFMG Defendants did not precisely state Mr. Anderson was combative, but rather that: "Clearly

26   the Courts recognize that when an inmate is being combative the use of force may become

27   necessary[,] [h]ere, Ms. Garcia and Ms. Guerrero reasonably believed the officers' use of force

28   to restrain a flailing inmate was necessary so that they could safely assess and treat the inmate."

(ECF No. 49-1 at 24.)  Thus, CFMG Defendants were more analogizing flailing to a combative situation that would similarly require restraining of the limbs in order to allow a nurse to assist such inmate.

Plaintiffs argue the nurses should have seen from Mr. Anderson's movements and medical history that he was, indeed, seizing; that they should have enforced the policies outlined in the remedial plan, such as the one against the use of restraints in a medical situation; and certainly should not have assisted in forcing Mr. Anderson's seizing body into a restraint device and chair.  (FAC ¶¶ 38-40.)  CFMG Defendants in reply argue that Plaintiffs have failed to cite to even a single case where the Courts have said that trying to subdue an individual who is thrashing around and poses a danger to himself and others, for the purposes of providing medical assistance, is a constitutional violation.  Defendants further emphasize that if it was determined that G. Garcia and Guerrero somehow used excessive force on Mr. Anderson, they would still be entitled to qualified immunity, since it has not been clearly established that the actions of Defendants Garcia and Guerrero violated any constitutional rights of Mr. Anderson.

The Court finds the lack of other similar prior case law weighs in favor of granting the motion to dismiss based on qualified immunity grounds, even at the pleadings stage.  Indeed, "[e]xcept in the rare case of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must '*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment.' "  Sharp v. Cnty. of Orange, 871 F.3d 901, 911 (9th Cir. 2017) (quoting White v. Pauly, 580 U.S. 73, 79, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017)).  "In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful."  Id.; see also Brosseau, 543 U.S. at 599 ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").  "To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."  Sharp, 871 F.3d at 911 (quoting Wilson v. Layne, 526 U.S.

1  603, 617, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999)).

2  　　　The lack of similar case law is particularly significant given this claim is brought as an
3  excessive force action against nurses G. Garcia and Guerrero.  " '[S]pecificity is especially
4  important in the Fourth Amendment context, where the Court has recognized that it is sometimes
5  difficult for an officer to determine how the relevant legal doctrine, here excessive force, will
6  apply to the factual situation the officer confronts.' "  Kisela, 138 S. Ct. at 1152–53 (quoting
7  Mullenix v. Luna, 577 U.S. 7, 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)).  "Use of
8  excessive force is an area of the law 'in which the result depends very much on the facts of each
9  case,' and thus police officers are entitled to qualified immunity unless existing precedent
10 'squarely governs' the specific facts at issue."  Kisela, 138 S. Ct. at 1153 (quoting Mullenix, 577
11 U.S. at 13).  "Precedent involving similar facts can help move a case beyond the otherwise 'hazy
12 border between excessive and acceptable force' and thereby provide an officer notice that a
13 specific use of force is unlawful."  Kisela, 138 S. Ct. at 1153 (quoting Mullenix, 577 U.S. at 18);
14 see also  Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1197–98 (9th Cir. 2002)
15 ("[T]he Graham Court admonished courts to examine the circumstances underlying a Fourth
16 Amendment claim from the viewpoint of the reasonable officer on the scene, 'rather than with
17 the 20/20 vision of hindsight[,]' . . . [f]or, '[t]he calculus of reasonableness must embody
18 allowance for the fact that police officers are often forced to make split-second judgments—in
19 circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is
20 necessary in a particular situation.' " (quoting Graham, 490 U.S. at 396)); Gibson, 290 F.3d at
21 1198 ("Because we have determined that there is no proof the deputies on duty at the jail were
22 aware that Gibson's behavior was connected to his treatable mental illness, we cannot hold them
23 accountable for having treated Gibson as a dangerous prisoner rather than a sick one, despite the
24 tragic consequences of this error.").

25 　　　Accordingly, the Court recommends granting the CFMG Defendants' motion to dismiss
26 the excessive force claim against G. Garcia and Guerrero, based on qualified immunity.
27 Although it does not appear Plaintiffs would be able to state a claim based on their inability to
28 provide any similar caselaw here, given the unclear presentation of the arguments concerning the

1  changes in the law since <u>Kingsley</u> proffered by CFMG Defendants, and the generally recognized

2  issues with adjudicating qualified immunity at this stage of pleadings, the Court recommends

3  granting Plaintiffs leave to amend.

4          6.    <u>The Court Recommends Deeming CFMG's Motion to Dismiss the Sixth Cause of</u>

5               <u>Action Withdrawn as Moot in Light of the Stipulation of the Parties</u>

6         CFMG Defendants moved to dismiss plaintiffs' sixth cause of action for violation of the

7  ADA, on the basis that as a matter of law, CFMG is not a public entity as that term is defined by

8  42 U.S.C. §12131, and therefore Title II is inapplicable to CFMG.   Plaintiffs and CFMG

9  stipulated to dismiss this claim sand replead a claim for relief under Title III of the Americans

10  with Disabilities Act instead.  (ECF No. 74.)  Accordingly, the Court recommends the motion to

11  dismiss the sixth cause of action be deemed withdrawn as moot in light of the stipulation of the

12  parties.

13         **D.**    **Defendant HIG's Motion to Dismiss and Motion to Strike**

14         HIG moves to dismiss all claims.  First, to the extent Plaintiffs seek to allege that HIG's

15  liability is based on its alleged alter ego relationship with CFMG, HIG argues the FAC fails to

16  allege sufficient facts to  invoke this doctrine.  Second, HIG argues Plaintiffs' <u>Monell</u> claim

17  under Section 1983 fails because the FAC lacks sufficient factual allegations that HIG is a state

18  actor; that in general, it lacks sufficient allegations to support a <u>Monell</u> claim; that Plaintiffs also

19  fail to plead that HIG was the proximate cause of the alleged constitutional violations, and that

20  the prayer for punitive damages fails for the same reasons.  Third, HIG moves to dismiss

21  Plaintiffs' sixth and seventh claims because HIG does not fall under the purview of Title II of the

22  Americans with Disabilities Act and the Rehabilitation Act.  Fourth, HIG moves to dismiss

23  Plaintiffs' ninth and tenth claims for wrongful death and negligence arguing the FAC does not

24  allege the essential elements of negligence or any factual allegations in support thereof.

25         1.    <u>The Court Recommends Granting HIG's Motion to Dismiss on Alter Ego Theory</u>

26         HIG argues that Plaintiffs only proffer insufficient conclusory allegations of the two alter

27  ego status elements in their complaint.  The Court agrees with HIG.

28

1        **a.      General Legal Standards**

2        "The alter ego doctrine prevents individuals or other corporations from misusing the

3   corporate laws by the device of a sham corporate entity formed for the purpose of committing

4   fraud or other misdeeds." Sonoro Diamond Corp. v. Sup. Ct., 83 Cal.App.4th 523, 538 (2000).

5   "Federal courts apply the law of the forum state in determining whether to pierce the corporate

6   veil." Mililani Grp., Inc. v. O'Reilly Auto., Inc., No. 2:12-CV-00891 JAM, 2012 WL 5932980,

7   at *2 (E.D. Cal. Nov. 27, 2012) (citing SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir.2003)).

8   "Many California courts have stated that '[t]here is no litmus test' for the existence of an alter

9   ego relationship." Hickey, 322 F.3d at 1128 (quoting Mesler v. Bragg Mgmt. Co., 39 Cal.3d

10  290, 216 Cal.Rptr. 443, 702 P.2d 601, 606 (1985)).  "But these courts also state that '[t]here are,

11  nevertheless, two general requirements': ownership and the specter of fraud." Id.  Therefore,

12  these "[t]wo elements must be present in order to find that one corporation is the alter ego of

13  another." Ruiz v. Gen. Ins. Co. of Am., No. 120CV00218AWIEPG, 2020 WL 4018274, at *4

14  (E.D. Cal. July 15, 2020) (quoting Calvert v. Huckins, 875 F.Supp. 674, 678 (E.D. Cal. 1995)).

15       "First, the parent must control 'the subsidiary to such a degree as to render the latter the

16  mere instrumentality of the former.' "  Calvert, 875 F.Supp. at 674 (quoting Institute of

17  Veterinary Pathology, Inc. v. California Health Laboratories, Inc., 116 Cal.App.3d 111, 119

18  (1981)); see also Sonoro, 83 Cal.App.4th at 538 ("First, there must be such a unity of interest and

19  ownership between the corporation and its equitable owner that the separate personalities of the

20  corporation and the shareholder do not in reality exist.").  "Second, because piercing the

21  corporate veil is a remedy founded on principles of equity, there must be enough evidence to

22  support a finding that failure to look past the corporate entity would 'sanction a fraud or promote

23  injustice.' "  Calvert, 875 F.Supp. at 674 (quoting Marr v. Postal Union Life Ins. Co., 40

24  Cal.App.2d 673, 681 (1940)); see also Sonoro, 83 Cal.App.4th at 538 ("Second, there must be an

25  inequitable result if the acts in question are treated as those of the corporation alone.").

26       "Whether to pierce the corporate veil is a factual inquiry that should be done on a case-

27  by-case basis." Calvert, 875 F. Supp. at 678 (citing Keffer v. H.K. Porter Co., Inc., 872 F.2d 60,

28  65 (4th Cir. 1989)).  "Underlying both of these factors is a general presumption in favor of

respecting the corporate entity." Calvert, 875 F. Supp. at 678. "Disregarding the corporate entity is recognized as an extreme remedy and '[c]ourts will pierce the corporate veil only in exceptional circumstances.' " Id. (quoting Nat'l Precast Crypt Co. v. Dy-Core of Pennsylvania, Inc., 785 F. Supp. 1186, 1192 (W.D. Pa. 1992)). Thus, "[s]imply availing oneself of the protections provided by corporate charters is not misconduct sufficient to justify a court in finding a corporation to be an alter ego." Ruiz, 2020 WL 4018274, at *4 (quoting Tatung Co., Ltd. v. Shu Tze Hsu, 217 F.Supp.3d 1138, 1176 (C.D. Cal. 2016)). "Conclusory allegations of 'alter ego' status are insufficient to state a claim." Gerritsen v. Warner Bros. Ent. Inc., 116 F. Supp. 3d 1104, 1136 (C.D. Cal. 2015) (citations omitted); Ruiz v. Gen. Ins. Co. of Am., 2020 WL 4018274, at *4 (E.D. Cal. July 15, 2020); Neilson, 290 F. Supp. 2d at 1116 (noting same and stating "a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each.").

### b.    Unity of Interest

Plaintiff must establish "that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." Monaco v. Liberty Life Assur. Co., No. C06-07021 MJJ, 2007 WL 1140460, at *4 (N.D. Cal. Apr. 17, 2007). Citing to Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 838-40 (Ct. App. 1962), HIG notes various factors courts look to show the first element of unity of interest. (HIG Mot. 17.) The Court finds it useful to excerpt the full explanation of factors from Associated Vendors:

> Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citation]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family

[citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citations].

Associated Vendors, 210 Cal. App. 2d at 838-40 (collecting cases) (citations omitted); Arnold v. Browne, 27 Cal. App. 3d 386, 394, 103 Cal. Rptr. 775 (Ct. App. 1972) (noting same factors); see also Mililani Grp., 2012 WL 5932980, at *2 ("[C]ourts consider several factors, including inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." (quoting Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc., 99 Cal.App.4th 228, 245, 121 Cal.Rptr.2d 1 (2002))).

The Court notes that Defendant HIG's listing of the above factors includes "identification of the equitable owners with the domination and control of the two entities," but does not include in its list the factor of "identification of the directors and officers of the two entities in the responsible supervision and management," a separate factor listed in Associated Vendors. (HIG Mot. 17.)  This factor is repeated in other cases cited by HIG, including Mililani. See 2012 WL 5932980, at *2.  Nonetheless, while it is not clear whether HIG was glossing over this factor, HIG then goes on to explain the caselaw supporting their argument that common directors is not uncommon in corporate governance.

Turning to specific factual assertions the parties' focus on, HIG argues Plaintiffs make only generic and boilerplate allegations of the unity of interest between HIG and CFMG, and highlight the entities are inconsistently referred to as "CFMG," "Wellpath," and "CFMG/ Wellpath."  (FAC ¶¶ 45-53).  The Court shall excerpt the relevant allegations in the complaint:

> 42.   Defendant California Forensic Medical Group ("CFMG" aka Correctional Medical Group Companies, Inc. or "CMGC," and now also known as Wellpath, since October 1, 2018). They are referred to collectively and individually as "Wellpath." . . .

> 45.    At all material times, Wellpath was and is owned and controlled by HIG Capital. Wellpath acts on behalf of HIG and was and is responsible for the hiring, retaining, training, and supervising of the conduct, policies and practices of its employees and agents of Wellpath, including DOES 1-20.

> 46.    HIG accomplishes this inter alia, by placing its in-house professional and expertise as board members of Wellpath to ensure their control over Wellpath. There is unity of interest and ownership such that the separate personalities of HIG and Wellpath no longer exist as Wellpath and their employees and agents act with the consent, management, approval, ratification and direction of HIG

> 47.   HIG places at least two Managing Directors and one Principal of its private equity team as Board members, Chief Financial Officers, or other executive officers of Wellpath aka CMGC to ensure continuity of control and management over Wellpath. These high-ranking HIG members include, but are not limited to, Justin Reyna, an HIG Managing Director who serves as a Board Member of Wellpath aka CMGC; Michael Kuritzky, an HIG Principal who serves as a Chief Financial Officer and Secretary of Wellpath aka CMGC; and Rob Wolfson, an HIG Managing Director who is intimately involved in the day-to-day management of Wellpath aka CMGC. HIG. employees are routinely appointed to Wellpath's Board of Directors to ensure financial control over its affairs. Additionally, they have knowledge of HIG's contractual relationship with Wellpath, which has subsumed CFMG, and how HIG employees are appointed to Wellpath's board of directors and the duties of its board members."

> 48.   Before acquiring CFMG through joining CFMG, CMGC, and CCS and renaming them Wellpath, HIG knew or should have known of the pervasive unconstitutional conduct of these companies. HIG knew this and acquired this information through performing due diligence analysis prior to acquiring CFMG, CMGC and CCS. It made the decision that providing health care in jails was a financially lucrative business to acquire, control and manage, and have adjusted its private equity fund investments and operational structure to capitalize on sick and mentally-ill inmates in jail systems across California. HIG's use of Wellpath is but a mere shell, an instrumentality or conduit for the business of

financially profiting from providing medical care to the sick, injured and mentally ill in jails through these shell companies.

49.   HIG renamed CCS-CMGC "Wellpath" in October 2018, for the purpose of carrying HIG's ownership and financial interests in providing jail mental and medical health care and so HIG controls the assets and financial gains while Wellpath assume the liabilities. Wellpath is HIG's 23rd control investment in healthcare since 2008 and is its 14th current platform in the sector. Wellpath is estimated to generate $1.5 billion annually.

50.   On October 1, 2018, HIG publicly announced that "[o]ver the years, as the country's health care system has changed; we have seen more and more individuals with acute mental health diagnosis and substance use disorders being treated by our doctors, nurses and clinicians in correctional settings."

51.   A Managing Director of HIG announced, "We are proud of what we have accomplished since partnering with CMGC in 2012, and excited to bring these two companies together."[7]

52.   HIG uses the corporate entity as a shield against personal liability and harm caused to inmates in need of medical treatment in jails.

53.   Recognition of HIG. as a separate corporate entity would promote injustice and defeat the rights and equities of persons such as Mr. Anderson and Plaintiffs; it would enable and facilitate continued Wellpath unconstitutional conduct, practices, customs and policies, actions and inactions that harm this particularly vulnerable jail population and discourage abatement of these unconstitutional actions and inactions.

(FAC ¶¶ 42-53 (footnotes omitted).)

Turning to the specific arguments, while Plaintiffs assert that "Wellpath was and is owned and controlled by HIG Capital" (FAC ¶ 45), HIG argues this allegation is immediately contradicted by a press release referenced in the FAC, which provides that an affiliate of HIG, not HIG itself, acquired Correct Care Solutions (not CFMG).[17]   Plaintiffs do not dispute that the proffer was incorrect, but argue the distinction is meaningless.  Initially, while the distinction may not ultimately matter in some circumstances as discussed below, the Court finds the incorrect factual proffer, which is indeed a main factual foundational basis for piercing the corporate veil, does weigh in favor granting the motion to dismiss, although with leave to amend.

---

[17]  Plaintiffs' complaint proffers in a footnote that: "HIG acquired CFMG/Wellpath, rebranding its name under the umbrella of Correctional Medical Group Companies (CMGC) in 2013, *see* https://www.linkedin.com/company/correctional-medical-group-companies-inc-, and https://www.linkedin.com/company/ca-forensic-medical-group."  (FAC ¶ 42 n.1.)

1   See Mililani, 2012 WL 5932980, at *2 (finding leave to amend proper as although O'Reilly may
2   not be CSK's parent company, under California law, "the alter ego doctrine may apply between a
3   parent and a subsidiary or, under the single enterprise rule, between sister and affiliated
4   companies . . . [and because] the companies are affiliated, alter ego liability under these
5   circumstances is still possible if properly alleged.").

6       HIG argues Plaintiffs' allegations totally ignore the distinction between HIG and the
7   affiliate, and against basic principles of corporate separateness, Plaintiffs attempt to treat both
8   entities as one and the same throughout the FAC.  (FAC ¶¶ 42, 45, 48-50).  HIG also argues
9   Plaintiffs make only boilerplate allegations of the purported unity of interest between HIG and
10  Wellpath arising from "HIG placing its in-house professional and expertise as board members of
11  Wellpath to ensure their control over Wellpath."  (FAC ¶¶ 46-47).  HIG argues it is settled that
12  an overlap between two companies' directors or executive leadership alone is not suggestive of a
13  unity of interest and ownership but rather is merely indicative of intercorporate connections.
14  (HIG Mot. 18.)  HIG argues that in the absence of actual control, courts generally presume
15  directors can and do "change hats" to represent each corporation separately, despite their
16  overlapping obligations as officers or directors for more than one entity.

17      HIG first cites to Kramer Motors, wherein the court found similar allegations to be
18  insufficient.  Kramer Motors, Inc. v. Brit. Leyland, Ltd., 628 F.2d 1175 (9th Cir. 1980).  In
19  Kramer Motors, the record showed that "at various times, some directors of the British
20  defendants have sat on the board of BLMI, the United States importer subsidiary," that "[f]rom
21  1971 to 1975 the president of BLMI served as a director of BLIL, its British parent," that at
22  relevant times, "BLIL was generally responsible for the sale of British Leyland products outside
23  the United Kingdom, had general executive responsibility for the operation of BLMI, and
24  reviewed and approved its major policy decisions," that "BLIL has guaranteed obligations of
25  BLMI to United States banks," that "[e]xecutives of the British companies work closely with
26  executives of BLMI on pricing of vehicles for the United States market and sometimes travel to
27  the United States for talks on pricing," that "United States residents, through a 'personnel export
28  screen,' can originate a car purchase through BLMI, then go to Europe on vacation, pick up the

1   car there and bring it back to the United States," and that "BLIL approved the BLMI proposal for

2   consolidating distribution of British Leyland vehicles within the United States."  Kramer Motors,

3   628 F.2d at 1177.  The Ninth Circuit found the facts insufficient to establish alter ego status for a

4   finding of jurisdiction over that entity:

> These facts are insufficient to make BLMI an "alter ego" or
> "agent" of any of the British corporations so as to make any of
> them subject to jurisdiction solely through BLMI's presence in the
> United States. See Wells Fargo, supra, 556 F.2d at 419-422. The
> record does not show that executives and directors of the British
> corporations ever controlled the BLMI board or formed a board
> majority. None of the United Kingdom companies controls the
> internal affairs of BLMI or determines how it operates on a daily
> basis. BLMI has primary and exclusive responsibility for the
> distribution, marketing, and sale of British Leyland vehicles, parts
> and accessories within the United States. BLIL did not implement
> or supervise the reorganization plan. It proposed no changes in the
> plan. The parent and subsidiary have dealt with each other as
> distinct corporate entities.

13   Id. at 1177–78 (footnote omitted).  Plaintiffs are correct in highlighting Kramer Motors involved

14   a motion to dismiss based on personal jurisdiction, not a motion to dismiss brought under

15   12(b)(6).  (Opp'n HIG 23.)  Plaintiffs are also correct that Allphin v. Peter K. Fitness, LLC, No.

16   13-CV-01338-BLF, 2014 WL 6997653, at *5 (N.D. Cal. Dec. 11, 2014), and Calvert v. Huckins,

17   875 F. Supp. 674, also similarly dealt with jurisdictional motions.

18       Nonetheless, the Court finds the caselaw throughout this order pulls principles and

19   factors from various types of motions related to piercing the corporate veil, and finds the

20   discussions on the issues still instructive to analyzing relevant factors, although the Court

21   acknowledges issues regarding the presentation of evidence for such jurisdictional motions, as

22   discussed herein.  See Goldstein v. ExxonMobil Corp., No. CV 17-2477 DSF (SKX), 2017 WL

23   6888252, at *1-2 (C.D. Cal. Aug. 14, 2017) (applying United States v. Bestfoods, 524 U.S. 51,

24   69, 118 S. Ct. 1876, 1888, 141 L. Ed. 2d 43 (1998), to 12(b)(6) motion to dismiss concerning

25   alter ego liability, granting with leave to amend, and noting "the allegations in the complaint are

26   insufficient either to state a claim based on direct actions by the PBF Defendants or liability

27   based on an alter ego theory.").

28       Indeed, the Ninth Circuit in Doe v. Unocal, which concerned personal jurisdiction,

described Bestfoods as distinguishing between "a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility," and went on to state that "[i]n doing so, the Supreme Court articulated a *generally applicable principle* that a parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.' " Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (emphasis added) (quoting Bestfoods, 524 U.S. at 71-72).   The Ninth Circuit repeated that "[a]ppropriate parental involvement includes: 'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures.' " Id.

As the Supreme Court stated in Bestfoods, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." Bestfoods, 524 U.S. at 69 (quoting Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 57 (2d Cir. 1988)).   The Court went on to state: "This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately, despite their common ownership.' " Bestfoods, 524 U.S. at 69 (quoting Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779 (5th Cir. 1997)).   "Since courts generally presume 'that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary,' . . . it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." Bestfoods, 524 U.S. at 69-70 (citations omitted).

The Court finds that in consideration of the factual allegations proffered by Plaintiffs as to overlapping directors and officers (FAC ¶¶ 46-47), the factual proffers are conclusory attached to legal conclusions concerning control, and even taking the allegations in the light most favorable to Plaintiffs, weigh in favor of granting the motion in favor of HIG under the relevant legal standards.   See Associated Vendors, 210 Cal. App. 2d at 838-40 ("identification of the directors and officers of the two entities in the responsible supervision and management" one of

1  relevant factors); Goldstein, 2017 WL 6888252, at *1 (C.D. Cal. Aug. 14, 2017) ("Defendants

2  are alleged to share some of the same directors and senior officers . . . [b]ut the law is clear that a

3  mere sharing of some directors and officers is not sufficient to show alter ego liability." (citing

4  Bestfoods, 524 U.S. at 69)); Naghavi v. Belter Health Measurement & Analysis Tech. Co., No.

5  20-CV-01723-H-KSC, 2020 WL 6150431, at *7 (S.D. Cal. Oct. 20, 2020) ("[A] mere allegation

6  that a corporate director/officer held positions with both a parent and its subsidiary without more

7  is insufficient to establish direct liability as to the parent."); Doe v. Unocal, 248 F.3d at 926 (A

8  "parent corporation may be directly involved in the activities of its subsidiaries without incurring

9  liability so long as that involvement is 'consistent with the parent's investor status.' " (quoting

10  Bestfoods, 524 U.S. at 71-72)).

11       HIG argues the FAC does not provide any facts, let alone evidence, to support a claim of

12  HIG's actual control over CFMG.  Specifically HIG proffers that apart from allegations of

13  shared board members, Plaintiffs present only sparse boilerplate allegations taken straight from

14  the "*alter ego* playbook," such as including that: "CFMG/Wellpath [executive directors and

15  employees] act on behalf of HIG and CFMG/Wellpath [and] HIG is the alter ego of

16  CFMG/Wellpath, and/or alternatively CFMG/Wellpath act on behalf of HIG who have control

17  over them" (FAC ¶ 14); "[t]here is unity of interest and ownership such that the separate

18  personalities of HIG and Wellpath no longer exist as Wellpath and their employees and agents

19  act with the consent, management, approval, ratification and direction of HIG" (FAC ¶ 46);

20  "HIG renamed CCS-CMGC 'Wellpath' in October 2018, for the purpose of carrying HIG's

21  ownership and financial interest . . . and so HIG controls the assets and financial gains while

22  Wellpath assume[s] the liabilities" (FAC ¶ 49); "HIG's use of Wellpath is but a mere shell"

23  (FAC ¶ 48); and "HIG uses the corporate entity as a shield against personal liability" (FAC ¶

24  52).  (HIG Mot. 18.)

25       The Court agrees with HIG and finds the allegations contained in the FAC too conclusory

26  and unsupported by specific facts, to plausibly allege alter ego liability.  See Mililani, 2012 WL

27  5932980, at *2 (finding while plaintiff alleged several relevant factors, including that company

28  "operated at the will and whim of O'Reilly, it has no separate corporate office, it has no

management employees, day to day decisions regarding the Premises . . . were made by O'Reilly employees . . . [and] that O'Reilly carried out business in CSK's name to such an extent that any individuality or separateness of CSK and O'Reilly no longer exists," plaintiff failed to provide sufficient facts to support the allegations, and such "general allegations are too broad and insufficient to show a unity of interest and ownership."); see also Wehlage v. EmpRes Healthcare, Inc., 791 F. Supp. 2d 774, 782–83 (N.D. Cal. 2011) (finding "general allegations that the EmpRes Entities make decisions for [the other companies], that [they used EmpRes Entites] to procure labor, services and/or merchandise for the SNFs and that Defendants share officers, directors and employees" were "broad allegations [] not sufficient to show a unity of interest and ownership."); Wine Bottle Recycling, LLC v. Niagara Sys. LLC, No. 12-1924 SC, 2013 WL 1120962, at *9 (N.D. Cal. Mar. 18, 2013) ("Plaintiff makes a conclusory assertion that NCB and South Shore used NSL as a shell [but] [t]his is plainly insufficient to satisfy the alter ego exception.").[18]

The Court notes that in Mililani, the court nonetheless rejected the defendants' more broad argument that "the claims against O'Reilly fail substantively because O'Reilly is 'three steps removed' from CSK in the corporate structure and O'Reilly is not CSK's parent company according to the judicially noticed documents." Mililani, 2012 WL 5932980, at *2. The court found such argument did "not eliminate all potential alter ego liability," as although O'Reilly may not be CSK's parent company, under California law, "the alter ego doctrine may apply between a parent and a subsidiary or, under the single enterprise rule, between sister and affiliated companies . . . [and because] the companies are affiliated, alter ego liability under these circumstances is still possible if properly alleged." Id. This later statement influences the Court's granting of leave to amend, however, as currently pled, the Court agrees with HIG that the allegations are conclusory and insufficient even at the pleading stage for alter ego liability. See id. ("Plaintiff has not alleged either element of alter ego liability . . . .[t]he Court grants leave

---

[18]  The Court recognizes this holding applied to the jurisdictional motion, and the court granted plaintiff's request for jurisdictional discovery as to facts relevant to whether the alter ego exception was applicable. Wine Bottle Recycling, 2013 WL 1120962, at *13.

1  to amend, however, because Plaintiff may be able to allege the unity of interest element in

2  greater detail and allege sufficient facts to establish bad faith conduct by the Defendants.").

3         Next, HIG argues that wholly absent from the FAC is a single allegation of commingling

4  of funds, failure to maintain records, failure to observe corporate formalities or indicia of

5  disregarding the corporate form, and that California law plainly requires more than what is

6  alleged.  (HIG Mot. 19.)  The Court agrees that the FAC does not contain, nor does Plaintiffs'

7  briefing highlight therein, facts that would plausibly support a finding that additional relevant

8  factors weigh in favor of finding a unity of interest.  See Associated Vendors, 210 Cal. App. 2d

9  at 838-40; Mililani Grp., 2012 WL 5932980, at *2 ("[C]ourts consider several factors, including

10 inadequate capitalization, commingling of funds and other assets of the two entities, the holding

11 out by one entity that it is liable for the debts of the other, identical equitable ownership in the

12 two entities, use of the same offices and employees, use of one as a mere conduit for the affairs

13 of the other, disregard of corporate formalities, lack of segregation of corporate records, and

14 identical directors and officers." (quoting Virtualmagic, 99 Cal.App.4th at 245)); Wine Bottle

15 Recycling, 2013 WL 1120962, at *9 ("Plaintiff cites factors courts have considered in alter ego

16 cases, but never cites facts to which those factors might apply.").

17        The Court now turns to the cases where courts have analyzed similar arguments as

18 applied to the same defendants HIG and CFMG, which the parties focus heavily on in briefing.

19 HIG relies on Est. of Ricardez v. Cnty. of Ventura, No. CV 20-79-JFW(ASX), 2020 WL

20 3891460 (C.D. Cal. June 24, 2020).[19]   There, the court concluded plaintiffs had "failed to

21

[19]  The factual allegations were similar in the type of allegations and level of specificity:

22

In their SAC, Plaintiffs allege that the Private Equity Defendants are responsible for Decedent's
23        death because HIG is the alter ego of CFMG and the Private Equity Defendants are state actors.
          Specifically, Plaintiffs allege that because CFMG has a contract with the County and VCSD,
24        CFMG and HIG "provide a governmental function and stand in the same capacity as the County
          and VCSO in carrying out their duties at the VCSO jail." SAC, ¶ 16. Plaintiffs also allege that
25        HIG is "the owner, manager, and partner of CFMG," and that it controls CFMG "by placing its in-
          house professional and expertise, such as Justin Reyna, as a board member of CFMG" and that
26        "HIG is the alter ego of [CFMG] and/or alternatively [CFMG] act[s] on behalf of [HIG]." See,
          e.g., id., ¶¶ 22-24, 54, and 64. Similarly, Plaintiffs allege that "[t]here is unity of interest and
27        ownership such that the separate personalities of [HIG] and CFMG no longer exist as CFMG and
          their employees and agents act with the consent, management, approval, ratification and direction
28        of [HIG]." Id., ¶ 64; see also id., ¶ 24 ("[HIG]'s use of [CFMG] is but a mere shell, an
          instrumentality or conduit for the business of financially profiting from providing mental/medical

1  sufficiently allege that HIG is the alter ego of CMFG," that plaintiffs specifically had "failed to

2  sufficiently allege that there is a unity of interest and ownership between HIG and CMFG such

3  that separate personalities do not exist," and found significant that "[t]here [were] numerous

4  factors that could be alleged . . . to demonstrate a unity of interest," but such <u>Associated Vendors</u>

5  factors were not alleged.  <u>Ricardez</u>, 2020 WL 3891460, at *4 ("Plaintiffs have failed to allege

6  facts demonstrating the existence of any of these factors and, instead, allege only in general and

7  conclusory fashion that there is a unity of interest between HIG and CFMG.").

8      HIG further highlights that in <u>Ricardez</u>, the court found plaintiffs' conclusory allegations

9  were contradicted by certain press releases relied on in their complaint, a similar argument

10  presented here as to the articles cited in Plaintiffs' complaint.  <u>See</u> <u>Ricardez</u>, 2020 WL 3891460,

11  at *6 n.5 ("[T]he press releases relied on by Plaintiffs contradict Plaintiffs' allegations that HIG

12  owned and/or managed CFMG and specifically state that an *affiliate* of HIG, not HIG itself,

13  'made a strategic investment in' CFMG . . .  addition[ally], another press release makes clear, it

14  is not unusual that an affiliate of HIG would invest in a company and HIG would have no direct

15  control over that company because '[s]ince its founding in 1993, [HIG] invested in and managed

16  more than 200 companies worldwide [and] [t]he firm's current portfolio includes more than 70

17  companies.' ").  Plaintiffs do not dispute their proffer of what the LinkedIn articles was

18  inaccurate in that regard, but respond that the distinction that the purchase was not by HIG but by

19  an affiliate is a meaningless distinction.  (Opp'n HIG 21.)

20

---

21      care to the mentally ill in jails through these shell companies"); *Id.* ("[HIG] uses the corporate

22  entity as a shield against personal liability"). In addition, Plaintiffs allege that "[CFMG] and [its]
    employees are agents of [HIG]" and that all the individual defendants were employees and/or
    agents of HIG/CFMG/Wellpath. *See id.*, ¶¶ 25-36.

23  With respect to Reyna, Plaintiffs allege that he "was and is an employee and/or agent of H.I.G.

24  acting on behalf of H.I.G./CFMG/Wellpath, and [an] Executive and Board Member of CFMG and
    also a Managing Director of H.I.G." and that "[a]t all times mentioned herein [Reyna] was acting

25  under color of law." *Id.*, ¶ 30. In addition, Plaintiffs allege that Reyna "is and was responsible for
    promulgation of policies, procedures and allowance of the practices/customs pursuant to which the
    acts of H.I.G., CFMG/Wellpath and its employees and agents, alleged herein were committed"

26  (*id.*), and that he, with other "employees, supervisors, directors, and managers of H.I.G.
    CFMG/Wellpath" has "a unity of ownership and unity of purpose and interest that extends to all

27  CFMG providers of health care in all county jails where CFMG/Wellpath does business." *Id.*, ¶ 64

28  <u>Ricardez</u>, 2020 WL 3891460, at *2.

In reply, HIG again emphasizes the allegation of ownership is immediately contradicted by the press release referenced in the FAC, which provides that an affiliate of HIG, not HIG itself, acquired Correct Care Solutions (not CFMG).  While Plaintiffs suggest the distinction is meaningless, HIG replies that such bold assertion defies basic legal principles of corporate separateness, and the Court should consider the failure to substantively address the argument to be a concession and necessitates granting the motion to dismiss.  (HIG Reply 12 n.4.)  The Court treats it as a concession that the referenced article and Plaintiffs' reliance on the facts therein were incorrect as stated in the complaint, but Plaintiffs still proffer some argument in opposition, and thus the Court does not find Plaintiffs' lack of further respond to necessitate granting HIG's motion.  However, the Court finds Plaintiffs' lack of meaningful response only reinforces the Court's findings in favor of HIG, and reinforces the Court's finding of the FAC's conclusory allegations being insufficient in specific factual support to maintain Plaintiffs' alter ego theory against HIG.

As noted above, the Court finds the incorrect factual proffer in this regard does weigh in favor of dismissal.  The Court disagrees the inaccurate proffer is meaningless, but does acknowledge the distinction may be less relevant depending on the precise factual circumstances, in relation to all of the relevant factors.  See Mililani, 2012 WL 5932980, at *2.  However, this incorrect foundational proffer, in relation to the absence of pleading other relevant factors, weighs in favor of dismissal.  See Associated Vendors, 210 Cal. App. 2d at 838-40; Mililani Grp., 2012 WL 5932980, at *2; Wine Bottle Recycling, 2013 WL 1120962, at *9.  As HIG emphasizes in reply, even total ownership and control are alone insufficient to establish an alter ego relationship.  See Ranza v. Nike, Inc., 793 F.3d 1059, 1073 (9th Cir. 2015) ("Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." (citing Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd., 328 F.3d 1122, 1135 (9th Cir. 2003))).

HIG correctly argues that as to Plaintiffs' allegations of "control," Plaintiffs must allege facts showing that Wellpath has controlled HIG "to such a degree as to render the latter the mere instrumentality of the former."  NuCal Foods, Inc. v. Quality Egg LLC, 887 F. Supp. 2d 977, 992

1  (E.D. Cal. 2012) (quoting Calvert, 875 F. Supp. at 679); Ricardez, 2020 WL 3891460, at *4

2  ("Plaintiffs have failed to sufficiently allege that there is a unity of interest and ownership

3  between HIG and CMFG such that separate personalities do not exist.").  The Court agrees with

4  HIG that Plaintiffs have not alleged any such facts of control, and the FAC is deficient of other

5  types of specific facts commonly considered in weighing this requirement.  See Mililani Grp.,

6  2012 WL 5932980, at *2 ("[C]ourts consider several factors . . . " (quoting Virtualmagic, 99

7  Cal.App.4th at 245)); Ricardez, 2020 WL 3891460, at *4 ("Plaintiffs have failed to allege facts

8  demonstrating the existence of any of these [Associated Vendors] factors and, instead, allege

9  only in general and conclusory fashion that there is a unity of interest between HIG and

10  CFMG.").

11      Plaintiffs also direct the Court to their allegation that HIG utilized companies that are

12  nothing more than shells or instrumentalities (FAC ¶ 48), arguing these "downstream entities" as

13  HIG calls them, assume HIG liabilities while HIG reaps profits (FAC ¶ 49); and Plaintiffs submit

14  this is exactly the kind of arrangement that results in liability under agency, alter ego, joint

15  venture, joint ownership, and ratification theories.  (Opp'n HIG 21.)[20] As noted above, the Court

16  finds these allegations insufficient and conclusory.  See Mililani, 2012 WL 5932980, at *2

17  (finding plaintiff failed to provide sufficient facts to support the allegations, and such "general

18  allegations are too broad and insufficient to show a unity of interest and ownership."); Wehlage,

19  791 F. Supp. 2d at 782.

20      Like HIG relies on Ricardez, Plaintiffs rely on the opinion issued by Chief Judge Mueller

21  in Est. of Miller v. Cnty. of Sutter, No. 220CV00577KJMDMC, 2020 WL 6392565, at *6 (E.D.

22  Cal. Oct. 30, 2020).  Plaintiffs argue that, as HIG did in its motion to dismiss in Miller, HIG has

23  not contested the substance of Plaintiffs' alter ego allegations and merely claims that the

24  allegations are "conclusory."  (Opp'n HIG 18.)  In Miller, the court found the implications of the

25  factual allegations plausibly supported alter-ego liability, allegations that are similar to those

26  here, in their implications:

27  _____

28  [20]  In regard to these multiple theories, Plaintiffs emphasize that HIG only devotes one footnote to such theories, but Plaintiffs address each in opposition.  (Opp'n HIG 21.)  The Court addresses each of these other theories below.

The complaint here includes several pages of allegations illustrating how the plaintiffs intend to prove that the companies under the "Wellpath" umbrella are not really separate from HIG, but rather instruments that HIG wields to artificially divorce its profits from its liabilities. For example, the complaint alleges the names of these entities and their relationships have converged as a result of rebranding efforts and the consolidation of control in HIG. *See, e.g.*, FAC ¶¶ 34, 40. It alleges HIG controls the companies that actually provide healthcare in county jails and directs day-to-day operations by creating policies, setting strategic goals, installing executives and board members, and choosing who will work in jails as supervisors, doctors and nurses. *See, e.g.*, *id.* ¶¶ 34–36. It alleges HIG and its owners have attempted to increase the value of their investment by collecting profits and gains while saddling subsidiaries with liabilities and losses, entities HIG creates specifically for that purpose. *See, e.g.*, *id.* ¶¶ 38, 40, 44. It also alleges that if HIG and Wellpath are not treated as the same entity, HIG will continue depriving inmates of healthcare and preventing improvements to California jails, even after successful civil rights lawsuits. *Id.* ¶¶ 44–45. These are allegations only and HIG may well disprove them. But they are factual allegations, and at this stage, the court must assume they are true. Doing so, the court infers a plausible theory of alter-ego liability.

*Miller*, 2020 WL 6392565, at *6. The *Miller* court was privy to *Ricardez*, but rejected the conclusions of that court. *Miller*, 2020 WL 6392565, at *7 ("[T]he Central District court did not cite or distinguish any of the decisions summarized above . . . It relied instead on five older decisions addressing complaints without factual allegations . . . [t]his court therefore declines to follow the Central District court's decision [and] [finds] [t]he factual allegations here suffice at this stage to support the plaintiffs' claim that HIG and Wellpath should be treated as alter egos.").

HIG replies to Plaintiffs' reliance on *Miller*, by suggesting Plaintiffs fail to explain whether there are any factual similarities between the allegations in *Miller* and the FAC other than that both cases are "jail death cases," and argue Plaintiffs do not sufficiently explain why the Court here should follow the *Miller* order's rationale. HIG emphasizes that, without conceding whether the allegations were sufficient, the operative complaint in *Miller* spanned over 60 pages and 245 paragraphs and alleged ten claims against HIG (and an HIG's executive), the *Miller* Order dismissed several of those claims, and thus HIG contends Plaintiffs cherry-pick favorable parts of the order and improperly treat the complaints as one and the same and for these reasons alone, Plaintiffs' reliance on the *Miller* order is improper.

First, the Court disagrees with HIG's wholesale suggestion that this makes Plaintiffs' reliance on <u>Miller</u> improper. Instead, the Court finds <u>Ricardez</u> and <u>Miller</u> both are properly relied on by the respective parties and the Court finds both informative as to the differing paths courts may take on similar factual allegations. More importantly, the Court turns to Defendants' arguments that the <u>Miller</u> court misapprehends holdings and factual allegations of the cases it relies on in concluding that "much more modest" allegations were sufficient to support an alter ego claim. The <u>Miller</u> court analyzed the claims in relation to other caselaw as follows:

> But the complaint here includes more than labels, conclusions and naked assertions. *See supra* at 11. The section of the complaint that describes HIG and Wellpath is several pages and dozens of paragraphs long. *See* FAC at 11–19. Similar allegations, and even much more modest allegations, have sufficed to support a claim that one entity is the alter ego of another in California federal district courts. In a case against a publisher and its affiliates, for example, the plaintiff survived a motion to dismiss despite alleging only that defendants had used the same or very similar names, a parent controlled its subsidiaries, and the companies had commingled funds. *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 961–62 (N.D. Cal. 2015). In a case of allegedly unpaid invoices, the court held the plaintiff had "properly alleged a unity of interests" among defendants—i.e., that its complaint satisfied the first part of the alter-ego test—by alleging simply that one entity "directed and controlled" the other, which was allegedly a "mere instrumentality, agency, conduit, or adjunct." *Daewoo Electronics Am., Inc. v. Opta Corp.*, No. 13-1247, 2013 WL 3877596, at *5 (N.D. Cal. July 25, 2013). In another case about reimbursement for healthcare services, the plaintiffs survived a motion to dismiss by alleging that some of the defendants had commingled assets and operations, ignored corporate formalities and exercised control over others. *See In re Out of Network Substance Use Disorder Claims*, No. 19-2075, 2020 WL 2114934, *11–12 (C.D. Cal. Feb. 21, 2020). And in *Pacific Maritime Freight, Inc. v. Foster*, the Southern District court concluded it was enough for the plaintiff to plead that a person was the sole owner of the alleged alter ego and the two commingled funds. *See* No. 10-0578, 2010 WL 3339432, at *6–7 (S.D. Cal. Aug. 24, 2010). California courts have sometimes required even less. *See, e.g.*, *Paul v. Palm Springs Homes Inc.*, 192 Cal. App. 2d 858, 863 (1961) (enough for plaintiff to allege sole ownership alone).

<u>Miller</u>, 2020 WL 6392565, at *6. HIG suggests that Plaintiffs simply copy the analysis from <u>Miller</u> without any scrutiny, for example, HIG proffers that contrary to the <u>Miller</u> court's assertion, the court in <u>Stewart</u> granted defendants' motion to dismiss on the alter ego claim.

1    Specifically, HIG proffers the following:

> Further, and more importantly, the *Miller* Order misapprehends
> holdings and factual allegations of the cases it relies in concluding
> that "much more modest" allegations were sufficient to support an
> alter ego claim (*Miller* Order, 5:5-24). Plaintiffs simply copy the
> analysis from the *Miller* Order without any scrutiny. For example,
> contrary to the *Miller* Order's assertion, the court in *Stewart*, 81 F.
> Supp. 3d at 961 <u>granted</u> defendants' motion to dismiss on the *alter
> ego* claim. Further, unlike Plaintiffs here, the plaintiff in *Stewart*
> alleged numerous facts supporting "[identical] equitable
> ownership, use of the same offices and employees, and identical
> officers and directors." *Id.* at 955-56. Nonetheless, the court
> determined that "[t]hese factors, even when considered together,
> [were] not sufficient to support a finding of unity of interest." *Id.*,
> at 956. Notably, perhaps to Plaintiffs' surprise, the court in *Stewart*
> also stated that "it is well-settled that common ownership is not
> dispositive," and that "directors can and do 'change hats.'" *Id.* 956.
> The *Stewart* court further found that plaintiff has not established an
> inequitable result. *Id.*

12   (HIG Reply 14.)  However, HIG appears to misapprehend some of the <u>Miller</u> court's statements

13   and analysis in relation to <u>Stewart</u>.  Here, HIG brings their motion pursuant to Rule 12(b)(6), for

14   failure to state a claim, not under 12(b)(2) for lack of personal jurisdiction.  Indeed, in <u>Miller</u>, the

15   court recognized the differences.  <u>See Miller</u>, 2020 WL 6392565, at *8 ("HIG also cites many

16   cases decided in very different procedural circumstances, namely when a defendant asserts a lack

17   of personal jurisdiction, [however,] [w]hen a court ascertains its personal jurisdiction, it consults

18   the plaintiff's evidence . . . [h]ere, by contrast, the court must decide whether the plaintiffs'

19   allegations, if true, could support a plausible claim of alter-ego liability.") (citations omitted).

20        The <u>Stewart</u> court did two alter ego analyses, first in the context of personal jurisdiction

21   under 12(b)(2), wherein the court granted defendant's motion, and which HIG appears to rely on

22   in their citation to the opinion.  The <u>Stewart</u> court noted the different analyses that were applied

23   to the different interconnected entities, but each analysis still employed the alter-ego elements.

24   <u>Stewart</u>, 81 F. Supp. 3d at 960 ("In contrast to the alter ego determination in the 12(b)(2) context,

25   which hinged on the relationship between Screen Gems–EMI, EMI, and EMI North America, the

26   sufficiency of Plaintiff's claims turns on whether Plaintiff has alleged enough facts to set forth a

27   plausible claim that Screen Gems–EMI and its foreign affiliated sub-publishers are part of a

28   single enterprise . . . [t]hus, the impropriety of Screen Gems–EMI's conduct—and therefore the

sufficiency of the FAC—rises and falls on whether Plaintiff has adequately alleged that Defendants and their foreign affiliates are alter egos of each other and are operating as a single enterprise.").  The <u>Stewart</u> court first granted the 12(b)(2) motion as to certain entities: "[t]he Court concludes that there is no basis for an exercise of personal jurisdiction over EMI and EMI North America: it is not appropriate to impute Screen Gems–EMI's contacts with California to the entities under an alter ego or agency theory, nor does EMI North America itself have sufficient contacts with the state to give rise to specific jurisdiction."  <u>Stewart</u>, 81 F. Supp. 3d at 953.  Specifically, the language referenced by HIG is in this section of the <u>Stewart</u> order:

> The next factor considers whether the entities have identical officers and directors. The evidence indicates that Johnson is the President, CEO, and Secretary of Screen Gems–EMI and EMI North America, as well as a director of EMI. Frank Crimmins is the CFO of Screen Gems–EMI, and the sole director of EMI North America and one of two EMI directors (the other being Johnson). Thus, the same two people are officers and directors of all three corporations. (Dkt. No. 13 ¶ 1; Dkt. No. 22–1 ¶¶ 4–6 & Ex. B–D.) Nonetheless, it is well-settled that common ownership is not dispositive. *See Square 1 Bank v. Lo,* No. 12–CV–05595–JSC, 2014 WL 4181907, at *2 (N.D.Cal. Aug. 22, 2014); *Sandoval,* 34 F.Supp.3d at 1040 ("Common ownership alone is insufficient to disregard the corporate form."). Moreover, in the absence of evidence of actual control, courts generally presume that directors can and do "change hats" to represent each corporation separately, despite their overlapping obligations as officers or directors for more than one entity. *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Allphin v. Peter K. Fitness, LLC,* No. 13–cv–1338–BLF, 2014 WL 6997653, at *5 (N.D.Cal. Dec. 11, 2014) (citation omitted). However, common ownership coupled with other factors, in particular, control, does weigh in favor of an alter ego analysis, even if ever so slightly.
>
> Here, three factors weigh in favor of finding a unity of interest among the EMI entities: equitable ownership, use of the same offices and employees (for EMI North America only), and identical officers and directors. These factors, even when considered together, are not sufficient to support a finding of unity of interest among these entities.

<u>Stewart</u>, 81 F. Supp. 3d at 957.  The <u>Miller</u> court referred to the <u>Stewart</u> court's findings at pages 81 F. Supp. 3d at 961–62, which is where the <u>Stewart</u> did find in favor of the plaintiff as to unity of interest:

> With respect to the unity of interest element, Plaintiff points to

allegations that Screen Gems–EMI and all EMI affiliates have all been doing business collectively as "EMI Music Publishing" (Dkt. No. 1–1 ¶ 11); that the foreign affiliates are all "wholly owned and/or controlled subsidiaries of EMI Music Publishing" (*id.* ¶ 25); that the foreign affiliates use the name "EMI Music Publishing" with the name of the territory appended (*id.*); and that EMI Music Publishing exercises total control over these subsidiaries (*id.* ¶ 26). The FAC alleges further that Screen Gems–EMI and the sub-publishers commingle funds "by arbitrarily allocate[ing] funds between and among themselves and the affiliates[.]" (*Id.* ¶ 32.)

These allegations are sufficient to survive a 12(b)(6) motion.

Stewart, 81 F. Supp. 3d at 961–63.

Therefore, while HIG may appropriately pull principles made in one regard in Stewart as to certain entities, recognizing they are from the 12(b)(2) portion of the opinion, the Court rejects HIG's wholesale contention that the Miller court misapprehended Stewart, as this Court finds no indication in the Miller order of such.  Again, the Miller court only stated as to Stewart that there, "the plaintiff survived a motion to dismiss despite alleging only that defendants had used the same or very similar names, a parent controlled its subsidiaries, and the companies had commingled funds." Miller, 2020 WL 6392565, at *6.  Miller's statement thus appears accurate, as to the Stewart court's findings and conclusions regarding the 12(b)(6) motion.  See Stewart, 81 F. Supp. 3d at 962 ("The FAC alleges specific facts regarding the nature of the relationship among Defendants and their foreign affiliates that are pertinent to assessing alter ego: they all use the same EMI name; the foreign affiliates are wholly owned and/or controlled subsidiaries of that entity; EMI exercises total control over the foreign affiliates; Screen Gems–EMI and the affiliated sub-publishers pass funds (specifically, fees for sub-publishing) between and among themselves—facts from which the Court could infer that there is a disregard of corporate formalities, commingling of corporate funds, or failure to segregate records.").

Next, HIG submits the following statement concerning the Miller court's review of Daewoo Elecs. Am. Inc. v. Opta Corp., No. C 13-1247 JSW, 2013 WL 3877596 (N.D. Cal. July 25, 2013):

The *Miller* Order's take on *Daewoo*, 2013 WL 3877596, at *1 is also misguided. Again, contrary to the *Miller* Order's assertion, the *Daewoo* court granted the motion to dismiss on the alter ego claim because "Daewoo has not properly alleged an inequitable result."

1

*Id.*, at *5. Further, at issue in *Daewoo* were affiliated entities and contractual guarantors, thus, the case was distinguishable to begin with. *Id.*, at *6 (N.D. Cal. July 25, 2013).

2

3   (Reply HIG 14.) However, the <u>Miller</u> decision confined its description of <u>Daewoo</u> to that court's

4   findings concerning the first prong of the alter ego test.  <u>Miller</u>, 2020 WL 6392565, at *6 ("In a

5   case of allegedly unpaid invoices, the court held the plaintiff had 'properly alleged a unity of

6   interests' among defendants—i.e., that its complaint satisfied the first part of the alter-ego test—

7   by alleging simply that one entity 'directed and controlled' the other, which was allegedly a

8   'mere instrumentality, agency, conduit, or adjunct.' " (quoting <u>Daewoo</u>, 2013 WL 3877596, at

9   *5).  Thus, the <u>Miller</u> court's description of the case is not inaccurate, because the <u>Daewoo</u> court

10   did make such finding as to the first element.  <u>See</u> <u>Daewoo</u>, 2013 WL 3877596, at *5 ("Here,

11   Daewoo pleads at least two factors in support of a unity of interest, including the contentions that

12   'GoVideo was a mere instrumentality, agency, conduit, or adjunct of Opta and/or TCL Entities'

13   and "Opta and/or TCL Entities directed and controlled GoVideo's dealings[,]' [and therefore the

14   court] finds that Daewoo has properly alleged a unity of interest.").  It is true the <u>Daewoo</u> court

15   did not find evidence in support of the second element.  <u>Id.</u> at *5-6 ("Although Daewoo has

16   properly plead the unity of interest element, Daewoo has failed to allege the presence of an

17   inequitable result and failed to link its alter ego claim with the prior 2007 default judgment.").

18       Finally, HIG presents the following arguments concerning the <u>Miller</u> order and Plaintiffs'

19   reliance on it:

20

In *In re Out of Network Substance Use Disorder Claim,* 2020 WL 2114934, at *12 (C.D. Cal. Feb. 21, 2020), at issue were various wholly-owned and/or controlled subsidiaries commingling assets, undercapitalizing operations, ignoring corporate formalities, and exercising dominion and control over the operations of the other defendants. Thus, again, contrary to the *Miller* Order's assertions, *In re Out of Network* is distinguishable, and its allegations are more detailed than allegations of the FAC.

21

22

23

24

Lastly, the *Miller* Order mispresents the allegations of *Paul v. Palm Springs Homes Inc.,* 192 Cal. App. 2d 858, 861 (Ct. App. 1961). There, several corporations were alleged to be the alter egos of their individual owners. Thus, again, the case was distinguishable. Further, contrary to the *Miller* Order's assertion, the alter ego allegations were much more than just of "sole ownership." Instead, the complaint alleged that individual defendants were doing business under different corporate names,

25

26

27

28

the acts and liabilities of these corporations were attributed to individual defendants, the corporations were not adequately financed and did not respect corporate formalities, and the individual owners owned the stock and controlled the corporate defendants. *Id.*, at 860-61. Thus, clearly, these allegations were much more detailed than the allegations of the FAC. For all these reasons, Plaintiffs' argument – merely copied straight from the *Miller* Order's -- that "much more modest allegations" suffice to establish an *alter ego* claim, simply lacks merit.

Finally, Plaintiffs' attempts to distinguish *Estate of Ricardez v. Cty. of Ventura*, 2020 WL 3891460 (C.D. Cal. June 24, 2020) are unavailing. First, Plaintiffs (again copying from the *Miller* Order) assert that *Ricardez* failed to consider the above-cited cases. However, as noted above, those cases were misconstrued in the *Miller* Order; and, in fact, they support the dismissal of Plaintiffs' alter ego claim. Second, Plaintiffs' attempt to discredit the well-established legal principle that "[c]onclusory allegations of 'alter ego' status are insufficient to state a claim" is frivolous and should be disregarded.

(HIG Reply 14-15.)

While HIG argues In re Out of Network is distinguishable, the Court does not find anything in the Miller court's statements to be untrue about the case. The Miller court stated: "In another case about reimbursement for healthcare services, the plaintiffs survived a motion to dismiss by alleging that some of the defendants had commingled assets and operations, ignored corporate formalities and exercised control over others." Miller, 2020 WL 6392565, at *6 (citing In re Out of Network, 2020 WL 2114934, at *11–12). Given the Court already finds HIG's characterization of the Miller court's other citations off-base, even if HIG is correct as to the other points concerning the extent of the factual allegations underlying Paul v. Palm Springs Homes Inc., 192 Cal. App. 2d 858, 861 (Ct. App. 1961), it would not change the Court's view that the Miller court's analysis is not necessarily flawed because of its framing of the above cases.

The Court does somewhat agree with HIG that Plaintiffs do not in detail explain the factual similarities between this case and Miller, and why the same analysis should apply. Like Seybold, the Court does not find these district court opinions to be determinative to this Court's analysis here as applied to the allegations in this complaint. See Seybold v. Tazewell Cnty., No. 20-CV-1386-JES-JEH, 2022 WL 68385, at *6 (C.D. Ill. Jan. 6, 2022) ("HIG also urges the Court

to reach the same conclusion as two other district courts that rejected theories of alter ego, agency, and color of law alleged by different plaintiffs to hold HIG liable for inmate deaths at other jails . . . [while] [l]ikewise, Plaintiff provides [Miller] where HIG was sued under similar theories, but the district court denied its motion to dismiss . . .  [n]otably, Plaintiff cites Miller but does not explain its factual similarity or the allegations therein as compared to the Complaint here, nor does she explain why the Court should follow that court's rationale [and] [t]he Court considered these opinions but did not rely on them in rendering its decision.”). Ultimately however, despite the Court taking issue with HIG’s framing of the Miller opinion, this Court reaches a different determination then the Miller court as to the alter ego status of HIG as currently pled in this case.

Accordingly, the Court finds consideration of the legal principles described in the above cases concerning the factor of unity of interest, as applied to the factual allegations currently contained in the FAC, weigh in favor of granting HIG’s motion to dismiss.  See Associated Vendors, 210 Cal. App. 2d at 838-40; Mililani, 2012 WL 5932980, at *2; Ricardez, 2020 WL 3891460, at *4; Ranza, 793 F.3d at 1073; Wine Bottle Recycling, 2013 WL 1120962, at *9; Wehlage, 791 F. Supp. 2d at 782–83; Naghavi, 2020 WL 6150431, at *7; Doe v. Unocal, 248 F.3d at 926; Bestfoods, 524 U.S. at 71-72.

### c.    Inequitable Result

Plaintiffs allege “HIG uses the corporate entity as a shield against personal liability and harm caused to inmates in need of medical treatment in jails.” (FAC ¶ 52.)  Plaintiffs also allege: “Recognition of HIG as a separate corporate entity would promote injustice and defeat the rights and equities of persons such as Mr. Anderson and Plaintiffs; it would enable and facilitate continued Wellpath unconstitutional conduct, practices, customs and policies, actions and inactions that harm this particularly vulnerable jail population and discourage abatement of these unconstitutional actions and inactions.”  (FAC ¶ 53.)  While the Court acknowledges ongoing debates relating to private companies providing medical care to prisons and jails, and theoretical and practical concerns that may relate to interconnected corporate entities, the Court finds that Plaintiffs’ allegations that could support the second element, are insufficiently conclusory and

lacking in factual support to maintain an alter ego theory of liability.

HIG argues California courts generally require evidence of some bad faith conduct that makes it inequitable to recognize the corporate form.  (HIG Mot. 19, citing Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1213, 11 Cal. Rptr. 2d 918 (1992); Calvert, 875 F.Supp. at 679 ("Even if plaintiffs had made a sufficient prima facie showing of control, defendants' motion would still be granted since plaintiffs have produced no evidence whatsoever going to the second requirement for piercing the corporate veil—that failure to do so would 'sanction a fraud or promote injustice.' " (quoting Marr, 40 Cal.App.2d at 681)).)  The Court notes that in Gardner, the court stated "[i]t is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity," but also noted "[t]he issue is one for the trier of fact and is reviewed on appeal according to the usual standards for sufficiency of the evidence to support the conclusion."  Gardner, 9 Cal. App. 4th at 1212–13 (citations omitted).  To be clear, for purposes of the 12(b)(6) motion, the Court does not find evidence is needed at this stage, and as acknowledged above, many of the cases in this area deal with jurisdiction motions that may consider evidence or allow for limited discovery on such issue.  See Miller, 2020 WL 6392565, at *8 ("HIG also cites many cases decided in very different procedural circumstances, namely when a defendant asserts a lack of personal jurisdiction, [however,] [w]hen a court ascertains its personal jurisdiction, it consults the plaintiff's evidence . . . [h]ere, by contrast, the court must decide whether the plaintiffs' allegations, if true, could support a plausible claim of alter-ego liability.") (citations omitted).

Nevertheless, the "rule is firmly settled that no reliance can be had on [an alter ego] theory in the absence of *pleading* that recognition of the corporate entity would sanction a fraud or promote injustice ... a plaintiff must plead those factors in order to state a cause of action against individual defendants."  Ricardez, 2020 WL 3891460, at *5 (quoting Meadows v. Emett & Chandler, 99 Cal. App. 2d 496, 499, 222 P.2d 145, 147 (1950)).  The Court concludes the allegations as to this element are conclusory and insufficient, and recommends granting dismissal.  See Calvert, 875 F.Supp. at 679 ("Plaintiffs make no allegations of fraud or similar misdeeds[, and] [t]here is not even a suggestion that Western is undercapitalized . . .  or that

1   efforts have been made by Centex or CXP to strip Western of assets in order to avoid liability.")

2   (citations omitted); Gardner, 9 Cal. App. 4th at 1213 ("The purpose of the doctrine is not to

3   protect every unsatisfied creditor, but rather to afford him protection, where some

4   conduct *amounting to bad faith* makes it inequitable, under the applicable rule above cited, for

5   the equitable owner of a corporation to hide behind its corporate veil."); Ricardez, 2020 WL

6   3891460, at \*5 ("Plaintiffs have failed to allege specific bad faith conduct that would make it

7   inequitable to recognize the corporate form . . . Plaintiffs fail to allege any facts, undoubtedly

8   because there are none, regarding the purported fraud or injustice that would 'arise' from not

9   holding HIG liable for the acts of CFMG.").

10       The Court now turns to address Plaintiffs' other theories of liability against HIG.

11       **d.    Agency**

12       "Under California law, an agent is defined as 'one who represents another, called the

13   principal, in dealings with third persons.' " Cal. Civ.Code § 2295.  Wallis v. Centennial Ins. Co.,

14   No. CIV. 08-02558 WBS, 2013 WL 3803971, at \*4 (E.D. Cal. July 19, 2013) (quoting Cal. Civ.

15   Code § 2295).  To plead such an agency relationship, a plaintiff must allege: "(1) that the agent

16   or apparent agent holds power to alter legal relations between [the] principal and third persons

17   and between [the] principal and himself; (2) that the agent is a fiduciary with respect to matters

18   within [the] scope of [the] agency; and (3) that the principal has right to control [the] conduct of

19   [the] agent with respect to matters entrusted to him." Ricardez, 2020 WL 3891460, at \*5 (citing

20   Palomares v. Bear Sterns Residential Mortg. Corp., 2008 WL 686683, at \*4 (S.D. Cal. Mar. 13,

21   2008)); see also Buchanan v. Neighbors Van Lines, 2010 WL 4916644, at \*3 (C.D. Cal., Nov.

22   29, 2010) (same).

23       Plaintiffs also submit that a parent corporation can be held liable for the acts of its

24   subsidiary when the subsidiary is an agent of the parent corporation.  See Sonora Diamond Corp.

25   v. Superior Court, 83 Cal. App. 4th 523, 540-42 (2000) (a subsidiary corporation is an agent of a

26   parent corporation if "a parent corporation exercises such a degree of control over its subsidiary

27   corporation that the subsidiary can legitimately be described as only a means through which the

28   parent acts, or nothing more than an incorporated department of the parent.").  Plaintiffs argue

1  courts may consider factors such as: (1) the degree and content of communications between the

2  subsidiary and the parent on the events at issue; (2) the degree to which parent set or participated

3  in setting policy for the subsidiary; and (3) whether the parent and subsidiary shared officers or

4  directors.  Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1243 (N.D. Cal. 2004).

5  Plaintiffs thus submit that they have pled HIG controls CFMG and is responsible for hiring,

6  retaining, training, and supervising CFMG employees (FAC ¶ 45); that in-house HIG

7  professionals and experts serve as CFMG board members to ensure HIG's control over CFMG

8  (FAC ¶ 46); and that at least two managing directors and one principal of HIG's private equity

9  team serves as CFMG board members, chief financial officers, or other executive officers (FAC

10  ¶ 47).

11       HIG first replies that Plaintiffs' agency arguments are improperly raised in opposition.

12  See Provencio v. Vazquez, 258 F.R.D. 626, 639 (E.D. Cal. 2009) ("Raising a completely new

13  theory of liability, with only attenuated connection to the complaint, in a brief in opposition to a

14  motion to dismiss does not grant Defendant fair notice of Plaintiffs' claim or the grounds upon

15  which it rests.").  The allegations pertaining to an actual agency relationship are slim in the

16  complaint, and the Court finds merit to HIG's argument.  (See FAC ¶ 18 ("Plaintiffs are

17  informed and believe and thereon alleges that each Defendant was at all material times an agent,

18  servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining

19  Defendants, and in doing the acts and omissions alleged, was acting within the course and scope

20  of those relationships.").)  However, it is not clear if these theories are so distinct from the alter

21  ego theory as to not put Defendant HIG on notice.

22       HIG also argues that Plaintiffs exclusively rely on the agency theory pertaining to a

23  parent-subsidiary relationship,  See Bowoto, 312 F. Supp. 2d at 1239.  HIG emphasizes the FAC

24  does not allege a parent-subsidiary relationship between HIG and CFMG, and nor could it allege

25  so consistently with Federal Rule of Civil Procedure 11.  However, it does not appear to the

26  Court that this would be fatal to Plaintiffs' agency claim.  See Fin. Express LLC v. Nowcom

27  Corp., No. SACV0701225CJCANX, 2008 WL 11342755, at *2 n.2 (C.D. Cal. Mar. 6, 2008)

28  ("The Court agrees with Defendants that although this case involves the liability of a corporation

for the conduct of its sister corporation rather than the liability of a parent for its subsidiary, the distinction is not significant for purposes of the alter ego and agency analyses . . . [so] the Court may properly rely on cases involving liability of a parent for the conduct of its subsidiary in its analysis here."); Stewart, 81 F. Supp. 3d at 957 ("While the agency relationship is more often applied to parent and subsidiary entities, the Ninth Circuit has noted that '[t]here appears to be no reason why a completely independent, in-state corporation cannot be held to have acted as an agent for another, out-of-state corporation.' " (quoting Wells Fargo & Co. v. Wells Fargo Exp. Co., 556 F.2d 406, 419 (9th Cir. 1977)); Conde v. Sensa, 259 F. Supp. 3d 1064, 1072 (S.D. Cal. 2017) ("Generally, alter ego liability is reserved for the parent-subsidiary relationship . . . [h]owever, California courts have recognized a 'single-enterprise rule' where liability can be found between sister companies.' " (quoting Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal.App.3d 1220, 1249, 1 Cal.Rptr.2d 301 (1991))).

        In either regard, the Court agrees with HIG that the complaint does not contain sufficient allegations to meet the required elements of an agency relationship between HIG and CFMG. The Court finds the discussion of the agency theory as stated in Wallis, appropriately addresses the interplay of California agency law, corporate agency law generally, and as how such relates to similar themes underlying the corporate alter ego elements:

> Under California law, an agent is defined as "one who represents another, called the principal, in dealings with third persons." Cal. Civ.Code § 2295. To establish liability under an agency theory when the purported principal and agent have a parent-subsidiary relationship, plaintiffs "must show more than mere representation of the parent by the subsidiary in dealings with third persons." *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App.4th 727, 741, 80 Cal.Rptr.2d 454 (3d Dist.1998). "The control exercised in a typical parent-subsidiary relationship is insufficient to create an agency relationship." *Van Maanen v. Youth With a Mission– Bishop,* 852 F.Supp.2d 1232, 1249 (E.D.Cal.2012) (England, J.). Rather, "[t]he showing required is that 'a parent corporation *so controls the subsidiary* as to cause the subsidiary to become *merely* the agent or instrumentality of the parent [.]' " *Laird,* 68 Cal.App.4th at 741, 80 Cal.Rptr.2d 454 (quoting *Linskey v. Heidelberg E., Inc.,* 470 F.Supp. 1181, 1184 (E.D.N.Y.1979)) (alteration in original). "[T]he parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Sonora Diamond Corp. v. Superior Court,* 83

> Cal.App.4th 523, 541, 99 Cal.Rptr.2d 824 (5th Dist.2000); *see id.* (control must be "so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities").

Wallis, 2013 WL 3803971, at *4. In Wallis, the court found the plaintiff's allegations were sufficient:

> Contrary to defendants' characterization of plaintiffs' allegations, plaintiffs do more than recite mere conclusory allegations of agency. They allege facts suggesting that Atlantic Mutual's control over Centennial was so "pervasive and continual" that Centennial was no more than the instrumentality of Atlantic Mutual. *Sonora Diamond,* 83 Cal.App.4th at 541, 99 Cal.Rptr.2d 824. Plaintiffs allege that once Centennial issued the policy, Atlantic Mutual assumed responsibility for almost everything else related to defense of the underlying state lawsuit, such as corresponding with plaintiffs and *Cumis* counsel, paying for plaintiffs' defense, and handling the administration of plaintiffs' claim. While Atlantic Mutual's imposition of billing guidelines might be the kind of general policy decision that does not indicate agency, *see id.* at 542, 99 Cal.Rptr.2d 824, its other acts appear to be the quotidian responsibilities that an insurer, like Centennial, would normally complete. Atlantic Mutual's assumption of such tasks suggests that it had more than the usual oversight and control that a parent has over a subsidiary. *See id.* at 541, 99 Cal.Rptr.2d 824.

Wallis, 2013 WL 3803971, at *4. The allegations in Wallis, unlike here, contained specific allegations of actions taken in relation to the case at hand that demonstrated agency for purposes of the lawsuit.

Accordingly the Court finds Plaintiffs have not set forth sufficient allegations to meet the required elements of an agency relationship between HIG and CFMG. See Wallis, 2013 WL 3803971, at *4 ("Atlantic Mutual's assumption of such tasks suggests that it had more than the usual oversight and control that a parent has over a subsidiary."); Stewart, 81 F. Supp. 3d at 957 ("Nor has Plaintiff made a prima facie showing that Screen Gems–EMI is the agent of EMI or EMI North America for the purposes of asserting personal jurisdiction over either entity."); Ricardez, 2020 WL 3891460, at *5 ("Plaintiff's agency allegations are mere legal conclusions – 'CMFG/Wellpath and their employees are agents of HIG'. . . – which are insufficient.").

### e.   Ratification

"To show ratification, a plaintiff must show that the 'authorized policymakers approve a

1   subordinate's decision and the basis for it.' " Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004)

2   (quoting Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999)); see also Koenig v. City of

3   Bainbridge Island, No. C10-5700 RJB, 2011 WL 3759779, at *8 (W.D. Wash. Aug. 25, 2011)

4   ("A mere failure to overrule a subordinate's actions, without more, is insufficient to support a

5   claim [and] [t]he policymaker must have knowledge of the constitutional violation and must

6   make a conscious, affirmative choice to ratify the conduct at issue.") (citations omitted);

7   Praprotnik, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision

8   and the basis for it, their ratification would be chargeable to the municipality because their

9   decision is final.").

10      HIG argues the FAC lacks any substantive ratification allegations, and contend Plaintiffs'

11   opposition only underscores this deficiency where it points to a single boilerplate allegation that

12   "CFMG acts on HIG's behalf."  To be clear, at this point in the opposition, Plaintiffs also direct

13   the Court to "the allegations described in detail above,"[21] and also argue "[b]ecause HIG and

14   CFMG share officers and directors, HIG's senior employees and leaders have particular

15   knowledge of CFMG's actions taken on HIG's behalf in performing its day-to-day operations."

16   (Opp'n HIG 24.)

17      Even in consideration of Plaintiffs' citation to broader allegations, and taking them in the

18   light most favorable to Plaintiffs, the Court still finds insufficient allegations in the FAC to

19   support a ratification theory.  The ratification theory would have to flow through CFMG, and

20   above, supra Section IV(C)(3)(c)(ii), the Court found insufficient allegations to support a

21   ratification theory as to CFMG and its employees, G. Garcia and Guerrero.  For similar reasons

22   but even more attenuated as to HIG's actions that would constitute ratification, the Court finds

23   Plaintiffs' fail to plausibly allege ratification as to HIG.  See Garcia, 2010 WL 3911457, at *2

24   ("In other words, in order for there to be ratification, there must be 'something more' than a

25   single failure to discipline or the fact that a policymaker concluded that the defendant officer's

---

26   [21]  The referenced section highlights allegations, which the Court addressed above, that HIG controls CFMG and is
responsible for hiring, retaining, training, and supervising CFMG employees (FAC ¶ 45); that in-house HIG

27   professionals and experts serve as CFMG board members to ensure HIG's control over CFMG (FAC ¶ 46); and that
at least two managing directors and one principal of HIG's private equity team serves as CFMG board members,

28   chief financial officers, or other executive officers (FAC ¶ 47).

1   actions were in keeping with the applicable policies and procedures." (quoting <u>Haugen</u>, 351 F.3d

2   at 393)); <u>Sheehan</u>, 743 F.3d at 1231 ("Ratification, however, generally requires more than

3   acquiescence[,] [t]here is no evidence in the record that policymakers 'made a deliberate choice

4   to endorse' the officers' actions[,] [and] [t]he mere failure to discipline [] does not amount to

5   ratification of their allegedly unconstitutional actions." (quoting <u>Gillette</u>, 979 F.2d at 1348)).

6       Accordingly the Court finds Plaintiffs have not set forth sufficient allegations to

7   demonstrate ratification by HIG.

8       **f.    Joint Venture**

9       The parties do not dispute the legal elements of a joint venture.  (See Reply HIG 16;

10  Opp'n HIG 23.)  "The essential element of a joint venture is an undertaking by two or more

11  persons to carry out a single business enterprise jointly for profit."  <u>Prostar Wireless Grp., LLC</u>

12  <u>v. Domino's Pizza, Inc.</u>, 360 F. Supp. 3d 994, 1008 (N.D. Cal. 2018) (quoting <u>Pellegrini v.</u>

13  <u>Weiss</u>, 165 Cal. App. 4th 515, 525, 81 Cal.Rptr.3d 387 (2008)).  A joint venture agreement

14  "requires an agreement under which the parties have (1) a joint interest in a common business,

15  (2) an understanding that profits and losses will be shared, and (3) a right to joint control."

16  <u>Prostar</u>, 360 F. Supp. 3d at 1008 (quoting <u>Ramirez v. Long Beach Unified Sch. Dist.</u>, 105 Cal.

17  App. 4th 182, 129 Cal.Rptr.2d 128 (2002)).

18      Plaintiffs argue they have sufficiently pled that HIG and CFMG exist as a common

19  business and exercise control over one another's operations, which are extensively integrated and

20  co-managed.  (FAC ¶¶ 42-53.)  Plaintiffs argue the FAC raises raise a plausible inference that

21  HIG and CFMG share profits and losses, (FAC ¶ 49), and it stands to reason that HIG, as a

22  private equity firm, only gains when CFMG turns a profit.  Thus, Plaintiffs submit they have

23  sufficiently alleged that HIG and CFMG engaged in a joint venture or partnership for purposes

24  of securing and performing contracts to provide healthcare services in the jail.  (Opp'n HIG 24.)

25      HIG argues Plaintiffs' joint-venture allegations are limited to a single mention of the

26  phrase "joint venturer."  (FAC ¶ 18 ("Plaintiffs are informed and believe and thereon alleges that

27  each Defendant was at all material times an agent, servant, employee, partner, joint venturer, co-

28  conspirator, and/or alter ego of the remaining Defendants, and in doing the acts and omissions

1  alleged, was acting within the course and scope of those relationships.").)  HIG argues the FAC

2  lacks any factual allegations supporting a joint-venture theory.

3      For similar reasons expressed above, particularly as to the element of control under the

4  alter ego theory, the Court finds insufficient factual allegation to plausibly establish the elements

5  for a joint venture agreement.  Prostar, 360 F. Supp. 3d at 1008; Florists' Mut. Ins. Co. v.

6  Floricultura Pac., Inc., No. 19-CV-05793-WHO, 2020 WL 6440039, at *3 (N.D. Cal. Apr. 3,

7  2020) ("That companies are affiliated is not, by itself, a basis for imposing joint liability," noting

8  that Target Media found "allegations demonstrated a normal parent/subsidiary relationship and

9  therefore were insufficient to impose liability on non-signatory under alter ego, agency or joint

10  venture theories," and holding plaintiff failed to plead the required elements under any of the

11  alleged theories (citing Target Media Partners LLC v. Hartford Fin. Servs. Grp., Inc., No.

12  B248293, 2014 WL 1653505, at *4-6 (Cal. Ct. App. Apr. 25, 2014); Langer v. Badger Co., LLC,

13  No. 18CV934-LAB (AGS), 2020 WL 759312, at *1 (S.D. Cal. Feb. 14, 2020) ("Generalized and

14  conclusory allegations of agency or joint venture unsupported by any facts are insufficient.");

15  Dyke v. Lions Gate Ent., Inc., No. SACV13454JSTANX, 2013 WL 12128771, at *3 (C.D. Cal.

16  Aug. 14, 2013) ("Nothing about this allegation plausibly shows that Lions Gate had any

17  involvement in the alleged illicit increase of the Film's budget or any control over the production

18  of the Film [and] [t]he conclusory allegation of the existence of a joint venture is insufficient

19  under Rule 8.").

20      **g.**    **The Court Recommends Leave to Amend**

21      HIG argues Plaintiffs should not be granted leave to amend given their failure to plead

22  alter ego or related theories.  See Ricardez, 2020 WL 3891460, at *5.  The Court finds leave to

23  amend is proper here, as while this is the first amended complaint, this is the first motion to

24  dismiss before the Court on these issues.  See Ricardez, 2020 WL 3891460, at *5 n.2 ("Although

25  the Court recognizes that this Circuit has a liberal policy favoring amendments and that leave to

26  amend should be freely granted . . . Plaintiffs have had three attempts to allege a claim against

27  the Private Equity Defendant [and] have failed to indicate in their Opposition what additional

28  facts they could allege in order to state a viable claim against the Private Equity Defendants.").

2. <u>HIG's Motion to Dismiss Monell Claim</u>

HIG argues that Plaintiffs' Monell claim under Section 1983 fails because: the FAC lacks sufficient factual allegations that HIG is a state actor; in general, the FAC lacks sufficient allegations to support a <u>Monell</u> claim; Plaintiffs fail to plead that HIG was the proximate cause of the alleged constitutional violations; and Plaintiffs' related prayer for punitive damages is insufficiently supported.

a. **State Actor**

"The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." <u>Tsao</u>, 698 F.3d at 1140 (quoting <u>Franklin v. Fox</u>, 312 F.3d 423, 444–45 (9th Cir. 2002)); <u>see also</u> <u>Kirtley v. Rainey</u>, 326 F.3d 1088, 1092 (9th Cir. 2003).

HIG argues the FAC lacks sufficient factual allegations that HIG is a state actor. Plaintiffs argue that private for-profit companies that provide medical care in county jails act under color of state law and can be held liable under Section 1983. The Court agrees the balance of caselaw in the Ninth Circuit suggests this is accurate, and as noted above, *supra* Section IV(C)(3)(a), it does not appear that CFMG disputes this as applied to CFMG. <u>See</u> <u>Tsao</u>, 698 F.3d at 1139 ("Every one of our sister circuits to have considered the issue has concluded that the requirements of <u>Monell</u> do apply to suits against private entities under § 1983 . . . [w]e see no basis in the reasoning underlying <u>Monell</u> to distinguish between municipalities and private entities acting under color of state law."); <u>Oyenik</u>, 696 F. App'x at 794 ("Oyenik is suing Corizon, a corporation contracted by the State of Arizona to provide medical treatment to state prisoners[,] . . . a function is 'fairly attributable to the State' and can therefore give rise to § 1983 liability." (quoting <u>West</u>, 487 U.S. at 54)); <u>see also</u> <u>Long v. Corizon Health, Inc.</u>, No. 117CV00898JLTPC, 2018 WL 5962499, at *4 (E.D. Cal. Nov. 14, 2018) ("A private physician or hospital that contracts with a public prison system to provide treatment for inmates performs a public function and acts under color of law for purposes of § 1983."); <u>Royal v. Ierokomos</u>, No. 2:20-CV-0218-DMC-P, 2021 WL 3418676, at *3 (E.D. Cal. Aug. 5, 2021) ("Physicians who

1   contract with prisons to provide healthcare to inmates are state actors.").

2       In opposition, Plaintiffs argue that HIG only addresses the first test (public function), in

3   its motion; that at this early stage, Plaintiffs have sufficiently pled that HIG acts under color of

4   state law under each test; that HIG also acts under color of state law because it is the alter ego or

5   agent of CFMG, in a joint venture with CFMG, or has ratified CFMG's conduct; and highlights

6   that CFMG apparently concedes that, at this stage in the case, it acts under color of state law.

7       Based on the Court's findings above in favor of HIG as to the alter ego theory of liability,

8   and for similar reasons guiding that finding, the Court finds Plaintiffs arguments in support of the

9   three theories above are too conclusory and reliant on the Plaintiffs' presumption that they have

10  satisfied the alter ego theory of liability (or agency, ratification, or joint venture).  While these

11  arguments could be relevant if the Court were adjudicating a dispute directly between CFMG

12  and Plaintiffs as to whether CFMG, as the private entity directly providing health care to the jail,

13  could be liable as a state actor, the Court does not find the allegations in the complaint, in their

14  general and conclusory statements referring to CFMG and HIG, to properly support a theory of

15  state actor liability against HIG under <u>Monell</u>, in the face of the finding that Plaintiffs have not

16  established alter ego liability (or similar theories) as to HIG, and based on the allegations in the

17  FAC as currently pled.  Thus, the Court agrees with HIG that because Plaintiffs have failed to

18  plead the alter ego claim adequately, the other claims must also fail.  The Court also agrees with

19  HIG that the <u>Monell</u> claim independently fails because Plaintiffs do not make any plausible

20  allegations that HIG is a state actor.[22]

21

---

22  [22] Plaintiffs argue they meet the pleading standard for the first test—public function, as directing the provision of medical care in jails is indisputably an exclusive "public function," and Plaintiffs contend that HIG performs the

23  state function of directing, funding, and controlling medical care for prisoners on its own and through CFMG (FAC ¶¶ 42-53).  Plaintiffs state this mandatory state duty is delegated to CFMG and ratified by HIG, who is CFMG's

24  alter ego and/or agent, as alleged in the FAC.  Plaintiffs argue they meet the pleading standard for the second test—joint action, as joint action exists when the state has so far insinuated itself into a position of interdependence with

25  the private entity that it must be recognized as a joint participant in the challenged activity.  <u>See Tsao</u>, 698 F.3d at 1140.  Plaintiffs argue they satisfy the third test, government nexus, because there is a "close nexus between the

26  State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." <u>Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n</u>, 531 U.S. 288, 295 (2001) (internal quotation marks and

27  citation omitted).  Here, Plaintiffs argue the test is met because HIG directly assumes a delegated state function when it authorizes, directs, financially ensures, and provides medical care to prisoners that are involuntarily

28  incarcerated.

---

Accordingly, the Court recommends HIG's motion to dismiss the <u>Monell</u> claim be granted for failure to plausibly allege HIG is a state actor.  <u>See</u> <u>Sutton v. Providence St. Joseph Med. Ctr.</u>, 192 F.3d 826, 835 (9th Cir. 1999) ("When addressing whether a private party acted under color of law, we therefore start with the presumption that private conduct does not constitute governmental action."); <u>Price v. State of Hawaii</u>, 939 F.2d 702, 707–08 (9th Cir. 1991) ("[P]rivate parties are not generally acting under color of state law, and we have stated that '[c]onclusionary allegations, unsupported by facts, [will be] rejected as insufficient to state a claim under the Civil Rights Act.' " (quoting <u>Jones v. Community Redevelopment Agency</u>, 733 F.2d 646, 649 (9th Cir. 1984))); <u>Ricardez</u>, 2020 WL 3891460, at *6 ("Plaintiffs' vague and conclusory allegations fail to satisfy any of the four tests to determine that a private party is acting under color of law.").

**b.    General Factual Allegations to Support <u>Monell</u> Claim Against HIG**

HIG argues that even if Plaintiffs could plead that HIG was a state actor, the FAC completely lacks any facts that HIG had a deliberate policy or custom that was a moving force behind the alleged constitutional violation.

The Court finds that for much of the same reasons pertaining to the analysis of the <u>Monell</u> claim as against CFMG, *supra* Section IV(C)(3)(c)(i) (policy or custom), IV(C)(3)(c)(ii) (ratification), and IV(C)(3)(c)(iii) (failure to train), Plaintiffs have failed to state a claim against

---

The Court finds HIG's arguments more persuasive than Plaintiffs' and additionally support dismissal of the <u>Monell</u> claim.  For example, as to the first test, the Court finds merit to HIG's argument that the FAC is completely devoid of any facts that HIG itself was actually employed or contracted to provide medical care or manage any prison, and that the complaint's statement that "CFMG, now known as Wellpath and HIG . . . provide a governmental function and stand in the same capacity as County of Fresno in carrying out their duties at the Fresno County Jail," (FAC ¶ 13), is inaccurate as CFMG is not known as HIG, and finds merit to HIG's argument that the statement is also unsupported by any facts that would lend support to the public function test.  As for the joint action test, HIG is correct Plaintiffs do not cite to any allegations of the FAC that would support this conclusion in their opposition, and that the cases are not persuasively applicable to the facts here.  As for the government nexus test, the Court agrees with HIG that Plaintiffs' claim in opposition that "HIG directly assumes a delegated state function when it authorizes, directs, financially ensures, and provides medical care to voluntary incarcerated prisoners," (Opp'n HIG 26), is not plausibly supported by the general and conclusory allegations in the FAC.

The Court's finding HIG's arguments more persuasive as to these tests is reinforced by the Court's findings above pertaining to the alter ego and related theories of liability.  Because Plaintiffs' arguments are largely based on an assumption of the alter ego and related theories being maintained, the Court finds these arguments may more properly left to more in-depth analysis after Plaintiffs file an amended complaint.  At present, given the findings on the alter ego and related theories, Plaintiffs' arguments are not persuasive.

1    HIG.   Indeed, Plaintiffs' arguments are similar to those mounted in opposition to CFMG's

2    similar motion, emphasizing the decision in Osuna, 392 F. Supp. 3d 1162, and the allegations in

3    paragraph 85 of the FAC.  (Compare Opp'n HIG 27-30, with Opp'n CFMG 19-23.)

4          Because the Court finds insufficient allegations to support an alter ego or related theory

5    of liability as to HIG, the factual allegations discussed in the analysis as to CFMG, would be

6    even more weighed toward dismissal because of the more attenuated nature of the claims as to

7    HIG, particularly given the references to "Defendants" generally in the most pertinent sections of

8    the complaint.  (See, e.g., FAC ¶ 85.)  Therefore, the Court finds the failure to allege any HIG-

9    specific conduct as to the Monell claim renders the complaint insufficient to state a Monell claim

10   against HIG.  Lozano, 2019 WL 6841215, at *18 ("Plaintiff has not identified an official policy

11   or decision crafted by a final policymaking authority; nor has Plaintiff stated facts sufficient to

12   establish a 'widespread' and 'well-settled' custom by county officials."); Vandenburg, 722 F.

13   App'x at 658 ("A single mistake does not give rise to municipal liability; 'proof of random acts

14   or isolated events are insufficient to establish custom' under Monell." (quoting Thompson, 885

15   F.2d at 1444)); Osuna, 392 F. Supp. 3d at 1172, 1174 ("Certainly, the complaint must contain

16   sufficient factual allegations to plausibly suggest a policy or custom, as opposed to merely

17   random, unconnected acts of misconduct."); Connick, 563 U.S. at 61 (policy of inadequate

18   training is "far more nebulous, and a good deal further removed from the constitutional violation,

19   than was the policy in Monell." (quoting Tuttle, 471 U.S. at 822–823)).

20         c.      **Proximate Causation**

21         HIG argues that the FAC makes only general allegations of proximate causation either

22   directed to the omnibus "Defendants" or "Defendants County of Fresno, Wellpath, [HIG], and

23   [CFMG]."  (See FAC, ¶¶ 62, 67, 77, 84, 89, 90, 99, 109, 113, 117-119, 125, 134, 137, 138.)

24   HIG emphasizes the FAC completely lacks any specific allegations that HIG had any

25   involvement, control, or authority over either the alleged constitutional violation or any decision

26   leading up to the alleged constitutional violation.  HIG contends this is not surprising as HIG's

27   far-removed role simply cannot support allegations that would place it as the proximate cause of

28   the alleged constitutional violations.

Plaintiffs respond that the FAC alleges HIG plays a significant role in creating, implementing, and ratifying the policies that are operative in the jail, and additionally, Plaintiffs have alleged HIG is CFMG's alter-ego, agents, or joint-venturer, or that HIG has ratified CFMG's conduct, and contend this is sufficient at this stage.  See Miller, 2020 WL 6392565, at *12 ("The intervening causes described in the defendants' motions do not break the chain of causation here [as] [f]or claims under § 1983, it is enough that the defendants' actions were merely 'one of the causes' of the injury, a 'moving force' behind the suicide, as long as the intervening cause was foreseeable.") (citation omitted).

Based on similar reasons expressed in the preceding subsections, the Court finds insufficient allegations in the complaint to allege proximate causation as to Defendant HIG. Given the findings concerning the alter ego and related theories of liability, the Court finds Plaintiffs' allegations of HIG's role in creating and implementing policies that led to Mr. Anderson's death to be conclusory and insufficient to demonstrate proximate cause, given the even more attenuated nature of the claims against HIG compared to CFMG, for the reasons discussed throughout this order.

### 3.    HIG's Motion to Dismiss Plaintiffs' Sixth and Seventh Causes of Action

HIG moves to dismiss the sixth and seventh causes of action arguing Plaintiffs' ADA and RA claims do not allege any HIG- specific conduct; and particularly, the ADA claim is even more deficient and confusing, as the initial ADA allegations are directed against Defendant Fresno County as "a public entity under Title II of the ADA," but the latter allegations are directed towards the omnibus "Defendants."  (See FAC ¶¶ 95, 97-100.)  HIG highlights Plaintiffs do not explain how all the Defendants fall under the ADA statutory scheme and, instead, simply allege in wholly conclusory fashion that "Defendants failed to reasonably accommodate[] Mr. Anderson's disability," and, "[a]s a direct and proximate results of Defendants' conduct, Mr. Anderson experienced pain …and other damages."  (FAC ¶¶ 98-99.)

To state a claim for relief under Title II of the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated

1   against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by

2   reason of his disability.  Weinreich v. Los Angeles Cnty. Metro. Transp. Auth., 114 F.3d 976,

3   978 (9th Cir. 1997) (citing 42 U.S.C. § 12132).[23]  HIG emphasizes that under the ADA, a public

4   entity is defined to include any state or local government and any department, agency or other

5   instrumentality of a state or local government.  See 42 U.S.C. § 12131(1)(A)-(B).  Therefore,

6   HIG argues it is clearly not a public entity and, thus, does not fall under the ADA and Plaintiffs

7   have not and cannot demonstrate otherwise.

8        Under Section 504 of the Rehabilitation Act ("RA"), a plaintiff must show: (1) he is an

9   individual with a disability (2) he is otherwise qualified to receive the benefit; (3) he was denied

10  the benefits of the program solely by reason of his disability; and (4) the program receives

11  federal financial assistance.  Weinreich, 114 F.3d at 978 (citing 29 U.S.C. § 794).  Section 504 of

12  the RA applies specifically to programs that receive Federal financial assistance.  Id.; see also

13  Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001).  Thus, HIG argues dismissal of

14  the seventh cause of action is appropriate as the FAC does not and cannot allege that HIG

15  receives "federal financial assistance," and further, HIG does not fall under the definition of

16  programs and activities as set forth under Section 794(b) of the RA.

17       In opposition, Plaintiffs concede that HIG is correct that a majority of courts have found

18  that Title II does not apply to entities like HIG.  However, Plaintiffs argue that the policy

19  implications of these rulings are significant and negatively impact prisoners, and proffer a

20  number of individual judges have dissented from the majority rule.  See Edison v. Douberly, 604

21  F.3d 1307, 1311 (11th Cir. 2010) (Barkett, J., dissenting) ("To the extent that the majority holds

22  that contracting with the government to provide services does not, by itself, make a private

23  company subject to Title II of the ADA, I agree[,] [h]owever, when a company *takes the place of*

24  *the state* in performing a function within the exclusive province of the state, that company cannot

25  be permitted to avoid the requirements of the law governing that state function."); see also

26  _____

27  [23] "To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability."  Molski v. M.J.

28  Cable, Inc., 481 F.3d 724, 730 (9th Cir. 2007) (citing 42 U.S.C. §§ 12182(a)-(b)).

Phillips v. Tiona, No. 10-CV-00334-PAB-KMT, 2011 WL 7277585, at *9 (D. Colo. Nov. 10, 2011) ("Judge Barkett's broader, more functional approach might reconcile better with the 'national mandate for the elimination of discrimination against individuals with disabilities.' " (quoting Edison, 604 F.3d at 1311 n.2)).

Thus, Plaintiffs urge the Court to adopt the minority's view, *or* allow Plaintiffs leave to amend and bring this claim under Title III of the ADA. See Hernandez v. Cnty. of Monterey, 70 F. Supp. 3d 963, 978 (N.D. Cal. 2014) (denying CFMG's motion to dismiss a claim brought under Title III as "Plaintiffs have sufficiently alleged that CFMG 'operates' a professional office in the actual physical 'place' of the jail to provide the 'public accommodation' of all required medical care."). In regards to leave to amend, Plaintiffs submit that as "the alter ego or agent of HIG, CFMG's liability under Title III will extend to HIG; the same is true under joint venture and ratification theories of liability." (Reply HIG 32.)

The Court agrees with HIG that Plaintiffs' argument to adopt the dissent from another circuit is not persuasive. See United States v. Ameline, 409 F.3d 1073, 1083 n.5 (9th Cir. 2005) ("Those dissents, of course, are not precedential."). This is particularly true given CFMG and Plaintiffs have already stipulated to dismiss the ADA Title II claim with leave to amend to allege a Title III claim. The Court therefore finds HIG's motion to dismiss the sixth cause of action for violation of the ADA under Title II, should be granted, and Plaintiff should be granted leave to amend to replead the claim as a Title III claim. Given this finding, and because the Court already above found Plaintiffs had not stated claims of deliberate indifference against G. Garcia, Guerrero, and in turn CFMG under Monell, the Court finds it need not fully analyze the parties' other arguments here. The Court would be inclined to grant leave to amend in either regard, and the arguments are more properly addressed in an amended complaint with the claim brought under Title III. See Palacios v. Cnty. of San Diego, No. 20-CV-450-MMA (DEB), 2020 WL 4201686, at *13 (S.D. Cal. July 22, 2020) ("Although inadequate treatment is insufficient to sustain an ADA claim, extreme inadequate treatment that amounts to a deliberate denial or outright refusal to accommodate a plaintiff's disability-related needs or to provide medical

services solely by reason of the disability may sustain an ADA claim.").[24]

As for the RA claim, HIG is correct that Plaintiffs did not address the arguments concerning the RA with any specificity.  Therefore, the Court finds it may properly be dismissed, but recommends it be dismissed with leave to amend at this stage of the pleadings.[25]

Accordingly, the Court recommends granting HIG's motion to dismiss the sixth and seventh causes of action with leave to amend.

### 4.    HIG's Motion to Dismiss the Ninth and Tenth Cause of Action for Negligence and Wrongful Death for Failure to Plead Essential Elements or Factual Support

The Court incorporates its discussion of the legal standards pertaining to the negligence and wrongful causes of action from above, *supra* Section IV(B)(4).

HIG argues that like their other claims against HIG, Plaintiffs' wrongful death claim improperly refers to "Defendants" collectively and fails to plead any specific allegations with respect to HIG.  (FAC ¶¶ 116-121.)  HIG argues Plaintiffs fail to mention the other elements of negligence, let alone properly allege them, as required for the wrongful death claim, and argue Plaintiffs' negligence allegations do not cure any of these deficiencies.  HIG contends Plaintiffs wholly fail to allege any special relationship between Mr. Anderson and HIG that would give rise to a duty of care; nor facts concerning breach of the duty which was the proximate causation

---

[24]  HIG argues that to the extent Plaintiffs allege "Defendants" discriminated against him because they did not provide the services he needed and did not accommodate his medical condition (FAC, ¶¶98-100, 105-109), the ADA does not prohibit "inadequate treatment for disability."  Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); see also id. ("The ADA does not create a remedy for medical malpractice." (quoting Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996)).  HIG argues the RA claim fails for similar reasons.  See Zukle v. Regents of Univ. of California, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.").  Plaintiffs counter that it is well-established that "[a] correctional facility's 'deliberate refusal' to accommodate plaintiff's disability-related needs violates the ADA and the RA."  Atayde v. Napa State Hosp., 255 F. Supp. 3d 978, 1001 (E.D. Cal. 2017) (citing United States v. Georgia, 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006)).  In reply, HIG emphasizes that for the first time, Plaintiffs allege that Mr. Anderson was "discriminatorily precluded from access to medical treatment," despite the FAC not containing any allegations of "deliberate denial" or "outright refusal of treatment," and HIG submits the arguments in opposition should be disregarded.

[25]  While HIG argues it does not fall under the definition of the a "program" under the RA, the Court does not find such conclusion clearly apparent simply based on the cited provision.  See 29 U.S.C. § 794(b)(3)(A)(ii) (program or activity means "all of the operations of . . . an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation.").

1   of Mr. Anderson's death.

2       Plaintiffs respond that they have described at length the role HIG plays in the jail and the

3   foreseeability of this kind of outcome; that as the alter ego or agent of HIG, CFMG's duty

4   extends to HIG, as does its breach; and the same is true under joint venture and ratification

5   theories of liability.  (Opp'n HIG 34.)

6       Because of Plaintiffs' heavy reliance on alleging liability for these claims through

7   CFMG, and given the Court's recommendations above concerning alter ego liability, agency,

8   joint venture, and ratification, the Court similarly finds that Plaintiffs have failed to adequately

9   allege the essential elements of the ninth and tenth causes of action as against HIG, for

10  negligence and wrongful death.  Given the Court recommends leave to amend even as to these

11  two claims, the Court does not find it need address the more substantive arguments concerning

12  the legal standards and Plaintiffs' theories of establishing such claims through CFMG.  The

13  Court finds it more prudent to address such arguments as applied to an amended complaint that

14  should be more precisely tuned to the factual allegations delineated as to the specific Defendants,

15  if Plaintiff in good faith believes it  can maintain such claims against HIG, in the face of the

16  Court's findings as to the alter ego and related theories of liability above.

17      Accordingly, the Court recommends granting HIG's motion to dismiss with leave to

18  amend.

19          5.    <u>HIG's Motion to Strike Prayer for Punitive Damages</u>

20      HIG, citing Rule 12(f)'s reference to striking redundant, immaterial, impenitent, or

21  scandalous matter, moves to strike Plaintiffs' prayer for punitive damages, contending that

22  Plaintiffs' FAC fails to allege HIG's conduct was motivated by evil motive or involved reckless

23  or callous indifference to the rights of plaintiffs.  (HIG Mot. 30.)

24      As noted above as to the Officer Defendants' motion to dismiss the request for punitive

25  damages as to eighth cause of action, recent cases hold motions to dismiss are an improper

26  vehicle to address punitive damages.  <u>See Elias</u>, 2017 WL 1013122, at *4; <u>Jones</u>, 2022 WL

27  783452, at *12.  While HIG here cites the standards for a motion to strike, HIG's argument

28  appears somewhat like a 12(b)(6) argument in that HIG argues the factual allegations are not

1  sufficient, without a more direct showing of why the request should be stricken under the

2  standards pertaining to the material being redundant, immaterial, impertinent, or scandalous.

3  Some courts have indeed found such motions to strike are improper and a motion to dismiss *is*

4  the proper vehicle when a motion is brought in such manner.  See Kelley v. Corr. Corp. of Am.,

5  750 F. Supp. 2d 1132, 1146 (E.D. Cal. 2010) ("The court finds that Defendant's motion to strike

6  Plaintiff's claims for punitive damages is based entirely on issue of whether Plaintiff sufficiently

7  pled facts to show that there was fraud, oppression or malice  . . .  Defendant is challenging the

8  sufficiency of claims for punitive damages without any argument that the claims are redundant,

9  immaterial, impertinent or scandalous [and] the court finds that Defendant's resort to Rule 12(f)

10  is misplaced," and therefore the court converted the Rule 12(f) motion into a 12(b)(6) motion and

11  granted the motion to dismiss); Walker v. McCoud Cmty. Servs. Dist., No. 2:16-61 WBS CMK,

12  2016 WL 951635, at *2 (E.D. Cal. Mar. 14, 2016) ("Because defendant argues that plaintiff may

13  not recover punitive damages as a matter of law, defendant's motion is based entirely on the

14  sufficiency of plaintiff's request for punitive damages [and] [t]he proper vehicle for challenging

15  the sufficiency of a punitive damages claim is a motion to dismiss under Rule 12(b)(6), and not a

16  motion to strike under Rule 12(f).") (citing Kelley, 750 F. Supp. 2d at 1146).

17        The Court does not recommend converting the motion to a 12(b)(6) motion given the

18  more recent line of cases disfavoring motions to dismiss punitive damages.  See Elias, 2017 WL

19  1013122, at *4 ("Recent court decisions have held that because a prayer for relief is a remedy

20  and not a claim, a Rule 12(b)(6) motion to dismiss for failure to state a claim is not a proper

21  vehicle to challenge a plaintiff's prayer for punitive damages, because Rule 12(b)(6) only

22  countenances dismissal for failure to state a claim."); Jones, 2022 WL 783452, at *12.

23        The Court finds under the standards for a motion to strike, HIG has not met its burden of

24  showing the material is redundant, immaterial, impenitent, or scandalous.  Rees v. PNC Bank,

25  N.A., 308 F.R.D. 266, 273–74 (N.D. Cal. 2015) ("California's heightened pleading standard

26  irreconcilably conflicts with Rules 8 and 9 of the Federal Rules of Civil Procedure—the

27  provisions governing the adequacy of pleadings in federal court[;] . . . [u]nder Fed. Rule. Civ. P.

28  9(b), malice, intent, knowledge, and other conditions of the mind may be alleged generally[;] [i]n

the Ninth Circuit, plaintiffs need not plead any particularity in connection with an averment of intent, knowledge or condition of the mind [and] [i]n federal court, a plaintiff may include a short and plain prayer for punitive damages that relies entirely on unsupported and conclusory averments of malice or fraudulent intent . . . [thus] [e]ven if conclusory and unsupported, such an averment of malice or fraudulent intent is sufficient to support a request for punitive damages under Cal. Civ. Code § 3294(a) in federal court on a motion to strike.") (citations and quotation marks omitted).

The Court is recommending dismissal of all claims against HIG with leave to amend. Accordingly, the Court recommends denying the motion to strike the reference to punitive damages, and does not recommend denying the ability of Plaintiff to replead such prayer for punitive damages in any amended complaint. See Rees, 308 F.R.D. at 275 ("Defendants have not met their burden under Rule 12(f) to show that the cited portions of the FAC which concern exemplary and punitive damages should be stricken pursuant to Fed.R.Civ.P. 12(f) . . . the Court notes that the Ninth Circuit has expressed clear guidance that "Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law,' [and] [m]oreover, there is a strong preference against motions to strike." (quoting Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974 (9th Cir. 2010))).

## V.

## RECOMMENDATION

For all of the above explained reasons, IT IS HEREBY RECOMMENDED that:

1. The County Defendants' motion to strike references to the Consent Decree (ECF No. 25), be DENIED;

2. The Officer Defendants' motion to dismiss (ECF No. 56), be GRANTED in part and DENIED in part as follows:

   a. The Officer Defendants' motion to dismiss the first, second, third, fourth, eighth, ninth, tenth, eleventh, and twelfth causes of action for shotgun pleading be DENIED;

   b. The Officer Defendants' motion to dismiss the first and third causes of action

for improperly pleading both Eighth and Fourteenth Amendment violations be GRANTED to the extent the claims should be dismissed as brought under the Eighth Amendment, without leave to amend;

c.   The Officer Defendants' motion to dismiss the fourth cause of action be DENIED as to Defendants Ventura and Owens, and GRANTED as to Defendants Franco, Ponce, Thao, Cha, Her, C. Garcia, Carter, LeBeouf, Alanis, A. Sanchez, and J. Sanchez with leave to amend;

d.   The Officer Defendants' motion to dismiss the eighth cause of action for wrongful death be DENIED;

e.   The Officer Defendants' motion to dismiss the Bane Act claim be GRANTED in part and DENIED in part, in that Plaintiff Doris Anderson's Bane Act claim brought as the successor in interest to the Decedent Mr. Anderson should not be dismissed, but Plaintiff Doris Anderson's and Plaintiff James Jenkins' Bane Act claims, to the extent they are brought as individual claims on their own behalf for their own injuries, should be dismissed without leave to amend.

3.   The CFMG Defendants' motion to dismiss (ECF No. 49), be GRANTED in part and DENIED in part as follows:

a.   CFMG Defendants' motion to dismiss the first through fifth causes of action for shotgun pleading be DENIED;

b.   CFMG Defendants' motion to dismiss the first cause of action against G. Garcia and Guerrero be GRANTED with leave to amend;

c.   CFMG Defendants' motion to dismiss the Monell claim against CFMG be granted with leave to amend;

d.   CFMG Defendants' motion to dismiss the third cause of action for excessive force against G. Garcia and Guerrero on the basis of qualified immunity be GRANTED with leave to amend;

e.   CFMG Defendants' motion to dismiss the sixth cause of action be withdrawn

1        as moot in light of the stipulation of the parties;

2      4.      Defendant HIG's motion to dismiss (ECF No. 48), be GRANTED with leave to

3  amend;

4      5.      Defendant HIG's motion to strike punitive damages (ECF No. 48), be DENIED;

5  and

6      6.      Plaintiffs be GRANTED leave to file a second amended complaint under the

7  parameters outlined in these findings and recommendations.[26]

8        These findings and recommendations are submitted to the District Judge assigned to this

9  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **twenty-**

10  **one (21) days** of service of these recommendations, any party may file written objections to the

11  findings and recommendations with the Court.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  The District Judge will

13  review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. §

14  636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

15  result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014)

16  (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

17

18  IT IS SO ORDERED.

19  Dated:  __April 3, 2023__

                     UNITED STATES MAGISTRATE JUDGE

20

21

22

23

---

24  [26]  The Court recommends denying the Officer Defendants' motion to dismiss the first, second, third, fourth, eighth,

25  ninth, tenth, eleventh, and twelfth causes of action for shotgun pleading; recommends denying the Officer Defendants' separate motion to dismiss the eighth cause of action; and recommends denying the CFMG Defendants

26  motion to dismiss the first through fifth causes of action for shotgun pleading.  As noted above, the recommendation is based on a finding that the movants did not meet their burden as movants to connect the elements of the causes of action to the proffered deficiencies as to the defendants.  Recognizing the motions were based on the first amended

27  complaint that was later clarified through a stipulation filed after the motions to dismiss were filed (ECF No. 73), the Court further recommends that if Plaintiff elects to not file an amended complaint following adoption of these

28  recommendations, the Officer Defendants and CFMG Defendants should be afforded the opportunity to file renewed motions to dismiss as to these causes of action.